**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL F. DeRICHIE, Individually and as | : | |
| Administrator of the Estate of SARAH E. | : | |
| DeRICHIE, Deceased | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| WAYNE MEMORIAL COMMUNITY HEALTH | : | MEDICAL PROFESSIONAL |
| CENTERS d/b/a CARBONDALE FAMILY | : | LIABILITY CLAIM |
| HEALTH CENTER; | : | |
| WAYNE MEMORIAL HEALTH SYSTEM, INC.; | : | |
| KENNETH J. BANNON, PA-C; | : | |
| RICHARD K. HACKER, M.D.; | : | |
| GEISINGER CLINIC d/b/a GEISINGER | : | |
| VIEWMONT IMAGING; | : | |
| MARK M. SKEVOFILAX, D.O.; | : | JURY TRIAL DEMANDED |
| GERALD N. LARAR, M.D.; | : | |
| GEISINGER CLINIC d/b/a GEISINGER | : | |
| WYOMING VALLEY MEDICAL CENTER; | : | |
| DARREN L. JACOBS, D.O.; | : | |
| MARK A. LACEY, PA-C; | : | |
| HEATHER R. PADUCK, PA-C; | : | |
| DOUGLAS C. NATHANSON, M.D.; | : | |
| GLORIA A. POMBO, PA-C and | : | |
| GEISINGER HEALTH SYSTEM FOUNDATION | : | |
| | : | |
| Defendants | : | NO. |

**MEDICAL PROFESSIONAL LIABILITY COMPLAINT**

Plaintiff, Michael F. DeRichie, as Administrator of the Estate of Sarah E. DeRichie,

deceased, by and through his undersigned counsel, Malcolm L. MacGregor, Esquire and

Terrence R. Nealon, Jr., of the law firm of McDonald & MacGregor, LLC, brings this

1

action against the above-named Defendants in connection with the preventable death

of his wife, Sarah E. DeRichie, deceased, and demands damages in the sum in excess

of Seventy Five Thousand Dollars ($75,000.00) exclusive of pre-judgment interest,

post-judgment interest and costs, upon the causes of action set forth below.

## PARTIES AND JURISDICTIONAL FACTS

1.      Plaintiff, Michael F. DeRichie, is an adult individual and citizen of the

Commonwealth of Pennsylvania, residing at 215 Dundaff Street, Carbondale,

Lackawanna County, Pennsylvania 18407.

2.      Plaintiff, Michael F. DeRichie, is the surviving husband of the late Sarah E.

DeRichie, who died on May 1, 2017, and files this Complaint on behalf of himself

individually, his late wife's estate, and on behalf of their two (2) minor children,

Christopher DeRichie (age 14) and Michael C. DeRichie (age 10).

3.      Sarah E. DeRichie was a forty-four (44) year old wife and mother of two

(2) minor children who died prematurely on May 1, 2017 from a predictable,

diagnosable and treatable brain tumor which was not timely diagnosed or treated,

resulting in her untimely death, not having enjoyed the benefit of diagnosis and

treatment of her brain tumor.

4.      Plaintiff-Husband, Michael F. DeRichie, is the Administrator of the Estate

of Sarah E. DeRichie, having been so appointed by the Register of Wills of Lackawanna

County, on January 15, 2019.  (See Certificate of Letters of Administration, a copy of

which is attached hereto as Exhibit "A".)

5.       Plaintiff-Husband, Michael F. DeRichie, brought this action originally in

2

State Court on behalf of himself individually, his wife's estate, and their two (2) minor children, as beneficiaries under and by virtue of the Wrongful Death Act, 42 Pa. C.S.A. §8301, the Survival Act, 42 Pa. C.S.A. §8302, and the applicable Rules of Civil Procedure and decisional law.  A companion Federal Tort Claim Act claim was asserted by Michael F. DeRichie, on behalf of himself, his wife's estate and their two (2) minor children, on or about January 17, 2019.  (See FTCA Claim Form attached hereto as Exhibit "B".)

Due to the involvement of multiple healthcare provider entities under the jurisdiction of the Federal Courts through the Federal Tort Claim Act (FTCA), including Defendants Hacker, and Bannon PA-C, as well as Dr. Julianne J. O'Boyle and Kerri Falco, and other unknown employee/agents of Carbondale Family Health Center, d/b/a Wayne Memorial Community Health Center, the case was removed to the United States District Court for the Middle District of Pennsylvania.

Thereafter, because the Plaintiff's Estate Administrator and counsel agreed that the FTCA Claim against the United States had not been administratively exhausted as of October 3, 2019, the District Court, Caputo, J., dismissed the claims against the United States **WITHOUT PREJUDICE** for lack of subject matter jurisdiction, due to the pendency of the administrative FTCA Claim.  It was further ordered that the case be remanded to the Court of Common Pleas of Lackawanna County because the pending FTCA Claim against the United States was the sole basis for original jurisdiction over the matter.  (See Order of October 3, 2019 attached hereto as Exhibit "C".)

By Order dated January 21, 2021, The Honorable Margaret Bisignani Moyle of

the Court of Common Pleas of Lackawanna County **STAYED** the proceedings at the request of Defendant Skevofilax and his counsel Eugene Feeney, Esquire.   Defendants' Jacobs, Lacey and Paduck's Motion to Compel Discovery was denied, and the Motion to Dismiss the FTCA Defendants was stayed, given the pendency of the Plaintiff's Request for Reconsideration of Denial of their FTCA Claim pursuant to 28 C.F.R. §14.9.  (See Order of January 21, 2021, attached hereto as Exhibit "D".)

As of the filing of this lawsuit against the United States and other Co-Defendants, neither Plaintiffs nor their counsel have received or are aware of a determination from the Department of Health and Human Services, Office of General Counsel, on the Plaintiff's Request for Reconsideration.  Accordingly, consistent with 28 U.S.C. §2401(b), as well as the October 3, 2019 Order of the late Judge Caputo and the January 21, 2021 Order of Judge Bisignani Moyle of the Court of Common Pleas of Lackawanna County, Plaintiffs file this lawsuit on behalf of the Estate of Sarah DeRichie and her family.

6.     Notice of the institution of this action as required by Pa. R.C.P. 2205 has been given to the following individuals, who are the heirs at law of Sarah E. DeRichie:

     a)     Michael F. DeRichie, Husband, 215 Dundaff Street, Carbondale, Lackawanna County, PA  18407;

     b)     Christopher DeRichie, Minor Son, c/o Michael F. DeRichie, his Father, 215 Dundaff Street, Carbondale, Lackawanna County, PA 18407; and,

     c)     Michael C. DeRichie, Minor Son, c/o Michael F. DeRichie, his Father, 215 Dundaff Street, Carbondale, Lackawanna County, PA  18407.

7.     Wayne Memorial Community Health Centers, (hereinafter:  "WMCHC") is a

4

Federally Qualified Health Center (FQHC), supported in part through a grant from the US Health Resources and Services Administration, Bureau of Primary Health Care.  It is organized and existing under federal laws, as well as the laws of the Commonwealth of Pennsylvania, with a clinical affiliation with the Wayne Memorial Health System, Inc., both of whom own, maintain and operate, among other things, community health care centers including Carbondale Family Health Center, 141 Salem Avenue, Carbondale, Lackawanna County, Pennsylvania 18407 and Honesdale Neurology, Stourbridge Professional Medical Complex, 600 Maple Avenue, Suite 1, Honesdale, Wayne County, Pennsylvania 18431, and were directly and through their entities, employees and agents, at all relevant times, engaged in the provision of medical care and services to the public, including Sarah DeRichie, including primary care and neurology specialty services, during the relevant period in question from December 2014 to May 2017.  The claims asserted against this Defendant are for the professional negligence of its actual, apparent, and/or ostensible agents, employees, and servants, including other physicians, residents, medical graduate trainees, fellows, interns, physician's assistants, nurses, nurse practitioners and technicians, specifically including Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D., Julianne J. O'Boyle, M.D. and Kerri Falco, and others whose names cannot be deciphered in Ms. DeRichie's medical records, who participated in the care of Sarah DeRichie as more specifically described herein.

8.      A companion Federal Standard Form 95, Claim For Damage, Injury, or Death, was filed against the United States and their actual, apparent and/or ostensible agents, employees and servants, including physicians, residents, medical graduate

5

trainees, fellows, interns, physician's assistants, nurses, nurse practitioners, including

Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D., Julianne J. O'Boyle, M.D. and Kerri

Falco, and others whose names cannot be deciphered in Ms. DeRichie's medical

records, who participated in the care of Sarah DeRichie as more specifically described

herein.  A copy of the FTCA Form 95 Claim is attached hereto as Exhibit "B".

9.     Defendant, Wayne Memorial Health System, Inc., (hereinafter: "WMHS")

is a health system, partnership, corporation, or other legal entity organized and existing

under federal law and the laws of the Commonwealth of Pennsylvania, and is clinically

affiliated with the Wayne Memorial Community Health Centers (WMCHC).  Wayne

Memorial Health System, Inc. has a registered office and/or principal place of business

at Park & West Streets, Honesdale, Wayne County, Pennsylvania 18431, as does

Defendant WMCHC.  At all relevant times Defendant, Wayne Memorial Health System,

Inc., was engaged in the provision of medical care and services to the public, including

Sarah DeRichie, in coordination and clinical affiliation with the Wayne Memorial

Community Health Centers, Carbondale Family Health Center and Honesdale Neurology,

during the relevant time period in question, from December 2014 to May 2017.  The

claims asserted against this Defendant are for professional negligence of its actual,

apparent, and/or ostensible agents, employees, and servants, including physicians,

residents, medical graduate trainees, fellows, interns, physician's assistants, nurses,

nurse practitioners, including Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D.,

Julianne J. O'Boyle, M.D. and Kerri Falco, and others whose names cannot be

deciphered in Ms. DeRichie's medical records, who participated in the care of Sarah

6

DeRichie as more specifically described herein.

10.     Carbondale Family Health Center (hereinafter: "CFHC") is a medical service provider through the Wayne Memorial Community Health Centers and Wayne Memorial Health System, Inc., and a legal entity, organized and existing under federal law and the laws of the Commonwealth of Pennsylvania, which provides, among other services, primary medical care to the public, including Sarah DeRichie, through their Carbondale Family Health Center location at 141 Salem Avenue, Carbondale, Lackawanna County, Pennsylvania 18407.  The claims asserted against Defendant WMCHC and Defendant WMHS are for the professional negligence of its actual, apparent and/or ostensible agents, employees and servants, including other physicians, residents, medical graduate trainees, fellows, interns, physician's assistants, nurse, nurse practitioners, including Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D., and others whose names cannot be deciphered in Sarah DeRichie's medical records, who participated in the care of Sarah DeRichie from December 2014 to May 2017, as more specifically described herein.

11.     Honesdale Neurology, is a medical service provider through the Wayne Memorial Community Health Centers and Wayne Memorial Health System, Inc. and a legal entity, organized and existing under federal law and the laws of the Commonwealth of Pennsylvania, which provides, among other services, specialty medical care to the public, including Sarah DeRichie, through their Honesdale Neurology location at Stourbridge Professional Medical Complex, 600 Maple Avenue, Suite 1, Honesdale, Wayne County, Pennsylvania 18431.  The claims asserted against

Defendant WMCHC and Defendant WMHS are for the professional negligence of its actual, apparent and/or ostensible agents, employees and servants, including other physicians, residents, medical graduate trainees, fellows, interns, physician's assistants, nurse, nurse practitioners, including Julianne J. O'Boyle, M.D. and Kerri Falco, and others whose names cannot be deciphered in Ms. DeRichie's medical records, who participated in the care of Sarah DeRichie from May 2016 to May 2017, as more specifically described herein.

12.     Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, is a partnership, corporation or legal entity, organized and existing under the laws of the Commonwealth of Pennsylvania, with a registered office and/or principal address of 435 Scranton-Carbondale Highway, Scranton, Lackawanna County, Pennsylvania 18508 and 100 North Academy Avenue, Danville, Montour County, Pennsylvania, 17822, acting lawfully on behalf of Defendant, Geisinger Health System Foundation, 100 North Academy Avenue, Danville, Montour County, Pennsylvania 17822.  At all relevant times, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging was engaged in the provision of medical care and radiology services to the public, including Sarah DeRichie, at the aforementioned address from December 2014 through May 2017.  The claims asserted against this Defendant are for the professional negligence of its actual, apparent and/or ostensible agents, employees, and servants, including other physicians, residents, medical graduate trainees, fellows, interns, physician's assistants, nurses, nurse practitioners and technicians, specifically including Defendant, Mark Skevofilax, D.O., and Gerald N.  Larar, M.D., both at the 435 Scranton Carbondale Highway, Scranton,

8

Lackawanna County, Pennsylvania 18508, location and others whose names cannot be deciphered in Ms. DeRichie's medical records, who participated in the care and radiological evaluation of Sarah DeRichie or the patient's films while undergoing studies at Defendant, Geisinger Viewmont Imaging on the aforementioned dates, as more specifically described herein.

13.     Defendant, Mark M. Skevofilax, D.O., (hereinafter: "Defendant Skevofilax"), is an adult individual, citizen and resident of the State of Pennsylvania, and at all times, relevant hereto, was a physician duly licensed to practice medicine in the Commonwealth of Pennsylvania, specializing in radiology, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Viewmont Imaging, 435 Scranton Carbondale Highway, Scranton, Lackawanna County, Pennsylvania 18508.  Plaintiff is asserting a professional liability claim against this Defendant.

14.     Defendant, Gerald N. Larar, M.D., (hereinafter: "Defendant Larar"), is an adult individual, citizen and resident of the State of Pennsylvania, and at all times, relevant hereto, was a physician duly licensed to practice medicine in the Commonwealth of Pennsylvania, specializing in radiology, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Viewmont Imaging, 435 Scranton Carbondale Highway, Scranton, Lackawanna County, Pennsylvania 18508.  Plaintiff is asserting a professional liability claim against this Defendant.

15.     Defendant, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical

Center, is a partnership, corporation or other legal entity, organized and existing under

the laws of the Commonwealth of Pennsylvania, with a registered office and/or principal

place of business at 1000 East Mountain Drive, Wilkes Barre, Luzerne County,

Pennsylvania 18711 and 100 North Academy Avenue, Danville, Montour County,

Pennsylvania 17822, which owns, maintains and operates, among other things, a

medical center, located at 1000 East Mountain Drive, Wilkes Barre, Luzerne County,

Pennsylvania 18711.  At all relevant times, Defendant Geisinger Clinic d/b/a Geisinger

Wyoming Valley Medical Center, was engaged in the provision of medical care and

services to the public, including Sarah DeRichie at the aforementioned address, from

December 2014 through May 2017.  The claims asserted against this Defendant are for

the professional negligence of its actual, apparent, and/or ostensible agents, employees

and servants, including other physicians, residents, medical graduate trainees, fellows,

interns, physician's assistants, nurses, nurse practitioners and technicians, including

Defendant Darren J. Jacobs, D.O., Neurosurgery, Mark A. Lacey, PA-C, Heather R.

Paduck, PA-C, Defendant, Douglas C. Nathanson, M.D., Neurology, Gloria A. Pombo,

PA-C, and others whose names cannot be deciphered in Sarah DeRichie's medical

records, who participated in the care of Sarah DeRichie, at Geisinger Clinic d/b/a

Geisinger Wyoming Valley Medical Center from December 2014 through May 2017, as

more specifically described herein.  The claims against this Defendant also include

claims for negligence and corporate negligence under *Thompson v. Nason*, 591 A.2d

703 (Pa. 1991) at its progeny.

16.     Defendant, Darren L. Jacobs, D.O., (hereinafter:  "Defendant Jacobs"), is

an adult individual, citizen and resident of the State of Pennsylvania, and, at all times relevant hereto, was a physician duly licensed to practice in the Commonwealth of Pennsylvania, specializing in Neurosurgery, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, 1000 East Mountain Boulevard, Wilkes Barre, Luzerne County, Pennsylvania 18711.  Plaintiff is asserting a professional liability claim against this Defendant.

17.     Defendant, Mark A. Lacey, PA-C, (hereinafter:  "Defendant Lacey"), is an adult individual, citizen and resident of the State of Pennsylvania, and, at all times relevant hereto, was a Physician's Assistant-Certified, PA-C, authorized to work under the supervision of a physician in the Commonwealth of Pennsylvania, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, 1000 East Mountain Boulevard, Wilkes Barre, Luzerne County, Pennsylvania 18711.  Plaintiff is asserting a professional liability claim against this Defendant.

18.     Defendant, Heather R. Paduck, PA-C, (hereinafter:  "Defendant Paduck"), is an adult individual, citizen and resident of the State of Pennsylvania, and, at all times relevant hereto, was a Physician's Assistant-Certified, PA-C, authorized to work under the supervision of a physician in the Commonwealth of Pennsylvania, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, 1000 East Mountain Boulevard, Wilkes Barre, Luzerne County, Pennsylvania 18711.  Plaintiff is asserting a professional liability claim against this Defendant.

11

19.     Defendant, Douglas C. Nathanson, M.D., (hereafter: "Defendant Nathanson"), is an adult individual, citizen and resident of the State of Pennsylvania, and, at all times relevant hereto, was a physician duly licensed to practice in the Commonwealth of Pennsylvania, specializing in Neurology, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, 1000 East Mountain Boulevard, Wilkes Barre, Luzerne County, Pennsylvania 18711.  Plaintiff is asserting a professional liability claim against this Defendant.

20.     Defendant, Gloria A. Pombo, PA-C, (hereinafter: "Defendant Pombo"), is an adult individual, citizen and resident of the State of Pennsylvania, and, at all times relevant hereto, was a Physician's Assistant-Certified, PA-C, authorized to work under the supervision of a physician in the Commonwealth of Pennsylvania, with a place of business, medical office and medical practice located at Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, 1000 East Mountain Boulevard, Wilkes Barre, Luzerne County, Pennsylvania 18711.  Plaintiff is asserting a professional liability claim against this Defendant.

21.     Defendant, Geisinger Health System Foundation, (hereinafter: "Defendant Geisinger Foundation"), is a partnership, corporation or other legal entity, organized or existing under the laws of the Commonwealth of Pennsylvania, with a registered office address and/or principal place of business of 100 North Academy Avenue, Danville, Montour County, Pennsylvania, 17822, which owns, maintains and operates, among other things, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging, 435 Scranton

Carbondale Highway, Scranton, Lackawanna County, Pennsylvania 18508, Geisinger

Clinic d/b/a Geisinger Wyoming Valley Medical Center, 1000 East Mountain Boulevard,

Wilkes Barre, Luzerne County, Pennsylvania 18711, as well as the Geisinger Health

System Foundation, 100 North Academy Avenue, Danville, Montour County,

Pennsylvania 17822.  At all times relevant, Geisinger Health System Foundation,

through the aforementioned and subsequently mentioned medical entities and

healthcare providers, engaged in the provision of medical care and services to the

public, including Sarah DeRichie, at the aforementioned Geisinger addresses from

December 2014 through May 2017.  The claims asserted against this Defendant are for

the professional negligence of its actual, apparent and/or ostensible agents, employees,

and servants, including other physicians, residents, fellows, interns, physician's

assistants, nurses, nurse practitioners and technicians, including those at Geisinger

Clinic d/b/a Geisinger Viewmont Imaging, Defendant, Mark M. Skevofilax, D.O.,

Defendant, Gerald N. Larar, M.D., as well as those at Geisinger Clinic d/b/a Geisinger

Wyoming Valley Medical Center, and Defendant, Darren L. Jacobs, D.O., Neurosurgeon,

Defendant, Mark A. Lacey, PA-C, Defendant, Heather R. Paduck, PA-C, Defendant,

Douglas C. Nathanson, M.D., Neurology, Defendant, Gloria A. Pombo, PA-C, and others

whose names cannot be deciphered in Sarah DeRichie's medical records, who

participated in the care of Sarah DeRichie during her evaluation, testing, diagnosis,

misdiagnosis, hospitalization and treatment at Geisinger Health System Foundation

facilities, including the Geisinger Clinic, Geisinger Viewmont Imaging and Geisinger

Wyoming Valley Medical Center, by the aforementioned individuals, both known and

13

unknown, from December 2014 through May 2017, as specifically described herein. The claims against this Defendant also include claims for negligence and corporate negligence under *Thompson v. Nason*, 591 A.2d 703 (Pa. 1991) at its progeny.

22.     At all relevant times, Wayne Memorial Community Health Centers, in collaboration with Wayne Memorial Health System, Inc., through Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D., Julieanne O'Boyle, M.D., Kerri Falco, and others whose names cannot be deciphered in Sarah DeRichie's medical records, rendered medical care and services to Sarah DeRichie as actual, apparent or ostensible agents, servants and/or employees, acting with the course and scope of their agency and/or employment with the WMCHC and WMHS Defendants, under their exclusive control. Defendants WMCHC and WMHS are liable for the negligent acts or omissions of their authorized servants, employees and actual or ostensible agents, under theories of *respondeat superior*, master-servant, agency, and right of control.

23.     At all relevant times, Wayne Memorial Community Health Centers, in collaboration with Wayne Memorial Health System, engaged as its actual, apparent or ostensible agents, servants and/or other employees, various health care providers, physicians, residents, graduate medical trainees, fellows, interns, physicians' assistants and nursing staff who, at all times, were acting within the course and scope of their agency and/or employment with Wayne Memorial Community Health Centers, in collaboration with Wayne Memorial Health System, and under their exclusive control. Wayne Memorial Community Health Centers, in collaboration with Wayne Memorial Health System, are liable for the negligent acts or omissions of its authorized servants,

14

employees and actual or ostensible agents under theories of *respondeat superior*, master-servant, agency and right of control.  The identities of these agents, servants and employees include, Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D., Julieanne O'Boyle, M.D., Kerri Falco, and other employees, whose names cannot be deciphered in Sarah DeRichie's medical records despite reasonable investigation, who participated in the care of Sarah DeRichie as more specifically described below.

24.     At all relevant times, Defendant, Kenneth A. Bannon, PA-C and Defendant, Richard K. Hacker, M.D., were the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendants WMCHC d/b/a Carbondale Family Health Center and WMHS and/or acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or employment with said WMCHC d/b/a Carbondale Family Health Center and WMHS.

25.     At all relevant times, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, engaged as its actual, apparent or ostensible agents, servants and/or other employees, various health care providers, physicians, residents, graduate medical trainees, fellows, interns, physicians' assistants and nursing staff who, at all times, were acting within the course and scope of their agency and/or employment with Geisinger Clinic d/b/a Geisinger Viewmont Imaging and the Geisinger Health System Foundation and under their exclusive control.  Geisinger Clinic d/b/a/ Geisinger Viewmont Imaging and the Geisinger Health System Foundation are liable for the negligent acts or omissions of its authorized servants, employees and actual or ostensible agents under theories of *respondeat superior*, master-servant, agency and right of control.  The identities of

these agents, servants and employees include, Mark M. Skevofilax, D.O., Gerald N. Larar, M.D., as Interpreting Radiologists, and other employees, whose names cannot be deciphered in Sarah DeRichie's medical records despite reasonable investigation, who participated in the care of Sarah DeRichie as more specifically described below.

26.     At all relevant times, Defendant Skevofilax was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or their employment with Defendant Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Defendant, Geisinger Health System Foundation.

27.     At all relevant times, Defendant Larar was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or their employment with Defendant Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Defendant Geisinger Health System Foundation.

28.     At all relevant times, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, engaged as its actual, apparent or ostensible agents, servants and/or other employees, various health care providers, physicians, residents, graduate medical trainees, fellows, interns, physicians' assistants and nursing staff who, at all times, were acting within the course and scope of their agency and/or employment with Geisinger

16

Clinic d/b/a Geisinger Wyoming Valley Medical Center and the Geisinger Health System Foundation and under their exclusive control. Geisinger Clinic d/b/a/ Geisinger Wyoming Valley Medical Center and the Geisinger Health System Foundation are liable for the negligent acts or omissions of its authorized servants, employees and actual or ostensible agents under theories of *respondeat superior*, master-servant, agency and right of control. The identities of these agents, servants and employees include, Darren L. Jacobs, D.O., Neurosurgery, Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D., Neurology, Gloria A. Pombo, PA-C, and other employees, whose names cannot be deciphered in Sarah DeRichie's medical records despite reasonable investigation, who participated in the care of Sarah DeRichie as more specifically described below.

29.    At all relevant times, Defendant Jacobs was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or their employment with Defendant Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant Geisinger Health System Foundation.

30.    At all relevant times, Defendant Lacey was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible

agency, master-servant relationship and/or their employment with Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant, Geisinger Health System Foundation.

31.     At all relevant times, Defendant Paduck was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or their employment with Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant, Geisinger Health System Foundation.

32.     At all relevant times, Defendant Nathanson was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or their employment with Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant, Geisinger Health System Foundation.

33.     At all relevant times, Defendant Pombo was the actual, apparent and/or ostensible agent and/or servant and/or employee of Defendant, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Defendant Geisinger Health System Foundation, and was acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or their employment with Geisinger Clinic

d/b/a Geisinger Wyoming Valley Medical Center and Defendant, Geisinger Health

System Foundation.

34.    At all relevant times, Defendant Geisinger Health System Foundation,

through Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Geisinger Clinic d/b/a

Geisinger Wyoming Valley Medical Center and the Geisinger Health System Foundation

through the named defendant agents, as well as those whom Plaintiffs are unable to

name through the record presently, owed non-delegable legal duties directly to Sarah

DeRichie pursuant to *Thompson v. Nason*, 591 A.2d 703 (Pa. 1991) and its progeny,

including *Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d

1144 (Pa. Super. 2001).  These duties consisted of:  (1) a duty to use reasonable care

on the maintenance of safe and adequate facilities and equipment; (2) a duty to select

and retain only competent physicians; (3) a duty to oversee all persons who practice

medicine within its walls as to patient care; and, (4) a duty to formulate, adopt and

enforce adequate rules and policies to ensure quality care for patients.

35.    At all relevant times, the Geisinger Defendants, including, Geisinger Clinic

d/b/a Geisinger Viewmont Imaging and Geisinger Clinic d/b/a Geisinger Wyoming Valley

Medical and Geisinger Health System Foundation engaged as their actual, apparent or

ostensible agents, servants and/or employees, various health care providers, physicians,

residents, graduate medical trainees, interns, physicians' assistants and nursing staff

who, at all times, were acting within the course and scope of their agency and/or

employment with the Defendants and under their exclusive control.  The Geisinger

Defendants, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, Geisinger Clinic d/b/a

Geisinger Wyoming Valley Medical Center and Geisinger Health System Foundation are liable for the acts or omissions of their authorized, servants, employees and actual or ostensible agents, under theories of *respondeat superior*, master-servant, agency, and right of control.  The identities of these agents, servants and employees including Defendant Skevofilax, Defendant Larar, Defendant Jacobs, Defendant Lacey, Defendant Paduck, Defendant Nathanson, Defendant Pombo, and others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah DeRichie, as more specifically described herein.

36.     At all relevant times, Defendants Bannon, PA-C and Hacker as well as Falco and O'Boyle, and others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in her care while a patient at the Carbondale Family Health Center or Honesdale Neurology through the Wayne Memorial Community Health Centers and Wayne Memorial Health System, Inc., were engaged in the practice of medicine or the delivery of supervised medical care, pursuing their specialty and/or health care duties and education, and were obliged to use the professional skill, knowledge and care that they possessed in accordance with reasonably safe and accepted standards of medical care in general and in their respective specialties, in particular.

37.     At all relevant times, Defendants Skevofilax and Larar, and others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah DeRichie as set forth below and more specifically described herein, were engaged in the practice of medicine, pursuing their specialty of Radiology and/or

20

health care duties and education, and were obliged to use the professional skill,
knowledge and care that they possessed in order to pursue their profession in
accordance with recent safe and accepted standards of care of medicine in general and
in their respective specialty of Radiology, in particular.

38.     At all relevant times, Defendants Jacobs, Lacey, PA-C, Paduck, PA-C,
Nathanson and Pombo, PA-C, and others whose names cannot be deciphered in Sarah
DeRichie's medical records who participated in the care of Sarah DeRichie as set forth
below and more specifically described herein, were engaged in the practice of medicine
or the delivery of supervised medical services, pursuing their specialty and/or health
care duties and education, and were obliged to use the professional skill, knowledge
and care that they possessed in their profession in accordance with recent safe and
accepted standards of care of medical care in general and in their respective specialties,
in particular.

39.     At all relevant times, Defendants Bannon, PA-C and Hacker, as well as
Falco and O'Boyle and others whose names cannot be deciphered in Sarah DeRichie's
medical records who participated in the care of Sara DeRichie as set forth and
specifically described herein, were the actual, apparent and/or ostensible agents and/or
servants and/or employees of Wayne Memorial Community Health Centers d/b/a
Carbondale Family Health Center d/b/a Honesdale Neurology and Wayne Memorial
Health System, Inc., and were acting within the scope of that actual, apparent and/or
ostensible agency, master-servant relationship and/or employment with Wayne
Memorial Community Health Centers d/b/a Carbondale Family Health Center d/b/a

21

Honesdale Neurology and Wayne Memorial Health System, Inc., and as such, they are vicariously liable under the theories of *respondeat superior*, master-servant, agency and right of control.

40.     At all relevant times, Defendants Skevofilax and Larar, and others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah DeRichie as set forth and specifically described herein were the actual, apparent and/or ostensible agents and/or servants and/or employees of Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Geisinger Health System Foundation, and were acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or employment with Geisinger Clinic d/b/a Geisinger Viewmont Imaging and Geisinger Health System Foundation, and as such, they are vicariously liable under the theories of *respondeat superior*, master-servant, agency and right of control.

41.     At all relevant times, Defendants Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, and others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah DeRichie as set forth and specifically described herein were the actual, apparent and/or ostensible agents and/or servants and/or employees of Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Geisinger Health System Foundation, and were acting within the scope of that actual, apparent and/or ostensible agency, master-servant relationship and/or employment with Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and Geisinger Health System Foundation, and as such, they are vicariously liable

under the theories of *respondeat superior*, master-servant, agency and right of control.

42.     The carelessness and negligence of Defendants and their agents, servants and/or employees, and each of them, jointly and severally, as described herein, increased the risk of harm to Sarah DeRichie and were a substantial factor in causing her premature death.

43.     The catastrophic injuries and premature death of Sarah DeRichie were caused solely and exclusively by the negligent acts and omissions of the Defendants, their agents, servants and/or employees, as described more specifically herein, jointly and severally, and were not caused by any act or failure to act on the part of the Decedent, Sarah DeRichie, the Administrator, Michael DeRichie, or Sarah DeRichie's minor children.

44.     All of the Defendants herein and their agents, are vicariously liable to the Plaintiff for the negligent acts and omissions of those persons and/or entities whose conduct was under their supervision, control and/or right to control, and which conduct directly and proximately caused Plaintiff's injuries and losses.

45.     At all relevant times, Sarah DeRichie was under the medical care, treatment and attendance of Defendants, Wayne Memorial Community Health Centers d/b/a Carbondale Family Health Center d/b/a Honesdale Neurology and Wayne Memorial Health System, Inc., Geisinger Clinic d/b/a Geisinger Viewmont Imaging, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and the Geisinger Health System Foundation, directly or indirectly, through their agents, servants and/or employees as described herein, for whom they are vicariously liable under the theories

23

of *respondeat superior*, master-servant, agency, right to control and/or corporate negligence where applicable.

46.     At all relevant times, the Decedent, Sarah DeRichie, her husband, Michael DeRichie, looked to and relied upon the knowledge, care, skill, treatment, advice and expertise of the Defendants, and their agents, servants and/or employees, in connection with her medical diagnosis, care and treatment.

47.     The Defendants, and their agents, servants and/or employees, failed to diagnose Sarah DeRichie's brain tumor in a timely fashion and misdiagnosed her condition as Multiple Sclerosis (MS), resulting in a fatal delay in the diagnosis and treatment of her brain tumor, causing her premature death at the age of only forty four (44) years, leaving behind a husband and two (2) minor children ages 12 and 8, respectively.

## STATEMENT OF FACTS AS TO ALL COUNTS

48.     In December of 2014, Sarah DeRichie was experiencing diplopia or double vision and reported the same to her optometrist, Dr. Roseann Rupp, who referred her to Northeastern Eye Institute, Dr. Bill Jordan, where she was evaluated for double vision in the right eye, with the same eye turning in and the double vision getting worse when she turns her head and attempts to look out her right eye.  Dr. Jordan, an ophthalmologist, felt she may have had a sixth nerve palsy, but referred her for an MRI and blood work, and spoke to the patient's optometrist to confirm that there was no prior history.  The evaluation at Northeastern Eye Institute by Dr. Jordan occurred on or about December 5, 2014.

24

49.     Thereafter, Sarah DeRichie called Carbondale Family Health Center to alert her primary care provider, Defendant Hacker, through Kenneth Bannon, PA-C, of the results of her evaluation at Northeastern Eye by Dr. Jordan and the fact that she was having MRI and labs.

50.     On December 11, 2014, Sarah DeRichie came under the care of the Geisinger Clinic d/b/a Geisinger Viewmont Imaging, through the Geisinger Health System Foundation, for an MRI of her brain, with and without contrast, which was interpreted by Defendant, Mark Skevofilax, D.O.  Defendant Skevofilax's findings included diffuse abnormal signal intensity, greater anteriorly, within the pons. Defendant Skevofilax was unable to rule out other processes, including a neoplastic process such as a fibrillary astrocytoma, which was not entirely excluded.  He recommended correlation with clinical history.

In his conclusion Defendant Skevofilax noted the abnormal signal intensity within the pons without abnormal enhancement or restricted diffusion.  While noting that the finding was non-specific, he concluded that other etiologies, including a neoplastic process such as a fibrillary astrocytoma (brain tumor) could not be entirely excluded.

The findings were significant and concerning enough for Defendant Skevofilax to call Dr. Jordan's office on the date of the exam at 12:52 p.m. as was required by the American College of Radiology (ACR) standards on communication.  Defendant Skevofilax did not diagnose an astrocytoma nor suggest to Dr. Jordan or her primary care physician that Sarah DeRichie be worked up for a brain tumor, given the findings, along with her history.

On the same date, December 11, 2014, Dr. Jordan's office at Northeastern Eye Institute called Carbondale Family Health Center, Defendant, Kenneth Bannon, PA-C, asking Defendant Bannon to review Sarah DeRichie's MRI findings.  Defendant Bannon, for Defendant Hacker, lists, MRI brain – abnormal, as a new finding. He also documents that he called the patient to review the results but does not note anything in her record regarding the results.  He documented that he was going to refer the patient for evaluation.  There is no documentation of Defendant Bannon conferring with a supervising physician, Defendant Hacker, or discussing this serious medical finding with a supervising physician, nor does the note appear to contain a countersignature by a supervising physician.

51.    On December 24, 2014, Christmas Eve, the patient was seen by Defendant, Darren L. Jacobs, D.O., Neurosurgeon, and Defendant, Mark A. Lacey, PA-C, on referral for a C-6 nerve palsy with diplopia or double vision.  Sarah DeRichie was forty-one (41) years old at the time of the visit.  She related having double vision without trauma.  On neurological exam, she was unable to look far lateral left eye.  Review of imaging at the time was noted as showing a diffuse abnormal signal intensity within the pons.  Defendants Jacobs and Lacey, PA-C, noted that they discussed the patient's symptoms, exam and MRI findings, including reviewing the patient films.  Sarah DeRichie was referred to neurology for evaluation of a CN 6 palsy with a probable need for a lumbar puncture.  A specific notation was made to, **"eval at tumor board"**, which means evaluation of the patient's presentation and studies by a tumor board to determine if she had a brain tumor."  There is no documentation in subsequent

Geisinger Neurosurgery or Neurology records indicating that a tumor board evaluation was ever conducted in December of 2014 or at any time prior to her diagnosis with a brain tumor in January of 2017, some two (2) years later.  A repeat MRI was scheduled as was a follow up with Dr. Jacobs following the MRI.

52.     On December 30, 2014, Sarah DeRichie saw Defendant Bannon, PA-C, at the Carbondale Family Health Center for a recheck.  She continued to experience double vision.  Defendant Bannon noted that Sarah DeRichie was being followed by Ophthalmology and Neurosurgery and importantly, he noted, "… is being presented to the tumor board for further recommendation re: findings on MRI."  Yet neither he nor Defendant Hacker ever timely followed up on this critical plan item.  On physical examination, she was still unable to lateralize to the left and under Impression, was still noted with "MRI brain - abnormal", as well as sixth nerve palsy and double vision.  Remarkably, despite the seriousness of her condition which included the possibility of a brain tumor, her instructions included, "… follow up six weeks.  Contact office with any changes.  Keep appointments with specialist involved in your care.  Will await further neurosurgical recommendations."  As of December 30, 2014, there was no effort by Defendant Bannon, PA-C of Defendant Hacker to follow up on the tumor board presentation with Defendant Jacobs or Defendant Lacey through Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center.  There is no documentation that Defendant Bannon conferred with the supervising physician, Defendant Hacker, nor is this note counter-signed by a physician as far as the Plaintiffs can tell.

53.     Sarah DeRichie dutifully attended a neurology evaluation with Defendant

27

Nathanson and his PA-C, "G. Yablonsky", at Defendant Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center.  The intake indicates that the patient was referred by a "Dr. Bannon", despite the fact that Defendant Bannon is a PA-C only.  The patient was seen and examined by Defendant Nathanson, a Neurologist.

54.    The basis for the referral was noted as an evaluation for a **large pontine lesion seen on brain MRI** which was done because of a CN 6 palsy.  At the time of her neurology evaluation in January of 2015, Sarah DeRichie was still suffering from double vision and was unable to completely look laterally with the left eye.  She denied any symptoms of MS and had no other family history of MS or auto immune disease.

55.    The MRI of the brain was reviewed by Defendant Nathanson and confirmed a **large hyper intense lesion in the pons**, non-enhancing with contrast.

56.    Assessment and Plan specifically referenced left CN 6 palsy.  **Brain stem lesion**.  Defendant Nathanson specifically noted, "suspect demyelinating lesion, but **cannot rule out tumor**."  He noted that the patient was seen by neurosurgery and was scheduled for repeat MRI of the brain.  He suggested proceeding with a spinal tap for further evaluation of possible MS.  A order was issued for a follow up MRI of the brain to be done at G-CMC with results copied to neurosurgery as well.  Under Impression and Plan, the primary encounter diagnosis was listed as, **"brain stem lesion"**.  Cranial nerve 6 palsy.  Demyelinating disease of CNS.  Suspect patient has MS.  The plan included an IR procedure, spina tap, and an MRI of the brain with and without contrast as well as labs.  The patient was not referred for a biopsy in January 2015 by Defendant Nathanson.

57.     An MRI of the brain with and without contrast on the referral of "Mark

Lacey, PA-C", copying Kenneth Bannon, PA-C, not any medical doctors, was done on

February 3, 2015 at Defendant, Geisinger Viewmont Imaging, and interpreted by

Defendant Larar.  The indication for the study was "**pontine lesion**.  Follow up."

Findings referenced by Defendant Larar included the fact that he had the earlier study

of December 11, 2014 for a comparison and that again, there was a large region of

signal abnormality anteriorly and inferiorly on the pons, measuring approximately 1.8 x

3.7 x 1.8 cm in greatest ap, transverse and cephalocaudad extent.  Defendant Larar

also found that there was a mild mass affect with pontine enlargement.  He specifically

found, **"... the lesion remains of indeterminate etiology with benign and**

**malignant etiologies remaining among differential considerations.**

**(Inflammatory, demyelinating disease, glioma, astrocytoma (brain tumors).)**

Defendant Larar concluded that it was a **"stable large pontine lesion of**

**indeterminate etiology.  Glioma, lymphoma, vasculitis, infectious,**

**inflammatory process are among differential considerations."**  He

recommended clinical correlation and further management as warranted, without any

further specifics.  He did not call the referring PA-C's or the treating physicians,

Defendant Jacobs, his PA-C Defendant Lacey, or Defendant PA-C Bannon, or Defendant

Hacker, to alert them to the critical findings, as required by American College of

Radiology (ACR) Standards of Care.

58.     On February 11, 2015, Sarah DeRichie had a follow up visit with

Defendant Jacobs and Defendant Lacey, PA-C, at Defendant, Geisinger Clinic d/b/a

Geisinger Wyoming Valley Medical Center, through the Geisinger Health System Foundation.  Neither Defendant Jacobs nor Defendant Lacey, PA-C, documented anywhere in the record that Sarah DeRichie's presentation and case were presented for evaluation in the tumor board, as referenced in the note and plan on December 24, 2014.  Indeed, the Geisinger record fails to reveal any evaluation and tumor board review of Sarah DeRichie's confirmed pons lesion.  Both Defendant Jacobs and Defendant Lacey, PA-C, indicate that the follow up MRI of 2/3/15 interpreted by Defendant Larar revealed no change in the pons lesion, which was not accurate.  There was reference made to a "resident's note" in documenting findings and plan of care, but the Plaintiffs are unable to decipher the name or identification of a resident agent who participated in Sarah DeRichie's care on February 11, 2015.

Defendant Jacobs specifically documents in his attending note that Sarah DeRichie was seen in follow up today for, **"surveillance of a brain stem lesion seen on imaging three months ago."**  He documented that her examination with respect to her left sixth nerve palsy remained unchanged.  He noted that the patient had yet to have her lumbar puncture and follow up neurological evaluation as they were delayed due to inclement weather.  Both he and his PA-C documented that if the diagnosis of MS or demyelinating disease is confirmed, then they would follow up with a new MRI in six months' time or by August 2015.  However, if her workup does not reveal a demyelinating process, including MS, then he would follow up with another MRI sooner or in three months' time on or by May 2015.  Defendant Jacobs, having not referred the patient to tumor board as previously, indicated in notes on February 11, 2015, some

30

two months after his first opportunity to present her case to tumor board, that he would present her to our tumor board after an MRI in three months if she is not diagnosed with MS.

There is no documentation in Sarah DeRichie's Geisinger chart that her case was ever referred to a tumor board in December of 2014 or at any time after February of 2015 as was planned.  There is also no documentation in her chart that Defendants Jacobs, Lacey, PA-C, Defendant Nathanson or his PA-C, Defendant, Gloria Pombo, ever referred Sarah DeRichie for a follow up MRI any time before her brain tumor was belatedly diagnosed in January of 2017 when she finally had a follow up MRI of the brain by Defendant Larar at Defendant, Geisinger Viewmont Imaging, revealing a differential diagnosis including astrocytoma brain tumor, without confirming any misdiagnosis responsible for the delay in the diagnosis of the brain tumor and/or ruling out her existing diagnosis of Multiple Sclerosis.  Sarah DeRichie was subsequently emergently hospitalized at Defendant, Geisinger Wyoming Valley Emergency Department in January 2017, during which time she had a brain biopsy with results on or about January 20, 2017, including a diagnosis of brain tumor, but again, not ruling out or indicating that her existing Multiple Sclerosis diagnosis was incorrect and/or indicating to the Plaintiff-patient that her earlier identified brain tumor had not been timely diagnosed by the Defendant healthcare providers.  At no time while under the care of Defendant Jacobs, a Neurosurgeon, or his PA-C, Defendant Lacey, was any further diagnostic study of the brain or brain biopsy undertaken to rule out a brain tumor, specifically an astrocytoma, as had been raised from the time of her initial MRI

on December 11, 2014, until the time of her subsequent pathological diagnosis of brain

tumor over two (2) years later, on or about January 20, 2017.

59.     Sarah DeRichie remained under the care of Defendants Bannon, PA-C and

Hacker, and agents, employees and servants of the Wayne Memorial Community Health

Centers d/b/a Carbondale Family Health Center in collaboration with Wayne Memorial

Health System, Inc., continuously from December of 2014 as referenced above through

the aforementioned February 2015, with Neurosurgery, Neurology and Radiology

consultations and testing.  A review of the records appears to confirm that Sarah

DeRichie dutifully followed up with her primary care physicians at the Carbondale

Family Health Center, Defendant Bannon, PA-C and Defendant Hacker on April 2, 2015;

July 22, 2015; September 2, 2015; November 9, 2015; January 21, 2016; February 29,

2016; May 23, 2016; September 15, 2016; January 5, 2017, a total of (9) nine visits.

This does not even including numerous interim phone contacts from the patient, all

opportunities, along with the benefit of receiving consultative neurosurgery, neurology,

radiology reports prior to a later MRI on January 9, 2017, identifying a progressive

neoplasm, low grade astrocytoma as the leading differential diagnosis, prior to her

January 14th-18, 2017 hospitalization at Geisinger Wyoming Valley Emergency

Department when she underwent a stereotactic brain biopsy confirming a Grade III

anaplastic astrocytoma.  Defendants Bannon, PA-C and Hacker, as well as agents,

employees and services of Wayne Memorial Community Health Centers d/b/a

Carbondale Family Health Center in collaboration with the Wayne Memorial Health

System, Inc., failed to timely diagnosis Sarah DeRichie's brain tumor at an earlier date

despite its identification as early as December 11, 2014, and despite numerous examination opportunities, and worsening complaints which were not consistent with a diagnosis of Multiple Sclerosis.  Moreover, these Defendants failed, during Sarah DeRichie's lifetime, to ever advise her that she was a victim of misdiagnosis and/or delayed diagnosis resulting in the increased risk of illness and death to Sarah DeRichie. To the time of her death on May 1, 2017, each and every Defendant in this case failed to explain to Sarah DeRichie or her husband, Michael DeRichie, that the cause of the advanced brain tumor that would ultimately take her life was the failure of her healthcare providers to follow up upon, investigate, test or treat earlier findings of a brain lesion, as opposed to misdiagnosing and treating her for Multiple Sclerosis.

60.     Carbondale Family Health Center record of April 2, 2015 authored by Defendant Bannon, PA-C, memorializes that Sarah DeRichie was recently diagnosed with MS, but does not make any specific reference to who diagnosed her with Multiple Sclerosis or the basis for the diagnosis, including history, physical examination findings, or test results.  The note does document that the Plaintiff-patient was nervous about the side effects of MS medications.  There is no reference to her consulting Neurologist or a neurology plan going forward, nor is there any reference to the prior plan for tumor board evaluation of the pons lesion or serial MRIs for future observation of the lesion, which could not be ruled out as being a brain tumor.  The patient did not have signs and symptoms consistent only with Multiple Sclerosis.  The patient did not have Multiple Sclerosis.  Sarah DeRichie had a brain tumor which required emergent diagnosis and treatment for her to have an opportunity for a cure and/or to reduce the

harmful effects of the tumor growing and becoming fatal.  Despite the importance of this visit in which the patient was diagnosed with a demyelinating disease, MS, and no further treatment was suggested for evaluation of her brain lesion, the record does not reveal that Defendant Hacker cosigned this note.  One of her current problems on April 2, 2015 is listed as "MRI brain, abnormal …"

61.    Similarly, when Sarah DeRichie was seen by Defendant Bannon, PA-C, and presumably, Defendant Hacker, who cosigned this note on September 2, 2015, her current problems included MS, as well as "MRI brain, abnormal …"  The note indicates that she is following with neurology, but there is no reference to what Neurologist she is following up with nor any reference to any neurological findings to confirm that she was following up with Neurology.  Defendants Bannon, PA-C and Hacker, indicated that they would request consultative records.  She was instructed to follow up in four to six months.  Sarah DeRichie was not evaluated, tested or worked up further for her pons lesion which as of this date, had not been ruled out as being a brain tumor.  Defendant Bannon, PA-C and Defendant Hacker, failed to refer her for further evaluation of her pons lesion, including MRI study, biopsy, or to follow up on why she had not received tumor board evaluation as planned.

62.    The Plaintiff-patient's next evaluation at Carbondale Family Health Center on November 9, 2015 was for annual GYN care and there is no reference to evaluation of her **"left brain pontine lesion"** which is referenced in her past medical history.

63.    On February 29, 2016, Sarah DeRichie was seen by Defendant Bannon, PA-C, memorialized in a note cosigned by Defendant Hacker, for a six month follow up.

Again, in addition to her MS diagnosis, there is continued and consistent notation of her "MRI brain, abnormal", without any action being taken whatsoever to obtain any further radiological studies, updated neurological consultation, biopsy or updated neurosurgical evaluation.

Importantly, on February 29, 2016, Sarah DeRichie advised Defendants Bannon, PA-C and Hacker, that she was now experiencing intermittent headaches, in the back of her head, which would be consistent with the area of the pons, which were worse when she coughs.  They had been occurring for the past month or so.  It was also noted that she was experiencing "SOB", shortness of breath, which is another sign or symptom that can be caused by a tumor in the area of the pons.  Again, she was simply told to follow up in four to six months.  Importantly, rather than making arrangements for an updated MRI for their patient, Defendants Bannon, PA-C and Hacker, noted, "update MRI may be due and will leave decision up to neurology," without documenting follow up.  The instructions went on to recommend that she advise her neurologist of her intermittent headaches and shortness of breath, both of which she did.  Defendants Bannon, PA-C and Hacker failed to take action to workup Sarah DeRichie's pons lesion on February 29, 2016, despite increasing signs and symptoms, no definitive diagnosis of the lesion and in the absence of MS symptomatology.  There was also no indication that Defendants Bannon, PA-C or Hacker contacted Sarah DeRichie's treating Neurologist to discuss these findings or the need for follow up brain studies, including MRI, biopsy, or whether she had ever undergone tumor board evaluation at Defendant Geisinger as previously referenced.

35

64.    On May 16, 2016, Sarah DeRichie came under the care of Julieanne O'Boyle, M.D., at Honesdale Neurology, a specialty service provider of Defendant Wayne Memorial Community Health Centers through collaboration with Wayne Memorial Health System, Inc.  Kerri Falco and Dr. Julieanne O'Boyle, a Neurologist, were agents, servants, employees, actually or apparently, of Defendant Wayne Memorial Community Health Centers and Wayne Memorial Health System, Inc.  Sarah DeRichie was referred to Dr. O'Boyle, a WMCHC and WMHS system, by Defendant Bannon, PA-C.

65.    Sarah DeRichie was seen by Dr. O'Boyle and Kerri Falco at Honesdale Neurology, part of the WMCHC and WMHS, for initial neurological evaluation.  Sarah DeRichie provided an updated history which included her diagnosis of MS, as well as her abnormal MRI of the brain in the area of the pons.  She reported continued double vision, which was fairly constant, expect with use of glasses, being worse at the end of the day.  The patient also reported facial drooping around the mouth and numbness which comes and goes.  Importantly, she related a history of occasional headaches traveling from the neck up the back of her head again in the area of the pons, which she described as a throbbing pain, lasting for several seconds and she can have one to two episodes like this in a day or go days in between episodes.  She did not report signs and symptoms exclusively consistent with Multiple Sclerosis, nor did the examination findings reveal signs and symptoms consistent only with Multiple Sclerosis.  Despite obtaining an updated history and performing a "detailed neurological examination," Dr. O'Boyle and Kerri Falco failed to correct the misdiagnosis of Multiple

Sclerosis or investigate further whether the Plaintiff patient in fact had Multiple

Sclerosis, given the absence of family history, the lack of historical information and the

absence of physical examination findings consistent with MS.  Thus, a chance was lost

to correct the misdiagnosis of Multiple Sclerosis and correctly diagnose her brain tumor

or work her up for the same, thereby increasing the risk that the brain tumor would

grow, untested, undiagnosed and untreated and lead to her untimely death.

Perhaps most importantly and fatefully, Dr. O'Boyle decided and noted, ". . . at

this time, (May 16, 2016), another MRI of the brain will not be ordered."  Had Dr.

O'Boyle or Kerri Falco ordered an MRI given the history of pons lesion of unknown

etiology, which included the possibility of astrocytoma or brain tumor, the tumor would

have been diagnosed some eight (8) months earlier so that Sarah DeRichie could have

commenced treatment of the same forthwith.  The failure to order a follow-up MRI

when the agents of WMCHC and WMHS were aware of her history, including the

positive MRI finding of a lesion of unknown etiology in the pons, represented another

lost chance to timely diagnose and treat Sarah DeRichie's astrocytoma, thereby

increasing the likelihood that it would cause her untimely death.

66.    Upon receipt of the consultative neurology note and/or becoming aware of

the same, neither Defendant Bannon, PA-C nor Defendant Hacker contacted the new

Neurologist, Dr. O'Boyle, to discuss ordering a follow up MRI for the brain lesion as they

had raised on their last visit, nor did they discuss or inquire as to why a tumor board

review had not been done of Sarah DeRichie's case.

67.    Sarah DeRichie returned, as scheduled, to Honesdale Neurology, Dr.

O'Boyle and Kerri Falco, agents, employees, servants and representatives, actual or implied, of WMCHC and WMHS on August 24, 2016.  In addition to reemphasizing her earlier complaints including double vision, numbness by the mouth and fatigue, she again noted headache, specifically when bending over on occasion.  She denied symptoms consistent with Multiple Sclerosis once again.  She was deemed to be "doing fairly well", despite the existence of undiagnosed, unworked up, untreated brain tumor. She was simply told to return in six months for reevaluation.  There is no reference in the note of any MRI of the brain being considered or any further discussion of the tumor board follow-up.

68.    On September 15, 2016, Sarah DeRichie returned to Carbondale Family Health Center, Defendant Bannon, PA-C, for a checkup.  "MRI brain, abnormal" was still listed as one of her current problems, despite not having had any radiological workup for the same since February of 2015.  Important additional historical information included the fact that Sarah DeRichie now complained that her headaches were very bothersome and were triggered with position and mostly in the rear of her head, consistent with the undiagnosed pons tumor she was suffering from.  The Plaintiff-patient specifically advised Defendant Bannon, PA-C that, "… stated neurology unsure of cause of headaches."  Yet Defendants Bannon, PA-C and Hacker did nothing to find the cause of the headaches, including following up on the etiology of the known pontine lesion.

Impressions and Recommendations noted the headache, but seem to attribute it to cervical pain, despite the fact that the same would not be consistent with positional

headaches and would be consistent with a brain tumor in the area of the pons.  Again, the Plaintiff did not report symptoms exclusively consistent with Multiple Sclerosis.

With respect to patient instructions, she was encouraged to keep appointment with neurology, which she did.  Importantly, there is a reference under Patient Instruction to **"Plan update brain MRI."**  Once again, despite the fact that an updated MRI was referenced as being planned in September of 2016, no action was taken by Defendant Bannon, PA-C or Defendant Hacker of the Carbondale Family Health Center, to schedule an MRI or have her current treating Neurologist and fellow WMCHC and WMHS providers, Dr. O'Boyle or Kerri Falco, schedule an MRI.  There was no countersignature by Dr. Hacker for this visit.

69.    Ironically, in September of 2016, Defendants Bannon, PA-C and Hacker were arranging for the Plaintiff-patient to have a cervical spine x-ray and a cervical MRI, rather than an MRI of her brain for her confirmed lesion in the pons of unknown etiology with said possible diagnosis including a brain tumor/astrocytoma!

70.    On December 9, 2016, approximately one (1) month before an MRI of January 9, 2017, revealing marked interval increase of brain stem lesion with mass enlargement, associated mild cerebella tonsillar herniation and obstructive hydrocephalus and a recommendation for clinical correlation for a leading differential consideration of astrocytoma with Lymphoma, tumefactive Multiple Sclerosis and other etiologies not able to be excluded, Sarah DeRichie was seen by Dr. O'Boyle and Kerri Falco at Honesdale Neurology, agents, servants, employees, actual or implied, of the WMCHC and WMHS, in their capacity as Sarah DeRichie's consulting treating

neurologist.

The updated history now reported a new facial droop along the right side and pain and numbness throughout her face.  By this time, Sarah DeRichie's speech was slurred, and she was suffering from constant headaches.  She also noted right upper extremity weakness, with difficulty opening or lifting things with her right hand and arm.  She also reported that when she bends over, stands up quickly, laughs or coughs, she will get a pounding pain the back of her head for one to two minutes as if her neck is squeezing her head.  These findings are all consistent with her astrocytoma brain tumor, rather than Multiple Sclerosis.  Neurological examination confirmed the symptoms as reported by the patient.

An MRI of the brain with contrast was ordered, her first since February 3, 2015. Even with these dramatically increased symptoms due to the progression of her undiagnosed and untreated tumor, Dr. O'Boyle failed to even reference the pons lesion as a possible cause of her symptomatology, as opposed to an exacerbation of MS or a Bell's Palsy. As a result, the Plaintiff-Patient had no idea at this time that she was a victim of malpractice or that the failure of the Defendant Healthcare providers was causing a delay in the diagnosis and treatment of her brain tumor, thereby increasing her risk of premature death.

71.    On January 5, 2017, Sarah DeRichie returned to the Carbondale Family Health Center, Defendant Bannon, PA-C, and Defendant Hacker.  It is listed as an acute care visit for cold like symptoms, despite the patient's obvious advanced symptomatology from her undiagnosed and untreated brain tumor.  On physical

examination, she is listed as having positive facial symmetry, despite the neurological findings referenced above.  She is diagnosed as having positive muscle weakness, upper and lower, as well as shortness of breath.  There is no reference whatsoever to her recent neurological evaluation or her impending MRI of the brain.  She is referred for an ER evaluation, but there is no reference to what she is to be evaluated for.

72.     On January 9, 2017, Sarah DeRichie underwent an MRI of her brain almost two (2) years after her last MRI of the brain and without any follow-up MRI by Geisinger Neurosurgery or Neurology, Defendants Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson or Pombo, PA-C, or a follow up MRI by Defendants Bannon, PA-C, Hacker or Dr. O'Boyle.  Nor had the Plaintiff-patient's case ever been submitted to the Geisinger Tumor Board by January of 2017.  Her case would only be submitted to the Geisinger Tumor Board after she was diagnosed with a brain tumor following biopsy on January 20, 2017, when it was far too late.  Neither Sarah DeRichie nor her husband, Michael DeRichie, were advised, as of January 9, 2017, of the significance of the prior testing recommendations or results, consultation findings requiring follow up by her healthcare providers, treatment or review that was to have taken place to further evaluate her brain lesion or that the failure to conduct such testing, consultations and treatments and seek review by the Tumor Board, caused a delay in her brain tumor diagnosis resulting in an increased risk of death.  Nor did they advise her that she did not have Multiple Sclerosis or that she had it, as the two are not mutually exclusive, but also had a brain tumor at that time.

73.     Defendant Larar interpreted the MRI of the brain at Defendant Clinic d/b/a

41

Geisinger Viewmont Imaging on January 9, 2017. His findings and impressions

confirmed a marked interval increase of previously seen T2/FLARE hyper intensity in the

brain stem which now extends from the upper pons to the cervicomedullary junction,

approximately 5.6 cm in length. There was also an increase of AP extent of the signal

abnormality, there was moderate diffuse brain stem enlargement and associated mass

effect. There was flattening and pointing of the cerebral tonsils with a downward

herniation protruding approximately 7 mm through foramen magnum, as compared

with 4 mm previously. There was now diffuse ventriculomgaly.

Defendant Larar referred to a **progressive neoplasm such as a low-grade**

**astrocytoma as the leading differential consideration**. As he had done

previously, he recommended clinical correlation and further evaluation as warranted.

However, in this instance, unlike his prior MRI evaluation, Defendant Larar and/or a

representative of Geisinger Clinic d/b/a Geisinger Viewmont Imaging, called the report

to Dr. O'Boyle's office to report the marked interval increase in the brain stem lesion

with mass enlargement associated with mild cerebellar tonsillar herniation and

obstructive hydrocephalus, as required by the American College of Radiology (ACR)

standards for communication of significant radiology findings. Sarah DeRichie was

informed of the results of the MRI generally, without detailed explanation as to their

significance, and was referred to a Neurosurgeon, but once again, she was not advised

that she had been misdiagnosed as having Multiple Sclerosis as opposed to a brain

tumor, nor was she informed that the cause of the delay in diagnosing her brain tumor

were the inactions and actions of her healthcare providers. These MRI findings were

reported to Carbondale Family Health Center, Defendants Bannon, PA-C and Hacker, by

Dr. O'Boyle, who called their office upon receiving the information from Defendant

Larar.

74.     Dramatic worsening of her symptoms from an undiagnosed, untreated

brain tumor resulted in Sarah DeRichie being hospitalized emergently at Defendant

Geisinger Wyoming Valley Medical Center from January 14, 2017 through January 18,

2017.  MRI guided localization brain report revealed diffuse enlargement and T2 signal

abnormality within the pons and medulla, which is **increased compared with the**

**prior outside studies dated 12/11/14 and 2/3/15.  The findings were noted**

**to be worrisome for a brain stem glioma.  Downward cerebellar tonsillar**

**herniation was noted to be increased from the prior studies dated 12/11/14**

**and 2/3/15.  Interval enlargement of the ventricular system was also noted**

**compared with the prior outside MRIs which was worrisome for**

**hydrocephalus**.

75.     Stereotactic biopsy was performed on January 17, 2017.  With regard to

the indications and history, Dr. Margaret Riordan of Defendant Wyoming Valley Medical

Center specifically noted that Sarah DeRichie was a 43-year-old female with a history of

cranial nerve palsy diagnosed in 2014.  At that time, she had a **small pontine lesion**

that was followed with serial imaging (Dr. Riordan notes in her neurosurgery

discharge/hospitalization summary under Pertinent History, that imaging in 2014 had

showed the pontine lesion, which was being followed with serial scans, **however, no**

**repeat completed after 2015**).  Tragically, serial imaging was not done despite the

43

historical reference.  Dr. Riordan goes on to note that in 2015, the patient had a lumbar puncture showing oligoclonal bands and was diagnosed with MS.  The patient most recently presented to the ED with new right facial droop and facial right sided weakness, arm greater than leg.  **MRI showed enlargement of her brain stem lesion with obstructive hydrocephalus.**

Frozen biopsy confirmed a low-grade astrocytoma, as opposed to a glioma, so an additional sample was taken for permanent pathology.   Plaintiff-patient's initial primary diagnosis was brain mass.  However, following processing of the pathology report, on January 20, 2017, her **pathological diagnosis was a brain stem lesion, anaplastic astrocytoma, WHO Grade III**.  Immunostaining showed intact protein expression that ruled out diffuse midline glioma.  Additional immunostain was negative.

Sarah DeRichie was tentatively diagnosed with an astrocytoma brain tumor in the area of her pons on January 18, 2017, some two years and one month after her initial MRI by Defendant Skevofilax at Defendant Geisinger Viewmont Imaging had first revealed an abnormal brain MRI that could not rule out a neoplastic process or tumor including an astrocytoma.  Once again, the Plaintiff-patient was not advised of the earlier findings regarding a brain lesion, nor was she informed that the delay in her diagnosis was caused by the failure of her healthcare providers to follow up with timely testing, consultation, treatment or tumor board review.  She was also not advised that she had been misdiagnosed with Multiple Sclerosis or that she could have had a concurrent diagnosis of brain tumor and Multiple Sclerosis.  Sarah DeRichie's brain tumor was never biopsied prior to January 20, 2017, nor did she have the benefit of

serial MRIs or a tumor board evaluation, as specifically recommended and referenced by the Defendants herein and as such, her debilitating brain tumor was not diagnosed in a timely fashion, which increased the risk of harm and increased the likelihood that the tumor would grow and cause her premature death, which it did, in fact do.

76.     From January 20, 2017 through the date of her death on May 1, 2017, Sarah DeRichie endured the worsening symptoms of her untimely diagnosed brain tumor, including worsening gait and mobility abnormalities with poor balance and endurance, altered motor skills, worsening double vision, increasingly slurred speech, breathing difficulties, fever, weakness, facial disfigurement, inability to participate in supportive therapies, inability to even get up out of bed to go to the bathroom, until her final hospitalization on April 10, 2017 at Geisinger-CMC with fever, generalized weakness, dizziness, difficulty ambulating, nausea, and vomiting, from her brain tumor.

77.     During the aforementioned time frame, subsequent healthcare providers advised her husband and the Plaintiff-patient that she did not have MS and that her diagnosis confirmed by biopsy was indeed a Grade III astrocytoma of the brain stem that was causing her symptomatology. The belatedly diagnosed brain tumor would lead to her premature death at the age of only forty-four (44) years on May 1, 2017, leaving behind her husband, Michael F. DeRichie, and two (2) minor children, Christopher then aged twelve (12) and Michael then aged eight (8).  At no time prior to her premature death during this period did any of the Defendant healthcare providers or subsequent treaters specifically inform Sarah DeRichie or her husband, Michael DeRichie, of the cause of her tumor not being timely tested, evaluated and treated, that being the

grossly negligent inactions and actions of the Defendant healthcare providers which increased the risk of death to Sarah DeRichie and deprived her of an opportunity to be treated.  Had the named Defendants herein, as well as their agents, servants, and employees, both actual and implied, simply worked up her pons lesion in December of 2014 with further brain studies and a biopsy, with tumor board evaluation, her tumor would have been diagnosed and treated with chemotherapy and/or radiation, as she did not suffer from a fatal glioma, but rather, had a treatable astrocytoma.  By failing to properly test, diagnose and treat her astrocytoma tumor in her brain stem, and have a timely tumor board review, the Defendants, as well as their agents, employees and servants, actual or implied, increased the risk that Sarah DeRichie's tumor would go undiagnosed and would cause her premature death.  The same Defendants and their agents, servants and employees, actual or implied, caused Sarah DeRichie's premature death at the age of forty-four (44) years.

78.    The Defendants and their agents, servants and/or employees undertook and/or assumed a duty to Sarah DeRichie to provide her with reasonable, competent, skilled, proper, timely and adequate medical evaluation, care, monitoring, testing, treatment, management and diagnosis, and to take appropriate measures to ensure her safety and physical well-being, and to avoid the risk of harm, injury and death to her.

79.    Sarah DeRichie and her family relied on the medical knowledge, training, skill, advice and treatment of the Defendants and their agents, servants and/or employees caring for her to correctly diagnose and treat her condition.

80.    The carelessness and gross negligence of the Defendants, as well as their

agents, servants and/or employees and each of them jointly and severally, as described herein, increased the risk of harm to Sarah DeRichie and did, in fact, cause her catastrophic undiagnosed illness, injuries and premature death.

81.    As a direct result of the negligent acts and/or omissions of the Defendants and their agents, servants and/or employees, and each of them, jointly and severally, as described herein, Sarah DeRichie suffered the devastating effects of an undiagnosed and untreated astrocytoma brain tumor in the brain stem causing her great physical pain and suffering, including crushing headaches, double vision, facial asymmetry and pain, loss of balance, loss of well-being, weakness, immobility, inability to use her right upper and right lower extremities, slurred speech, tremendous anxiety, depression, post-traumatic stress, embarrassment, humiliation, disfigurement, abnormal breathing and ultimately, deterioration of her physical and mental well-being and her premature death.

82.    Had the Defendants and their agents, servants and/or employees acted in accordance with the accepted standards of care for a patient with an astrocytoma in the brain stem, visualized on MRI, then and there presenting with the symptoms set forth herein and in her medical records as of December 11, 2014, and been promptly and properly tested, diagnosed, reviewed and treated in a timely and appropriate manner, Sarah DeRichie would not have suffered the catastrophic physical and neurological downward spiral, resulting pain and suffering and untimely death at the age of only forty four (44) years.

83.    The catastrophic, permanent and fatal injuries of Sarah DeRichie and the

damages and losses suffered by her family, including her husband and two minor children, were caused solely and exclusively by the negligence of the Defendants named herein and/or their agents, servants and employees, jointly and severally, and were not caused or contributed to, by any act or failure to act on the part of the decedent, Sarah DeRichie, or the decedent's family, Michael DeRichie, or their minor children. Sarah DeRichie was a compliant patient who has no fault or contributory negligence whatsoever for he delayed diagnosis and untimely death.

84.    As a direct result of the negligence of the Defendants, and their agents, servants and/or employees, as described herein, the Estate of Sarah DeRichie, deceased, and the Plaintiff-patient's family, have suffered and will continue to suffer substantial economic and non-economic injuries, damages and losses, for which they should be compensated:

a)    Payment of past medical expenses;

b)    Payment of funeral and burial expenses;

c)    Payment of costs of estate administration;

d)    Profound psychological and emotional loss;

e)    Conscious pain and suffering, mental distress, anxiety, anguish, depression and post-traumatic stress;

f)    Loss of the comfort, care, society, support and services of their loving wife and mother, Sarah DeRichie;

g)    And such other injuries, damages and losses as described more fully herein and compensable law under Wrongful Death Act and

48

the Survival Act, and the decisional law of the Commonwealth of
Pennsylvania interpreting those acts.

85.     As a direct and proximate result of the careless and negligent conduct of
the Defendants, and each of them, as well as their employees, servants and agents as
set forth herein, the Plaintiff-decedent, Sarah DeRichie, sustained severe and serious
injuries, including premature death, from the failure of the Defendants, and their
agents, to timely evaluate, test, diagnose and treat her astrocytoma brain tumor of the
brain stem, in addition to all related injuries and worsening of conditions set forth
herein, as well as extreme mental anguish, distress, depression, emotional hardship and
post-traumatic stress up to the time of her premature death.

86.     As a direct and proximate result of the aforesaid negligent and carless
conduct of the Defendants, and each of them, as well as their agents, servants and
employees, the Plaintiff-decedent, Sarah DeRichie, suffered severe physical pain,
mental anguish, discomfort, embarrassment, humiliation, disfigurement, inconvenience
and distress up to the time of her death on May 1, 2017.

87.     As a further result of the aforesaid conduct of the Defendants, and each
of them, as well as their agents, the Plaintiff-decedent, Sarah DeRichie, was compelled
to expend various and diverse sums of money for medicines, medical care and
treatment in an effort to cure or rehabilitate herself and continued to incur such medical
expenses resulting in billing liens, up to the time of her death on May 1, 2017.

88.     By reason of the aforesaid conduct of the Defendants, and each of them,
and their agents, the Plaintiff-decedent, Sarah DeRichie, was unable to follow her usual

daily duties, labors, work, chores and tasks.

89.     As a further result of the aforesaid conduct of the Defendants, and each of them, and their agents, the Plaintiff-decedent, Sarah DeRichie, was unable to remain gainfully employed, losing past wages and related benefits, as well as future wages and benefits and loss of earnings and earning capacity as a result of her untimely death.

90.     As a further result of the aforementioned conduct of the Defendants, and each of them, and their agents, the Plaintiff-decedent, Sarah DeRichie, incurred other financial expenses and losses on account of the injuries aforesaid and the treatment required for the same.

91.     The economic and non-economic injuries, damages and losses suffered by the Estate of Sarah DeRichie and the Plaintiff-decedent's husband, and to their minor children, were caused solely and exclusively by the gross negligence of the Defendants and/or their agents, servants and employees, as described herein jointly and severally, and were not caused or contributed to by any act or failure to act on the part of Sarah DeRichie or Sarah DeRichie's family.

**COUNT I**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**WAYNE MEMORIAL COMMUNITY HEALTH CENTERS
d/b/a CARBONDALE FAMILY HEALTH CENTER AND
WAYNE MEMORIAL HEALTH SYSTEM, INC.**

92.    The preceding paragraphs of this Complaint are incorporated herein as though fully set forth herein.

93.    The negligence of Wayne Memorial Community Health Centers d/b/a Carbondale Family Health Center and Wayne Memorial Health System, Inc., acting by and through their actual, apparent and/or ostensible agents, servants and employees who participated in the care of Sarah DeRichie as described herein, including Defendant, Kenneth J. Bannon, PA-C, Richard K. Hacker, M.D., Julianne O'Boyle, M.D., Kerri Falco, as well as other agents, servants and employees whose name cannot be deciphered from the available medical record and who are unknown to the Plaintiffs, consisted of one or more of the following:

> a)    Negligently allowing Defendant, Kenneth J. Bannon, a Certified Physician's Assistant, to oversee the care of Sarah DeRichie without proper supervision of a physician's assistant by Defendant, Richard K. Hacker, M.D. or other physicians in the Carbondale Family Health Center, Wayne Memorial Community Health Center, and Wayne Memorial Health System, Inc. practice, thereby preventing Sarah DeRichie from having the benefit of an appropriate licensed physician evaluating her symptoms, or conducting physical examinations, referring for consultation and making timely diagnoses of her condition;

b)     Negligently failing, through their agents, Bannon, PA-C, Hacker,
       O'Boyle and Falco, to properly and timely diagnose Sarah
       DeRichie's brain tumor in the area of her pons at the brain stem
       from the time it was initially identified on December 11, 2014 until
       it was belatedly diagnosed on January 9, 2017 and confirmed by
       biopsy on January 20, 2017;

c)     Negligently failing, through its agents Bannon, PA-C, Hacker,
       O'Boyle and Falco, to obtain timely and appropriate follow up
       radiological brain studies, including MRI, CT or stereotactic biopsy
       to confirm whether or not the abnormal lesion at the Plaintiff-
       patient's brain stem first identified on December 11, 2014 was a
       tumor which required immediate diagnosis and treatment;

d)     Negligently failing, through their agents Bannon, PA-C and Hacker,
       to obtain timely and appropriate follow up radiological brain
       studies, including MRI, CT or stereotactic biopsy, to confirm
       whether or not the abnormal lesion at the Plaintiff-patient's brain
       stem was a tumor, from the time it was initially identified on
       December 11, 2014 until it was belatedly diagnosed on January 9,
       2017 and confirmed by biopsy on January 20, 2017;

e)     Negligently failing, through their agents O'Boyle and Falco, to
       obtain timely and appropriate follow up radiological brain studies,
       including MRI, CT or stereotactic biopsy, to confirm whether or not
       the abnormal lesion at the Plaintiff-patient's brain stem was a
       tumor first identified on December 11, 2014, while providing
       neurology treatment to Sarah DeRichie on May 16, 2016 until her
       initial diagnosis on January 9, 2017 and confirmed by biopsy on
       January 20, 2017;

f)     Negligently and incorrectly, through their agents, Bannon, PA-C,
       Hacker, O'Boyle and Falco, diagnosing Sarah DeRichie with Multiple
       Sclerosis (MS) and/or going along with a diagnosis of MS when her
       history, test results and physical examination did not support a
       diagnosis of MS, but rather, supported a diagnosis of a brain tumor
       at the brain stem as identified as early as December 11, 2014;

g)     Negligently, through their agents, Bannon, PA-C, Hacker, O'Boyle
       and Falco, failing to reconsider the diagnosis of Multiple Sclerosis
       and explore the etiology of the lesion at the pons on the brain
       stem, identified on MRIs of December 11, 2014 and February 3,
       2015, when a tumor diagnosis was more consistent with the
       radiological, historical and physical findings, as opposed to MS;

h)   Negligently failing, through their agents, Bannon, PA-C and Hacker, to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention once they became involved in her care as of May 16, 2016;

i)   Negligently failing, through their agents, O'Boyle and Falco to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

j)   Negligently failing, through their agents, Bannon, PA-C and Hacker, to follow up with the Geisinger Defendant Neurosurgeon Jacobs, and Geisinger Defendant Neurologist Nathanson, in a timely fashion regarding the neurosurgical and neurology consultations, findings, recommendations and plans;

k)   Negligently failing, through their agents, O'Boyle and Falco, to follow up with and/or consult the prior consulting neurosurgeon, Defendant Jacobs, and neurologist, Defendant Nathanson, regarding their neurosurgical and neurological evaluations as well as their opinions on the cause of the Plaintiff-patient's symptoms, and the etiology of the brain lesion, and whether or not the same were consistent with a diagnosis of Multiple Sclerosis or a brain tumor;

l)   Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to determine the etiology of the abnormal brain MRI and the lesion on the Plaintiff-patient's brain stem, which was not consistent with a diagnosis of Multiple Sclerosis and was consistent with a more life-threatening brain tumor;

m)   Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to request a biopsy of the pontine lesion in a timely fashion;

n)   Negligently failing, through their agents, Bannon, PA-C, Hacker,

O'Boyle and Falco, to refer the Plaintiff-patient for a biopsy of her pontine lesion to confirm its etiology;

o)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to reconsider the diagnosis of Multiple Sclerosis in the face of the patient's lack of history of the disease, minimal lumbar puncture finding, and absence of other symptomatology consistent with Multiple Sclerosis and most importantly, the presence of a known pontine lesion at the brain stem whose possible etiology included astrocytoma brain tumor;

p)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to determine if the pontine lesion first seen on December 11, 2014 was benign or cancerous;

q)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to ensure that timely MRI, CT or other radiological surveillance of the brain was conducted after December 11, 2014 and prior to her diagnosis by biopsy on January 20, 2017;

r)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to determine the basis for the Multiple Sclerosis diagnosis made by consulting neurologist and neurosurgeons consultants;

s)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to appreciate the significance of the Plaintiff-patient's increasing symptoms of headache, weakness, fatigue, right upper and lower extremity weakness, shortness of breath, slurred speech, continued double vision, in conjunction with an abnormal brain MRI with no knowledge of the etiology of the pontine lesion, thereby depriving the Plaintiff-patient of an opportunity for more timely intervention and treatment of her brain tumor;

t)    Negligently failing, through their agents, O'Boyle and Falco, to obtain an MRI at the time of their neurology consultation of May 16, 2016 when the patient had increased complaints including worsening headache, continued double vision with facial drooping and no MRI since February of 2015, despite a known pontine lesion without attribution to etiology;

u)    Negligently, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, attributing the patient's increasing brain and head pain,

facial symptomatology and complaints to preexisting neck condition despite the known presence of a pontine lesion of unknown etiology;

v)    Negligently and needlessly, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, causing Sarah DeRichie to endure considerable pain, suffering, worsening of her condition with no evaluation, diagnosis or treatment of her brain tumor until it was belatedly diagnosed as Stage III astrocytoma in January of 2017, thereby causing her untimely death;

w)    Negligently referring, through their agents, Bannon, PA-C and Hacker, the Plaintiff-patient to a part-time neurologist, Dr. O'Boyle, in a community health center when the seriousness of the patient's known pontine lesion required appropriate referral and follow up with a full-time neurologist in a clinical hospital setting to ensure timely testing, diagnosis and treatment of the Plaintiff-patient's brain tumor;

x)    Negligently failing to ensure Defendant Hacker oversaw Defendant Bannon, PA-C in his care and treatment of Sarah DeRichie;

y)    Negligently failing to ensure compliance with federal and state community health center standards of care for Wayne Memorial Community Health Centers and the Wayne Memorial Health System, Inc., in the rendering of care to patients like Sarah DeRichie;

z)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to prevent the growth and expansion of the Plaintiff-patient's brain tumor to a Grade III astrocytoma, thereby decreasing her chances of survival and increasing her risk of premature death;

aa)    Negligently concluding, through its agents, Bannon, PA-C, Hacker, O'Boyle and Falco, that the Plaintiff-patient's condition was stable and that her diagnosis of MS, appropriate and accurate, in the presence of a known pontine lesion of unknown etiology;

bb)    Negligently allowing, through its agents, Bannon, PA-C, Hacker, O'Boyle and Falco, readily diagnosable, treatable tumor to progress, undiagnosed and untreated, resulting in the loss of opportunity for a cure, full recovery and instead causing belated diagnosis of her astrocytoma tumor and her premature death.

94.     As a direct and proximate result of the negligence of Wayne Memorial Community Health Centers d/b/a Carbondale Family Health Center in collaboration with the Wayne Memorial Health System, Inc. and their agents, Defendant Bannon, PA-C, Defendant Hacker, Dr. O'Boyle and Kerri Falco and their agents, servants and employees, as described herein, jointly and severally, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)     The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)     The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)     The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)     The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)     The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)     The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty four (44) years, leaving behind a husband and two (2) minor children.

95.     At all relevant times, Defendants, Wayne Memorial Community Health Centers d/b/a Carbondale Family Health Center and collaborating with the Wayne Memorial Health System, Inc., through their agents, Defendant Bannon, PA-C, Defendant Hacker, Dr. O'Boyle and Kerri Falco, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah

DeRichie, as more specifically described herein, as agents, servants and/or employees, who provided medical care and treatment to Sarah DeRichie, acting within the course and scope of their actual, apparent and/or ostensible agency and/or employment with Defendants, WMCHC and WMHS.  Accordingly, WMCHC and WMHS are derivatively liable for the negligent acts and omissions of Defendants Bannon, PA-C, and Defendant Hacker, as well as Dr. O'Boyle and Kerri Falco, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records, who participated in her care from December of 2014 through the date of her death on May 1, 2017, as more specifically described herein, under principals of *respondeat superior*, master-servant, vicarious liability, agency or right of control.

96.     The foregoing negligence of WMCHC and WMHS, as well as their agents, Defendant Bannon, PA-C, Defendant Hacker and Dr. O'Boyle and Kerri Falco, as well as those other agents whose names cannot be deciphered in Sarah DeRichie's medical records who participated in her care as more specifically described herein, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

97.     As the direct and proximate result of the negligent acts and/or omissions of Defendants WMCHC and WMHS, as well as their agents, Defendants Bannon, PA-C and Defendant Hacker, Dr. O'Boyle and Kerri Falco and their agents, servants or employees who cannot be identified in the record presently, deprived Sarah DeRichie of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life

threatening before causing her untimely death.

98.     As a direct and proximate result of the negligence of the aforementioned

Defendants WMCHC and WMHS, and their agents, servants and/or employees as

described herein, and those who cannot be identified in the record presently, Sarah

DeRichie suffered catastrophic, permanent and fatal injuries and damages, including

death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendants, Wayne

Memorial Community Health Centers d/b/a Carbondale Family Health Center and Wayne

Memorial Health System, Inc., jointly and severally, in an amount in excess of the

applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of

attorney's fees, interest and costs.

**COUNT II**

**CORPORATE NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**WAYNE MEMORIAL HEALTH SYSTEM, INC. d/b/a
WAYNE MEMORIAL COMMUNITY HEALTH CENTER d/b/a
CARBONDALE FAMILY HEALTH CENTER**

99.     The preceding paragraphs of this Complaint are incorporated herein as

though fully set forth herein.

100.    In addition to the derivative and vicarious liability of Defendants WMHS

d/b/a Carbondale Family Health Center through WMCHC, for the negligent acts and

omissions of its agents, servants and employees, as defined more particularly herein, as

set forth in the preceding Counts, Defendants WMHS d/b/a Carbondale Family Health Center through WMCHC owed direct and non-delegable duties to Sarah DeRichie as set forth in *Thompson v. Nason*, 591 A.2d 709 (Pa. 1991) and its progeny of case law, including *Welsh vs. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d 1144 (Pa. Super. 2001).

101.   As part of their duties and responsibilities, Defendants WMHS d/b/a Carbondale Family Health Center through WMCHC owed duties to Sarah DeRichie, including a duty to use reasonable care in the maintenance of safe facilities and equipment; a duty to select and retain only competent physicians; a duty to oversee all persons who practice medicine within its walls as to patient care; and a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

102.   Acting through their administrators, various boards, committees and individuals, Defendants WMHS d/b/a Carbondale Family Health Center through WMCHC were responsible for establishing, ensuring compliance with and enforcing standards of professional medical practice and care by members of its staff.  Defendants WMHS d/b/a Carbondale Family Health Center through WMCHC had an obligation to establish proper treatment for individuals having brain lesion, brain tumor, problems and symptoms similar to those with which Sarah DeRichie presented in December 2014 through May 2017 as set forth above and hereinafter.

103.   Defendants WMHS d/b/a Carbondale Family Health Center through WMCHC owed a duty to Sarah DeRichie to exercise reasonable care in the appointment

and re-appointment of physicians, fellows, residents, graduate medical trainees, physician's assistants, nurses, nursing supervisors and technicians.

104.   Defendants, WMHS d/b/a Carbondale Family Health Center through WMCHC owed a duty to patients like Sarah DeRichie to provide reasonable and competent medical care and services and to avoid conduct that would increase the risk of and in fact, cause harm to its patients, including Sarah DeRichie.

105.   It is believed and therefore averred that the Defendants WMHS d/b/a Carbondale Family Health Center through WMCHC, through the negligent acts and omissions of its agents, servants and employees as set forth herein, were negligent in failing to properly determine the qualifications and proficiencies of physicians, residents, fellows, graduate medical trainees, physician's assistants, nurses, nursing supervisors and technicians, specifically including Defendant Bannon, PA-C, Defendant Hacker, Dr. O'Boyle and Kerri Falco, and other medical or nursing staff who may not be identified presently, but were responsible for the care of Sarah DeRichie at Wayne Memorial Community Health Center, Carbondale Family Health Center and Honesdale Neurology from December 2014 to May 2017.

106.   It is believed and therefore averred that the physicians, residents, fellows, graduate medical trainees, physician's assistants, nurses, nursing supervisor and technicians who participated in the care rendered to Sarah DeRichie from December 2014 to May of 2017, as more particularly detailed herein, did not possess the requisite training, experience, technical skills and judgment to render proper care and services to patients with conditions like Sarah DeRichie, including her presenting brain tumor, with

60

signs and symptoms and abnormalities demonstrated on multiple MRI imaging.

107.   It is believed and therefore averred that Defendant WMHS d/b/a

Carbondale Family Health Center through WMCHC were negligent in failing to supervise

and monitor the medical care and treatment rendered to Sarah DeRichie when it knew

or should have known that the aforementioned physicians, residents, fellows, graduate

medical trainees, physician's assistants, nurses, unidentified nursing supervisor and

technician and other medical or nursing staff who may not be identified presently in the

medical record that were charged with and responsible for Sarah DeRichie's care, did

not possess the requisite medical training, skill, knowledge and/or competence to

properly care for Sarah DeRichie.

108.   As a direct and proximate result of the conduct set forth above and

hereinafter, it is believed and therefore averred that Defendants WMHS d/b/a

Carbondale Family Health Center through WMCHC violated their duties as set forth in

the paragraphs above and hereinafter and failed to exercise the judgment of a

reasonable healthcare provider under the circumstances as follows:

        a)     Failing to have physicians, residents, graduate medical trainees, interns, fellows, physician's assistants, technicians, nurses and nurse supervisors, appropriate in number, training and/or experience, available to make appropriate and timely decisions with respect to the evaluation, testing, diagnosis, treatment and management of patients presenting to WMHS d/b/a Carbondale Family Health Center through WMCHC with a clinical history, physical signs and symptoms, and results of diagnostic studies such as those demonstrated by Sarah DeRichie as more particularly described herein;

        b)     Failing to have physicians, residents, graduate medical trainees, interns, fellows, physician's assistants, technicians, nurses and nursing supervisors, appropriate in number, training and/or

experience, available to make appropriate and timely decisions regarding the evaluation, testing, diagnosis, treatment and management of patients with abnormal findings on MRI, including a pontine lesion of unknown etiology, and symptomatology resulting therefrom which is distinct and different from signs and symptoms of Multiple Sclerosis;

c)      Failing to ensure that Sarah DeRichie received appropriate medical attention from fully trained, qualified and appropriately experienced physicians, specialists, including in the fields of radiology, interventional radiology, neurosurgery, pathology and neurology, residents, graduate medical trainees, interns, fellows, physician's assistants, technicians, nurses and nursing supervisors able to make appropriate and timely decisions with respect to the evaluation, diagnosis, treatment and management of patients who present to the hospital with a clinical history, physical signs and symptoms and results of diagnostic studies, including MRIs, demonstrating a pontine lesion of unknown etiology which could include brain tumor;

d)      Failing to select and retain physicians, residents, graduate medical trainees, fellows, interns, physician's assistants, nurse practitioners, technicians, nurses and nursing supervisors, as well as other competent medical staff with experience in the evaluation, testing, diagnosis, treatment and management of internal medicine and neurological patients like Sarah DeRichie with a recent finding of pontine lesion at the brain stem of unknown etiology which could include an astrocytoma tumor;

e)      Negligently selecting and allowing Defendant Bannon, PA-C to be responsible for the evaluation, testing, diagnosis, treatment and management of Sarah DeRichie's life threatening neurologic condition when they knew or should have known that he was not competent, given his limited education, training, qualifications and experience, to manage a patient like Sarah DeRichie;

f)      Negligently selecting and allowing Defendant Hacker to be responsible for the evaluation, testing, diagnosis, treatment and management of Sarah DeRichie's life threatening neurologic condition when they knew or should have known that he was not competent, given his limited education, training, qualifications and experience, to manage a patient like Sarah DeRichie;

62

g)      Failing to oversee all persons who practice medicine, internal medicine and neurology within its health system and in their community health centers as to patient care to assure that Sarah DeRichie's medical condition and risk for astrocytoma brain tumor, were appropriately and timely evaluated, assessed, managed and treated;

h)      Failing to oversee all persons who practice medicine within its walls as to patient care to ensure that the physician, resident, graduate medical trainee, physician's assistant, technicians, case managers, nurses, nursing supervisor and nursing staff, involved in the care and treatment of Sarah DeRichie were appropriately and adequately supervised by a member of the attending physician staff;

i)      Failing to formulate, adopt and enforce adequate policies and procedures to ensure quality patient care, including written policies, procedures and rules regarding the oversite of a physician's assistant – certified by a supervising physician consistent with federal and Pennsylvania laws, as well as the standards of practice for the community health standard and the standards of care for medical practice;

j)      Failing to formulate, adopt and enforce adequate policies and procedures to ensure quality patient care, including written policies, procedures and rules regarding the follow up on positive radiological findings to determine the etiology of lesions that could be tumors to be life threatening;

k)      Failing to formulate, adopt and enforce adequate policies and procedures to ensure quality patient care, including written policies, procedures and rules regarding the follow up on consultation, treatment plans with consulting specialties regarding follow up studies or proposed plan of action, including a determination of whether or not a lesion is cancerous be reviewed by a tumor board as proposed;

l)      Failing to formulate, adopt and enforce adequate policies and procedures to ensure quality patient care, including written policies, procedures and rules regarding oversight, review, participation in patient care and countersigning of patient office notes to ensure quality of care for the patient as rendered by physician's assistants be they certified or uncertified;

63

m)    Failing to formulate, adopt and enforce adequate policies and
      procedures to ensure quality patient care, including written policies,
      procedures and rules regarding compliance with federal and
      internal standard for community health centers;

n)    Failing to formulate, adopt and enforce adequate policies and
      procedures to ensure quality patient care, including written policies,
      procedures and rules regarding radiological surveillance of
      suspicious brain lesions to ensure they are timely tested, biopsied
      and diagnosed as soon as possible;

o)    Failing to formulate, adopt and enforce adequate policies and
      procedures to ensure quality patient care, including written policies,
      procedures and rules regarding communication of testing
      recommendations from consultants and follow up on plans of
      actions by consultants for the benefit of the patient;

p)    Defendants WMHS and WMCHC d/b/a Carbondale Family Health
      Center and Honesdale Neurology, knew or should have known as of
      December of 2014, that they did not have adequate written policies
      and procedures in place as described above;

q)    Defendants WMHS and WMCHC d/b/a Carbondale Family Health
      Center and Honesdale Neurology, knew or should have known that
      Defendant Bannon, PA-C, was not sufficiently familiar with and/or
      failed to follow their written policies and procedures with respect to
      the matters described above, to the extent that they existed;

r)    Defendants WMHS and WMCHC d/b/a Carbondale Family Health
      Center and Honesdale Neurology, knew or should have known that
      Defendant Hacker, was not sufficiently familiar with and/or failed to
      follow their written policies and procedures with respect to the
      matters described above, to the extent that they existed;

s)    Defendants WMHS and WMCHC d/b/a Carbondale Family Health
      Center and Honesdale Neurology, knew or should have known that
      its specialty agent neurologist, Dr. O'Boyle and Kerri Falco, did not
      possess the adequate training, skill, or knowledge in evaluation and
      management of patients with potential brain tumors as exhibited by

Sarah DeRichie to timely evaluate and treat them in a part-time capacity;

t)    Defendants WMHS and WMCHC d/b/a Carbondale Family Health Center and Honesdale Neurology, knew or should have known that it had failed to provide Defendant Bannon, PA-C, Defendant Hacker, Julianne O'Boyle and Kerri Falco with adequate training, skill and knowledge of policies, procedures and standards of care in order to care for patients at risk for brain tumors like Sarah DeRichie;

u)    Negligently allowing Defendant, Kenneth J. Bannon, a Certified Physician's Assistant, to oversee the care of Sarah DeRichie without proper supervision of a physician's assistant by Defendant, Richard K. Hacker, M.D. or other physicians in the Carbondale Family Health Center, Wayne Memorial Community Health Center, and Wayne Memorial Health System, Inc. practice thereby preventing Sarah DeRichie from having the benefit of an appropriate licensed physician evaluating her symptoms, or conducting physical examinations, referring for consultation and making timely diagnoses of her condition;

v)    Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco to properly and timely diagnose Sarah DeRichie's brain tumor in the area of her pons at the brain stem from the time it was initially identified on December 11, 2014 until it was belatedly diagnosed on January 9, 2017 and confirmed by biopsy on January 20, 2017;

w)    Negligently failing, through its agents Bannon, PA-C, Hacker, O'Boyle and Falco to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem first identified on December 11, 2014 was a tumor which required immediate diagnosis and treatment;

x)    Negligently failing, through their agents Bannon, PA-C, and Hacker, to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem from the time it was initially identified on December 11, 2014 until it was

belatedly diagnosed on January 9, 2017 and confirmed by biopsy on January 20, 2017;

y)    Negligently failing, through their agents O'Boyle and Falco, to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem first identified on December 11, 2014 and providing neurology treatment to Sarah DeRichie on May 16, 2016 until her initial diagnosis on January 9, 2017 and confirmed by biopsy on January 20, 2017;

z)    Negligently and incorrectly, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or going along with a diagnosis of MS when her history, test results and physical examination did not support a diagnosis of MS, but rather, supported a diagnosis of a brain tumor at the brain stem as identified as early as December 11, 2014;

aa)   Negligently, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, failing to reconsider the diagnosis of Multiple Sclerosis and explore the etiology of the lesion at the pons on the brain stem identified on MRIs of December 11, 2014 and February 3, 2015, when a tumor diagnosis was more consistent with the radiological, historical and physical findings, as opposed to MS;

bb)   Negligently failing, through their agents, Bannon, PA-C and Hacker to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

cc)   Negligently failing, through their agents, O'Boyle and Falco to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

dd)   Negligently failing, through their agents, Bannon, PA-C and Hacker,

to follow up with the Geisinger Defendant Neurosurgeon Jacobs, and Geisinger Defendant Neurologist Nathanson in a timely fashion regarding the neurosurgical and neurology consultations, findings, recommendations and plans;

ee)     Negligently failing, through their agents, O'Boyle and Falco, to follow up with and/or consult the prior consulting neurosurgeon, Defendant Jacobs, and neurologist, Defendant Nathanson, regarding their neurosurgical and neurological evaluations as well as their opinions on the cause of the Plaintiff-patient's symptoms, as well as the etiology of the brain lesion, and whether or not the same were consistent with a diagnosis of Multiple Sclerosis;

ff)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to determine the etiology of the abnormal brain MRI and the lesion on the Plaintiff-patient's brain stem, which was not consistent with a diagnosis of Multiple Sclerosis;

gg)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to request a biopsy of the pontine lesion in a timely fashion;

hh)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to refer the Plaintiff-patient for a biopsy of her pontine lesion to confirm its etiology;

ii)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to reconsider the diagnosis of Multiple Sclerosis in the face of the patient's lack of history of the disease, minimal lumbar puncture finding, and absence of other symptomatology consistent with Multiple Sclerosis and most importantly, the presence of a known pontine lesion at the brain stem whose possible etiology including astrocytoma brain tumor;

jj)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to determine if the pontine lesion first seen on December 11, 2014 was benign or cancerous;

kk)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to ensure that timely MRI, CT or other radiological surveillance of the brain was conducted after December 11, 2014 and prior to her diagnosis by biopsy on January 20, 2017;

ll)     Negligently failing, through their agents, Bannon, PA-C, Hacker,

O'Boyle and Falco, to determine the basis for the Multiple Sclerosis diagnosis made by consulting neurologist and neurosurgeons;

mm) Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to appreciate the significance of the Plaintiff-patient's increasing symptoms of headache, weakness, fatigue, right upper and lower extremity weakness, shortness of breath, slurred speech, continued double vision in conjunction with an abnormal brain MRI with no knowledge of the etiology of the pontine lesion, thereby depriving the Plaintiff-patient of an opportunity for more timely intervention and treatment of her brain tumor;

nn) Negligently failing, through their agents, O'Boyle and Falco, to obtain an MRI at the time of their neurology consultation of May 16, 2016 when the patient had increased complaints including worsening headache, continued double vision with facial drooping and no MRI since February of 2015 despite a known pontine lesion without attribution to etiology;

oo) Negligently, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, attributing the patient's increasing brain and head pain, facial symptomatology and complaints to preexisting neck condition despite the known presence of a pontine lesion of unknown etiology;

pp) Negligently and needlessly, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, causing Sarah DeRichie to endure considerable pain, suffering, worsening of her condition with no evaluation, diagnosis or treatment of her brain tumor until it was belatedly diagnosed as Stage III astrocytoma in January of 2017, thereby causing her untimely death;

qq) Negligently referring, through their agents, Bannon, PA-C and Hacker, the Plaintiff-patient to a part-time neurologist in a community health center when the seriousness of the patient's known pontine lesion required appropriate referral and follow up with a full-time neurologist in a clinical hospital setting to ensure timely diagnosis and treatment of the Plaintiff-patient's brain tumor;

rr) Negligently failing to ensure Defendant Hacker oversaw Defendant Bannon, PA-C in his care and treatment of Sarah DeRichie;

ss)     Negligently failing to ensure compliance with federal and state community health center standards of care for Wayne Memorial Community Health Centers and the Wayne Memorial Health System, Inc., in the rendering of care to patients like Sarah DeRichie;

tt)     Negligently failing, through their agents, Bannon, PA-C, Hacker, O'Boyle and Falco, to prevent the growth and expansion of the Plaintiff-patient's brain tumor to a Grade III station thereby decreasing her chances of survival and increasing her risk of premature death;

uu)     Negligently concluding, through its agents, Bannon, PA-C, Hacker, O'Boyle and Falco, that the Plaintiff-patient's condition was stable and that her diagnosis of MS, appropriate and accurate in the presence of a known pontine lesion of unknown etiology; and,

vv)     Negligently allowing, through its agents, Bannon, PA-C, Hacker, O'Boyle and Falco, readily diagnosable and entirely treatable condition to progress, undiagnosed and untreated, resulting in the loss of opportunity for a cure, full recovery and instead causing belated diagnosis of her astrocytoma tumor and her premature death.

109.     As a direct and proximate result of the corporate negligence of WMHS d/b/a Carbondale Family Health Center through, WMCHC, and their agents, Defendant Bannon, PA-C, Defendant Hacker, Dr. O'Boyle and Kerri Falco and their agents, servants and employees, as described herein, jointly and severally, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)     The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)     The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)     The Plaintiff decedent, Sarah DeRichie's, medical and physical

condition deteriorated;

d)   The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)   The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)   The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

110.   At all relevant times, Defendants, WMHS d/b/a Carbondale Family Health Center through WMCHC, through their agents, Defendant Bannon, PA-C, Defendant Hacker, Dr. O'Boyle and Kerri Falco, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah DeRichie, as more specifically described herein, as agents, servants and/or employees, who provided medical care and treatment to Sarah DeRichie, acting within the course and scope of their actual, apparent and/or ostensible agency and/or employment with Defendants, WMCHC and WMHS.  Accordingly, WMCHC and WMHS are derivatively liable for the negligent acts and omissions of Defendants Bannon, PA-C, and Defendant Hacker, as well as Dr. O'Boyle and Kerri Falco, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records, who participated in her care from December of 2014 through the date of her death on May 1, 2017, as more specifically described herein, under principals of *respondeat superior*, master-servant, vicarious liability, agency or right of control.

111.   The foregoing corporate negligence of Defendants, WMHS d/b/a Carbondale Family Health Center through WMCHC, as well as their agents, Defendant

Bannon, PA-C, Defendant Hacker and Dr. O'Boyle and Kerri Falco, as well as those other agents whose names cannot be deciphered in Sarah DeRichie's medical records who participated in her care as more specifically described herein, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

112.   As the direct and proximate result of the corporate negligence acts of Defendants, WMHS d/b/a Carbondale Family Health Center through WMCHC, as well as their agents, Defendants Bannon, PA-C and Defendant Hacker, Dr. O'Boyle and Kerri Falco and their agents, servants or employees who cannot be identified in the record presently, deprived Sarah DeRichie of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

113.   As a direct and proximate result of the corporate negligence of the aforementioned Defendants, WMHS d/b/a Carbondale Family Health Center through WMCHC, and their agents, servants and/or employees as described herein, and those who cannot be identified in the record presently, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendants, Wayne Memorial Community Health Centers d/b/a Carbondale Family Health Center and Wayne Memorial Health System, Inc., jointly and severally, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

**COUNT III**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**KENNETH J. BANNON, PA-C**

114.    The preceding paragraphs of this Complaint are incorporated as though

fully set forth herein.

115.    Defendant, Kenneth J. Bannon, PA-C, was negligent under the

circumstances in all or some of the following ways:

a)    Defendant, Kenneth J. Bannon, a Certified Physician's Assistant, negligently oversaw the care of Sarah DeRichie without proper supervision of a physician's assistant by Defendant, Richard K. Hacker, M.D. or other physicians in the Carbondale Family Health Center, Wayne Memorial Community Health Center, and Wayne Memorial Health System, Inc. practice thereby preventing Sarah DeRichie from having the benefit of an appropriate licensed physician evaluating her symptoms, or conducting physical examinations, referring for consultation and making timely diagnoses of her condition;

b)    Negligently failing to properly and timely diagnose Sarah DeRichie's brain tumor in the area of her pons at the brain stem from the time it was initially identified on December 11, 2014 until it was belatedly diagnosed on January 9, 2017 and confirmed by biopsy on January 20, 2017;

c)    Negligently failing to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem first identified on December 11, 2014 was a tumor which required immediate diagnosis and treatment;

d)    Negligently failing to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy

72

to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem from the time it was initially identified on December 11, 2014 until it was belatedly diagnosed on January 9, 2017 and confirmed by biopsy on January 20, 2017;

e)      Negligently failing to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem first identified on December 11, 2014 and providing neurology treatment to Sarah DeRichie on May 16, 2016 until her initial diagnosis on January 9, 2017 and confirmed by biopsy on January 20, 2017;

f)      Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or going along with a diagnosis of MS when her history, test results and physical examination did not support a diagnosis of MS, but rather, supported a diagnosis of a brain tumor at the brain stem as identified as early as December 11, 2014;

g)      Negligently failing to reconsider the diagnosis of Multiple Sclerosis and explore the etiology of the lesion at the pons on the brain stem identified on MRIs of December 11, 2014 and February 3, 2015, when a tumor diagnosis was more consistent with the radiological, historical and physical findings, as opposed to MS;

h)      Negligently failing to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

i)      Negligently failing to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

j)      Negligently failing to follow up with the Geisinger Defendant Neurosurgeon Jacobs, and Geisinger Defendant Neurologist Nathanson in a timely fashion regarding the neurosurgical and

73

neurology consultations, findings, recommendations and plans;

k)      Negligently failing to follow up with and/or consult the prior consulting neurosurgeon, Defendant Jacobs, and neurologist, Defendant Nathanson, regarding their neurosurgical and neurological evaluations as well as their opinions on the cause of the Plaintiff-patient's symptoms, as well as the etiology of the brain lesion, and whether or not the same were consistent with a diagnosis of Multiple Sclerosis;

l)      Negligently failing to determine the etiology of the abnormal brain MRI and the lesion on the Plaintiff-patient's brain stem, which was not consistent with a diagnosis of Multiple Sclerosis;

m)      Negligently failing to request a biopsy of the pontine lesion in a timely fashion;

n)      Negligently failing to refer the Plaintiff-patient for a biopsy of her pontine lesion to confirm its etiology;

o)      Negligently failing to reconsider the diagnosis of Multiple Sclerosis in the face of the patient's lack of history of the disease, minimal lumbar puncture finding, and absence of other symptomatology consistent with Multiple Sclerosis and most importantly, the presence of a known pontine lesion at the brain stem whose possible etiology including astrocytoma brain tumor;

p)      Negligently failing to determine if the pontine lesion first seen on December 11, 2014 was benign or cancerous;

q)      Negligently failing to ensure that timely MRI, CT or other radiological surveillance of the brain was conducted after December 11, 2014 and prior to her diagnosis by biopsy on January 20, 2017;

r)      Negligently failing to determine the basis for the Multiple Sclerosis diagnosis made by consulting neurologist and neurosurgeons;

s)      Negligently failing to appreciate the significance of the Plaintiff-patient's increasing symptoms of headache, weakness, fatigue, right upper and lower extremity weakness, shortness of breath, slurred speech, continued double vision in conjunction with an abnormal brain MRI with no knowledge of the etiology of the pontine lesion, thereby depriving the Plaintiff-patient of an opportunity for more timely intervention and treatment of her brain

tumor;

t)      Negligently failing to obtain an MRI at the time of their neurology consultation of May 16, 2016 when the patient had increased complaints including worsening headache, continued double vision with facial drooping and no MRI since February of 2015 despite a known pontine lesion without attribution to etiology;

u)      Negligently attributing the patient's increasing brain and head pain, facial symptomatology and complaints to preexisting neck condition despite the known presence of a pontine lesion of unknown etiology;

v)      Negligently and needlessly causing Sarah DeRichie to endure considerable pain, suffering, worsening of her condition with no evaluation, diagnosis or treatment of her brain tumor until it was belatedly diagnosed as Stage III astrocytoma in January of 2017, thereby causing her untimely death;

w)      Negligently referring the Plaintiff-patient to a part-time neurologist in a community health center when the seriousness of the patient's known pontine lesion required appropriate referral and follow up with a full-time neurologist in a clinical hospital setting to ensure timely diagnosis and treatment of the Plaintiff-patient's brain tumor;

x)      Negligently failing to ensure Defendant Hacker oversaw Defendant Bannon, PA-C in his care and treatment of Sarah DeRichie;

y)      Negligently failing to ensure compliance with federal and state community health center standards of care for Wayne Memorial Community Health Centers and the Wayne Memorial Health System, Inc., in the rendering of care to patients like Sarah DeRichie;

z)      Negligently failing to prevent the growth and expansion of the Plaintiff-patient's brain tumor to a Grade III station thereby decreasing her chances of survival and increasing her risk of premature death;

aa)     Negligently concluding that the Plaintiff-patient's condition was stable and that her diagnosis of MS, appropriate and accurate in the presence of a known pontine lesion of unknown etiology;

bb)   Negligently allowing readily diagnosable and entirely treatable condition to progress, undiagnosed and untreated, resulting in the loss of opportunity for a cure, full recovery and instead causing belated diagnosis of her astrocytoma tumor and her premature death.

116.   As a direct and proximate result of the negligence of Defendant Bannon, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)   The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)   The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)   The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)   The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)   The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

117.   The foregoing negligence of Defendant Bannon, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

118.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Bannon, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition,

allowing it to further progress and become life threatening before causing her untimely death.

119.     As a direct and proximate result of the negligence of the aforementioned Defendant Bannon, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendant, Kenneth J. Bannon, PA-C, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

**COUNT IV**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**RICHARD K. HACKER, M.D.**

120.     The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

121.     As a direct and proximate result of the negligence of the aforementioned Defendant Hacker, Sarah DeRichie, suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

122.     Defendant, Richard K. Hacker, M.D., was negligent under the circumstances in all or some of the following ways:

        a)      Negligently allowing Defendant, Kenneth J. Bannon, a Certified Physician's Assistant, to oversee the care of Sarah DeRichie without proper supervision of a physician's assistant by Defendant, Richard

77

K. Hacker, M.D. or other physicians in the Carbondale Family Health Center, Wayne Memorial Community Health Center, and Wayne Memorial Health System, Inc. practice thereby preventing Sarah DeRichie from having the benefit of an appropriate licensed physician evaluating her symptoms, or conducting physical examinations, referring for consultation and making timely diagnoses of her condition;

b)    Negligently failing to properly and timely diagnose Sarah DeRichie's brain tumor in the area of her pons at the brain stem from the time it was initially identified on December 11, 2014 until it was belatedly diagnosed on January 9, 2017 and confirmed by biopsy on January 20, 2017;

c)    Negligently failing to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem first identified on December 11, 2014 was a tumor which required immediate diagnosis and treatment;

d)    Negligently failing to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem from the time it was initially identified on December 11, 2014 until it was belatedly diagnosed on January 9, 2017 and confirmed by biopsy on January 20, 2017;

e)    Negligently failing to obtain timely and appropriate follow up radiological brain studies, including MRI, CT or stereotactic biopsy to confirm whether or not the abnormal lesion at the Plaintiff-patient's brain stem first identified on December 11, 2014 and providing neurology treatment to Sarah DeRichie on May 16, 2016 until her initial diagnosis on January 9, 2017 and confirmed by biopsy on January 20, 2017;

f)    Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or going along with a diagnosis of MS when her history, test results and physical examination did not support a diagnosis of MS, but rather, supported a diagnosis of a brain tumor at the brain stem as identified as early as December 11, 2014;

g)    Negligently failing to reconsider the diagnosis of Multiple Sclerosis and explore the etiology of the lesion at the pons on the brain stem identified on MRIs of December 11, 2014 and February 3, 2015,

when a tumor diagnosis was more consistent with the radiological, historical and physical findings, as opposed to MS;

h)    Negligently failing to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

i)    Negligently failing to follow up on the recommendation of the Defendant, Geisinger's Neurosurgeon, Defendant Jacobs and Defendant Nathanson's plan for tumor board review of the brain stem lesion as early as December 24, 2014 and subsequently on February 11, 2015, as well as their recommendations for repeat MRI surveillance of the lesion to determine its etiology and need for intervention;

j)    Negligently failing to follow up with the Geisinger Defendant Neurosurgeon Jacobs, and Geisinger Defendant Neurologist Nathanson in a timely fashion regarding the neurosurgical and neurology consultations, findings, recommendations and plans;

k)    Negligently failing to follow up with and/or consult the prior consulting neurosurgeon, Defendant Jacobs, and neurologist, Defendant Nathanson, regarding their neurosurgical and neurological evaluations as well as their opinions on the cause of the Plaintiff-patient's symptoms, as well as the etiology of the brain lesion, and whether or not the same were consistent with a diagnosis of Multiple Sclerosis;

l)    Negligently failing to determine the etiology of the abnormal brain MRI and the lesion on the Plaintiff-patient's brain stem, which was not consistent with a diagnosis of Multiple Sclerosis;

m)    Negligently failing to request a biopsy of the pontine lesion in a timely fashion;

n)    Negligently failing to refer the Plaintiff-patient for a biopsy of her pontine lesion to confirm its etiology;

o)    Negligently failing to reconsider the diagnosis of Multiple Sclerosis in the face of the patient's lack of history of the disease, minimal

lumbar puncture finding, and absence of other symptomatology consistent with Multiple Sclerosis and most importantly, the presence of a known pontine lesion at the brain stem whose possible etiology including astrocytoma brain tumor;

p)    Negligently failing to determine if the pontine lesion first seen on December 11, 2014 was benign or cancerous;

q)    Negligently failing to ensure that timely MRI, CT or other radiological surveillance of the brain was conducted after December 11, 2014 and prior to her diagnosis by biopsy on January 20, 2017;

r)    Negligently failing to determine the basis for the Multiple Sclerosis diagnosis made by consulting neurologist and neurosurgeons;

s)    Negligently failing to appreciate the significance of the Plaintiff-patient's increasing symptoms of headache, weakness, fatigue, right upper and lower extremity weakness, shortness of breath, slurred speech, continued double vision in conjunction with an abnormal brain MRI with no knowledge of the etiology of the pontine lesion, thereby depriving the Plaintiff-patient of an opportunity for more timely intervention and treatment of her brain tumor;

t)    Negligently failing to obtain an MRI at the time of their neurology consultation of May 16, 2016 when the patient had increased complaints including worsening headache, continued double vision with facial drooping and no MRI since February of 2015 despite a known pontine lesion without attribution to etiology;

u)    Negligently attributing the patient's increasing brain and head pain, facial symptomatology and complaints to preexisting neck condition despite the known presence of a pontine lesion of unknown etiology;

v)    Negligently and needlessly causing Sarah DeRichie to endure considerable pain, suffering, worsening of her condition with no evaluation, diagnosis or treatment of her brain tumor until it was belatedly diagnosed as Stage III astrocytoma in January of 2017, thereby causing her untimely death;

w)    Negligently referring the Plaintiff-patient to a part-time neurologist in a community health center when the seriousness of the patient's known pontine lesion required appropriate referral and follow up

80

with a full-time neurologist in a clinical hospital setting to ensure timely diagnosis and treatment of the Plaintiff-patient's brain tumor;

x)   Negligently failing to oversee Defendant Bannon, PA-C in his care and treatment of Sarah DeRichie;

y)   Negligently failing to ensure compliance with federal and state community health center standards of care for Wayne Memorial Community Health Centers and the Wayne Memorial Health System, Inc., in the rendering of care to patients like Sarah DeRichie;

z)   Negligently failing to prevent the growth and expansion of the Plaintiff-patient's brain tumor to a Grade III station thereby decreasing her chances of survival and increasing her risk of premature death;

aa)  Negligently concluding that the Plaintiff-patient's condition was stable and that her diagnosis of MS, appropriate and accurate in the presence of a known pontine lesion of unknown etiology;

bb)  Negligently allowing readily diagnosable and entirely treatable condition to progress, undiagnosed and untreated, resulting in the loss of opportunity for a cure, full recovery and instead causing belated diagnosis of her astrocytoma tumor and her premature death.

123.   As a direct and proximate result of the negligence of Defendant Hacker, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)   The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)   The Plaintiff decedent, Sarah DeRichie's, medical and physical

condition deteriorated;

d)   The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)   The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)   The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

124.   The foregoing negligence of Defendant Hacker, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

125.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Hacker, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

126.   As a direct and proximate result of the negligence of the aforementioned Defendant Hacker, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendant, Richard K. Hacker, M.D., in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

**COUNT V**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**GEISINGER CLINIC d/b/a GEISINGER VIEWMONT IMAGING**

127.    The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

128.    Defendants, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, and their agents, Defendant Skevofilax and Defendant Larar, held themselves out to be a health care provider with physician agents, employees and servants with expertise in the field of Radiology, who held themselves out to the public, including Sarah DeRichie, as possessing the skill and knowledge to perform radiological studies, including MRIs of the brain, and interpret the same accurately and specifically capable of determining the difference between a brain lesion and a brain tumor and/or the appropriate workup for the same.

129.    The negligence of Defendants, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, is vicarious and is based on the principles of agency and *respondeat superior* and also consists of one or more allegations in the subsequent counts against Defendants Skevofilax and Larar, which are incorporated herein by reference.

130.    Defendants Geisinger Clinic d/b/a Geisinger Viewmont Imaging are vicariously liable for the negligent acts and omissions of its actual, apparent and/or

ostensible agents as set forth herein, including for the negligent acts and omissions of

Defendants Skevofilax and Larar.

131.    Defendant Geisinger Clinic d/b/a Geisinger Viewmont Imaging was

negligent under the circumstances as follows:

a)    Negligently allowing Defendant Skevofilax to interpret Sarah DeRichie's MRI of the brain when they knew, or should have known, that he was not sufficiently skilled to differentiate between a benign lesion and an astrocytoma brain tumor and/or make appropriate recommendations for clinical follow up to confirm the accurate diagnosis;

b)    Negligently allowing Defendant Larar to interpret Sarah DeRichie's MRI of the brain when they knew, or should have known, that he was not sufficiently skilled to differentiate between a benign lesion and an astrocytoma brain tumor and/or make appropriate recommendations for clinical follow up to confirm the accurate diagnosis;

c)    Negligently entrusting Defendant Skevofilax to follow up with the ordering and primary care providers with regard to the serious nature of the findings on Sarah DeRichie's December 11, 2014 MRI of the brain which required accurate diagnosis of her astrocytoma, prompt notification to her health care providers and a recommendation for follow up studies;

d)    Negligently entrusting Defendant Larar to follow up with the ordering and primary care providers with regard to the serious nature of the findings on Sarah DeRichie's December 11, 2014 MRI of the brain which required accurate diagnosis of her astrocytoma, prompt notification to her health care providers and a recommendation for follow up studies;

e)    Negligently failing, through their agent, Defendant Skevofilax, to timely and accurately diagnose Sarah DeRichie's astrocytoma at the earliest opportunity on the December 11, 2014 MRI of the brain;

f)    Negligently failing, through their agent, Defendant Skevofilax, to ensure that the ordering and treating health care providers conducted clinical correlation of the clinical findings to ensure that the diagnosis of brain tumor was not missed;

g)   Negligently failing, through their agent, Defendant Skevofilax, to comply with the American College of Radiology (ACR) standards for interpretation, documentation, diagnosis and subsequent communication of MRI findings, recommended correlation and required studies for accurate diagnosis;

h)   Negligently failing, through their agent, Defendant Larar, to comply with the American College of Radiology (ACR) standards for interpretation, documentation, diagnosis and subsequent communication of MRI findings, recommended correlation and required studies for accurate diagnosis;

i)   Negligently diagnosing, through their agent, Defendant Skevofilax, the Plaintiff-patient's condition on December 11, 2014 as a possible demyelinating disease rather than a neoplasm, including an astrocytoma;

j)   Negligently failing, through their agent, Defendant Skevofilax, to appreciate the significance of the MRI findings including the nature of the abnormal signal intensity in the pons cerebellar tonsils lying approximately 7 mm below the foramen magnum, mistakenly suggesting a Chiari I malformation, as opposed to a neoplastic process;

k)   Negligently failing, through their agent, Defendant Skevofilax, to properly communicate to the ordering and/or primary physician the significance of the MRI brain findings and the need for specific follow up to rule out a brain tumor;

l)   Negligently failing, through their agent, Defendant Skevofilax, to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

m)   Negligently failing, through their agent, Defendant Larar, to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

n)   Negligently causing the delay in diagnosis of the Plaintiff-patient's astrocytoma brain tumor through their agent, Defendant

Skevofilax, by failing to diagnose the same on MRI so that it could be diagnosed and treated as soon as possible thereby increasing the chances of cure, responsiveness to treatment and survival;

o)   Negligently causing the delay in diagnosis of the Plaintiff-patient's astrocytoma brain tumor through their agent, Defendant Larar, by failing to diagnose the same on MRI so that it could be diagnosed and treated as soon as possible thereby increasing the chances of cure, responsiveness to treatment and survival;

p)   Negligently increasing the risk that the astrocytoma brain tumor would go undiagnosed and/or be delayed in diagnosis by failing to diagnose the same on MRI brain study through the actions or inactions of their agent, Defendant Skevofilax;

q)   Negligently increasing the risk that the astrocytoma brain tumor would go undiagnosed and/or be delayed in diagnosis by failing to diagnose the same on MRI brain study through the actions or inactions of their agent, Defendant Larar;

r)   Negligently causing subsequent evaluating physicians to misdiagnose and/or mischaracterize the findings on MRI studies interpreted by their agent, Defendant Skevofilax, due to his failure to diagnose the astrocytoma brain tumor;

s)   Negligently causing subsequent evaluating physicians to misdiagnose and/or mischaracterize the findings on MRI studies interpreted by their agent, Defendant Larar, due to his failure to diagnose the astrocytoma brain tumor;

t)   Failing through its agent, Defendant Larar, to accurately diagnose the Plaintiff-patient's astrocytoma brain tumor on February 3, 2015, despite the benefit of the prior December 11, 2014 MRI of the brain for comparison;

u)   Negligently failing, through their agent, Defendant Larar, to accurately diagnose the astrocytoma, as opposed to a benign pontine lesion, resulting in delay in diagnosis of her brain tumor;

v)   Negligently failing, through its agent, Defendant Larar, to recommend clinical correlation including follow up radiological studies or biopsy despite reporting a large region of signal abnormality anteriorly and inferiorly in the pons measuring approximately 1.8 x 3.7 x 1.8 cm in greatest AP, transverse and

cephalocaudad extent;

w)     Negligently failing to appreciate the changes between the initial MRI on December 11, 2014 and the subsequent MRI of February 3, 2015 including the size of the signal abnormality, and the mild mass effect with pontine enlargement and cerebellar tonsillar ectopia of 3 to 4 mm, based upon the interpretation of their agent, Defendant Larar;

x)     Failing to contact the referring or treating physicians to discuss the findings of the February 3, 2015 follow up MRI despite the fact that the identified lesion remained of indeterminate etiology with benign and malignant etiologies remaining among differential considerations, including a glioma and astrocytoma, as interpreted by their agent, Defendant Larar;

y)     Inaccurately characterizing, through its agent, Defendant Larar, the large pontine lesion of indeterminate etiology as "stable" given the difference between the initial MRI of December 11, 2014 and subsequent MRI of February 3, 20-15;

z)     Negligently recommending clinical correlation and further management "as warranted", without further radiological direction to the referring and treating physicians when their agent, Defendant Larar, knew or should have known that the clinical correlation should have included either CT scanning or biopsy to remove the uncertainty as to whether the lesion was benign or malignant given the risk to health and life of a malignant tumor;

aa)    Negligently delaying, through its agent, Defendant Larar, the diagnosis of astrocytoma by failing to correctly identify the tumor or recommend clinical correlation or recommend clinical correlation in the form of biopsy to confirm the same, thereby increasing the risk that the tumor would grow, undiagnosed and untreated;

bb)    Negligently allowing their agent, Defendant Larar, to continue to interpret brain MRIs when they knew or should have known that he had misinterpreted prior MRIS resulting in legal action by brain injured patients;

cc)    Failing to maintain an up-to-date credentialing file for Defendant Larar;

dd)    Failing to maintain an up-to-date credentialing file for Defendant

Skevofilax;

ee)   Failing to conduct random over reads of radiological studies performed by Defendant Larar to ensure his continued competency and accuracy;

ff)   Failing to conduct random overreads of radiological studies performed by Defendant Skevofilax to ensure his continued competency and accuracy;

gg)   Negligently allowing Sarah DeRichie to suffer the continued growth and related symptoms, pain and suffering from an undiagnosed astrocytoma brain tumor by failing, through their agents, Defendants Skevofilax and Larar, to timely diagnose or recommend appropriate clinical radiological or pathology/biopsy follow up to rule out an astrocytoma;

hh)   Failing to ensure compliance with Geisinger Clinic d/b/a Geisinger Viewmont Imaging standards of care for interpretation of MRI studies of the brain; and,

ii)   Failing to ensure compliance with Geisinger Clinic d/b/a Geisinger Viewmont Imaging standards of care for clinical recommendations, including follow up with referring or primary physicians, for evaluation of a potentially life-threatening lesion.

132.   As a direct and proximate result of the negligence of Geisinger Clinic d/b/a Geisinger Viewmont Imaging, and their agents, Defendants Skevofilax and Larar, and their agents, servants and employees, as described herein, jointly and severally, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)   The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)    The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)    The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)    The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)    The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

133.   At all relevant times, Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, through their agents, Defendants Skevofilax and Larar, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records who participated in the care of Sarah DeRichie, as more specifically described herein, as agents, servants and/or employees, who provided medical care and treatment to Sarah DeRichie, acting within the course and scope of their actual, apparent and/or ostensible agency and/or employment with Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging.  Accordingly, Geisinger Clinic d/b/a Geisinger Viewmont Imaging is derivatively liable for the negligent acts and omissions of Defendants, Skevofilax and Larar, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records, who participated in her care from December of 2014 through the date of her death on May 1, 2017, as more specifically described herein, under principals of *respondeat superior*, master-servant, vicarious liability, agency or right of control.

134.   The foregoing negligence of Geisinger Clinic d/b/a Geisinger Viewmont Imaging, as well as their agents, Defendants Skevofilax and Larar, as well as those

other agents whose names cannot be deciphered in Sarah DeRichie's medical records who participated in her care as more specifically described herein, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

135.   As the direct and proximate result of the negligent acts and/or omissions of Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, as well as their agents, Defendants Skevofilax and Larar, and their agents, servants or employees who cannot be identified in the record presently, deprived Sarah DeRichie of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

136.   As a direct and proximate result of the negligence of the aforementioned Defendant, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, and their agents, servants and/or employees as described herein, and those who cannot be identified in the record presently, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendants, Geisinger Clinic d/b/a Geisinger Viewmont Imaging, jointly and severally, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

# COUNT VI

## NEGLIGENCE

### MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

### VS.

### MARK M. SKEVOFILAX, D.O.

137.   The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

138.   Defendant, Mark M. Skevofilax, D.O., was negligent in all or some of the following ways:

a)   Negligently interpreting Sarah DeRichie's MRI of the brain when he knew, or should have known, that he was not sufficiently skilled to differentiate between a benign lesion and an astrocytoma brain tumor and/or make appropriate recommendations for clinical follow up to confirm the accurate diagnosis;

b)   Negligently failing to follow up with the ordering and primary care providers with regard to the serious nature of the findings on Sarah DeRichie's December 11, 2014 MRI of the brain which required accurate diagnosis of her astrocytoma, prompt notification to her health care providers and a recommendation for follow up studies;

c)   Negligently failing to timely and accurately diagnose Sarah DeRichie's astrocytoma at the earliest opportunity on the December 11, 2014 MRI of the brain;

d)   Negligently failing to ensure that the ordering and treating health care providers conducted clinical correlation of the clinical findings to ensure that the diagnosis of brain tumor was not missed;

e)   Negligently failing to comply with the American College of Radiology (ACR) standards for interpretation, documentation, diagnosis and subsequent communication of MRI findings,

91

recommended correlation and required studies for accurate diagnosis;

f)  Negligently diagnosing the Plaintiff-patient's condition on December 11, 2014 as a possible demyelinating disease rather than a neoplasm, including an astrocytoma;

g)  Negligently failing to appreciate the significance of the MRI findings including the nature of the abnormal signal intensity in the pons cerebellar tonsils lying approximately 7 mm below the foramen magnum, mistakenly suggesting a Chiari I malformation, as opposed to a neoplastic process;

h)  Negligently failing to properly communicate to the ordering and/or primary physician the significance of the MRI brain findings and the need for specific follow up to rule out a brain tumor;

i)  Negligently failing to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

j)  Negligently causing the delay in diagnosis of the Plaintiff-patient's astrocytoma brain tumor by failing to diagnose the same on MRI so that it could be diagnosed and treated as soon as possible thereby increasing the chances of cure, responsiveness to treatment and survival;

k)  Negligently increasing the risk that the astrocytoma brain tumor would go undiagnosed and/or be delayed in diagnosis by failing to diagnose the same on MRI brain study;

l)  Negligently causing subsequent evaluating physicians to misdiagnose and/or mischaracterize the findings on MRI studies interpreted by him due to his failure to diagnose the astrocytoma brain tumor;

m)  Negligently recommending clinical correlation and further management "as warranted", without further radiological direction to the referring and treating physicians when he knew or should have known that the clinical correlation should have included either CT scanning or biopsy to remove the uncertainty as to whether the lesion was benign or malignant given the risk to health and life of a malignant tumor;

92

n)   Negligently allowing Sarah DeRichie to suffer the continued growth and related symptoms, pain and suffering from an undiagnosed astrocytoma brain tumor by failing to timely diagnose or recommend appropriate clinical radiological or pathology/biopsy follow up to rule out an astrocytoma;

o)   Failing to comply with Geisinger Clinic d/b/a Geisinger Viewmont Imaging standards of care for interpretation of MRI studies of the brain; and,

p)   Failing to comply with Geisinger Clinic d/b/a Geisinger Viewmont Imaging and ACA standards of care for clinical recommendations, including follow up with referring or primary physicians, for evaluation of a potentially life-threatening lesion.

139.   As a direct and proximate result of the negligence of Mark A. Skevofilax, D.O., Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)   The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)   The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)   The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)   The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)   The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years,

leaving behind a husband and two (2) minor children.

140.    The foregoing negligence of Defendant Skevofilax increased the risk of

harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

141.    As the direct and proximate result of the negligent acts and/or omissions

of Defendant Skevofilax, Sarah DeRichie was deprived of necessary, timely and

appropriate evaluation, testing, diagnosis, treatment and management of her condition,

allowing it to further progress and become life threatening before causing her untimely

death.

142.    As a direct and proximate result of the negligence of the aforementioned

Defendant Skevofilax, Sarah DeRichie suffered catastrophic, permanent and fatal

injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendant, Mark A.

Skevofilax, D.O., in an amount in excess of the applicable arbitration limits of Seventy-

Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

**COUNT VII**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**GERALD N. LARAR, M.D.**

143.    The preceding paragraphs of this Complaint are incorporated as though

fully set forth herein.

144.   Defendant, Gerald N. Larar, M.D., was negligent in all or some of the

following ways:

a)   Negligently interpreting Sarah DeRichie's MRI of the brain when he knew, or should have known, that he was not sufficiently skilled to differentiate between a benign lesion and an astrocytoma brain tumor and/or make appropriate recommendations for clinical follow up to confirm the accurate diagnosis;

b)   Negligently failing to follow up with the ordering and primary care providers with regard to the serious nature of the findings on Sarah DeRichie's December 11, 2014 MRI and February 3, 2015 MRI of the brain which required accurate diagnosis of her astrocytoma, prompt notification to her health care providers and a recommendation for follow up studies;

c)   Negligently comply with the American College of Radiology (ACR) standards for interpretation, documentation, diagnosis and subsequent communication of MRI findings, recommended correlation and required studies for accurate diagnosis;

d)   Negligently failing to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

e)   Negligently failing to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

f)   Negligently causing the delay in diagnosis of the Plaintiff-patient's astrocytoma brain tumor through their agent, Defendant Larar, by failing to diagnose the same on MRI so that it could be diagnosed and treated as soon as possible thereby increasing the chances of cure, responsiveness to treatment and survival;

g)   Negligently increasing the risk that the astrocytoma brain tumor would go undiagnosed and/or be delayed in diagnosis by failing to diagnose the same on MRI brain study;

h)      Negligently causing subsequent evaluating physicians to misdiagnose and/or mischaracterize the findings on MRI studies, due to his failure to diagnose the astrocytoma brain tumor;

i)      Failing to accurately diagnose the Plaintiff-patient's astrocytoma brain tumor on February 3, 2015, despite the benefit of the prior December 11, 2014 MRI of the brain for comparison;

j)      Negligently failing to accurately diagnose the astrocytoma, as opposed to a benign pontine lesion, resulting in delay in diagnosis of her brain tumor;

k)      Negligently failing to recommend clinical correlation including follow up radiological studies or biopsy despite reporting a large region of signal abnormality anteriorly and inferiorly in the pons measuring approximately 1.8 x 3.7 x 1.8 cm in greatest AP, transverse and cephalocaudad extent;

l)      Negligently failing to appreciate the changes between the initial MRI on December 11, 2014 and the subsequent MRI of February 3, 2015 including the size of the signal abnormality, and the mild mass effect with pontine enlargement and cerebellar tonsillar ectopia of 3 to 4 mm;

m)      Failing to contact the referring or treating physicians to discuss the findings of the February 3, 2015 follow up MRI despite the fact that the identified lesion remained of indeterminate etiology with benign and malignant etiologies remaining among differential considerations, including a glioma and astrocytoma;

n)      Inaccurately characterizing the large pontine lesion of indeterminate etiology as "stable" given the difference between the initial MRI of December 11, 2014 and subsequent MRI of February 3, 20-15;

o)      Negligently recommending clinical correlation and further management "as warranted", without further radiological direction to the referring and treating physicians when he knew or should have known that the clinical correlation should have included either CT scanning or biopsy to remove the uncertainty as to whether the lesion was benign or malignant given the risk to health and life of a malignant tumor;

p)      Negligently delaying the diagnosis of astrocytoma by failing to

correctly identify the tumor or recommend clinical correlation or recommend clinical correlation in the form of biopsy to confirm the same, thereby increasing the risk that the tumor would grow, undiagnosed and untreated;

q)      Negligently allowing Sarah DeRichie to suffer the continued growth and related symptoms, pain and suffering from an undiagnosed astrocytoma brain tumor by failing to timely diagnose or recommend appropriate clinical radiological or pathology/biopsy follow up to rule out an astrocytoma;

r)      Failing to comply with Geisinger Clinic d/b/a Geisinger Viewmont Imaging standards of care for interpretation of MRI studies of the brain; and,

s)      Failing to comply with Geisinger Clinic d/b/a Geisinger Viewmont Imaging and ACA standards of care for clinical recommendations, including follow up with referring or primary physicians, for evaluation of a potentially life-threatening lesion.

145.   As a direct and proximate result of the negligence of Defendant Larar, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)      The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)      The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)      The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)      The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)      The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

      f)    The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

146.   The foregoing negligence of Defendant Larar increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

147.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Larar, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

148.   As a direct and proximate result of the negligence of the aforementioned Defendant Larar, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendant, Gerald N. Larar, M.D., jointly and severally, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

**COUNT VIII**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**GEISINGER CLINIC d/b/a GEISINGER WYOMING VALLEY MEDICAL
CENTER THROUGH THEIR AGENTS, DARREN L. JACOBS, D.O.,
MARK A. LACEY, PA-C, HEATHER R. PADUCK, PA-C,
DOUGLAS C. NATHANSON, M.D. AND GLORIA A. POMBO, PA-C**

149.    The preceding paragraphs of this Complaint are incorporated herein as though fully set forth at length.

150.    Defendants, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, and their agents, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, held themselves out to be a healthcare provider with physician and certified physicians' assistants' expertise in the fields of neurosurgery, neurology and radiology, and possessing the skill and knowledge in these areas of expertise to patients like Sarah DeRichie.

151.    The negligence of Defendants Clinic d/b/a Geisinger Wyoming Valley Medical Center is vicarious and is based upon the principals of agency and *respondeat superior* and also consists of one or more of the allegations as set forth in the subsequent Counts against Defendants Jacobs, Lacey, Paduck, Nathanson and Pombo, which are incorporated herein by reference.

152.    Defendants Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical

Center are vicarious liability for the negligent acts and omissions of its actual, apparent and/or ostensible agents as set forth herein, including the negligent acts and omissions of Defendants Jacobs, Lacey, Paduck, Nathanson and Pombo.

153.    Defendants Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center were negligent under the circumstances and through the actions of their agents as follows:

a)    Negligently failing through the actions and inactions of Defendants Jacobs, Lacey, Paduck, Nathanson and Pombo, to correctly diagnose and/or assist with the diagnosis of astrocytoma brain tumor, as opposed to Multiple Sclerosis, thereby resulting in a significant delay in the diagnosis of the Plaintiff patient's brain tumor which increased the likelihood that it will cause her premature death;

b)    Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as opposed to astrocytoma brain tumor, through their agents, Defendants Jacobs, Lacey, Paduck, Nathanson and Pombo, when they knew or should have known there was scant historical testing or examination findings to support a diagnosis of Multiple Sclerosis over confirmation of an astrocytoma seen on multiple MRIs in December of 2014 and February of 2015;

c)    Negligently failing to appreciate the relationship between the patient's double vision, inability to look far lateral left eye and MRI findings within the pons as signs and symptoms more consistent with a brain tumor than an L CN 6 palsy or Multiple Sclerosis as wrongfully interpreted by their agent Defendants Jacobs and Lacey, PA-C;

d)    Negligently allowing a certified physician's assistant, Defendant Mark Lacey, PA-C, or Heather Paduck, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurosurgeon Jacobs who does not event appear to have authored an attending note for the initial neurosurgery consultation on December 24, 2014;

e)    Negligently interpreting the MRI of the brain through their agent,

Mark Lacey, PA-C, as only showing diffuse abnormal signal intensity within the pons;

f)   Negligently failing to ensure review of the patient's MRI films from December 11, 2014 by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

g)   Negligently allowing Defendants Lacey, PA-C and Jacobs to interpret the MRI film as failing to reveal an astrocytoma when they did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

h)   Negligently diagnosing the patient only with an L CN 6th palsy through their agents, Defendant Lacey, Paduck, PA-C and Defendant Jacobs when, in fact, she had an astrocytoma brain tumor visible on MRI and in need of a biopsy;

i)   Negligently failing, through their agents, Defendants Jacobs and Lacey, PA-C, Paduck, PA-C, to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

j)   Negligently failing, through their agent, Defendant Jacobs, a Neurosurgeon, to perform a biopsy of the lesion in an effort to correctly diagnose her then existing astrocytoma in order to afford the Plaintiff patient the earliest opportunity for diagnosis, treatment and cure;

k)   Negligently failing, through their agent, Defendant Jacobs and Defendant Lacey, PA-C, to have Sarah DeRichie's films and case evaluated in tumor board as specifically noted as part of the plan on December 24, 2014, more than two (2) years before her delayed diagnosis;

l)   Negligently failing to ensure compliance with standards of care for neurosurgical evaluation of brain lesions through oversight and compliance by Defendants Jacobs and Lacey, PA-C;

m)   Negligently causing a delay in the diagnosis of the Sarah DeRichie's astrocytoma brain tumor as of December 24, 2014, thereby causing an increased risk that the same would go undiagnosed and untreated, as well as increasing the likelihood that it would cause

her premature death;

n)  Negligently causing subsequent treating physicians, including Defendant Neurology Consultant, Nathanson, as well as her primary treaters, to believe that the Plaintiff patient did not have a brain tumor and did not require emergent intervention based on the misdiagnosis of Defendants Jacobs and Lacey, PA-C;

o)  Negligently failing to ever submit Sarah DeRichie's case to the tumor board and/or submitting the case to the tumor board and erroneously concluding that she did not have a brain tumor;

p)  Negligently accepting the interpretation of the February 3, 2015 follow up brain MRI by Defendant Larar as showing no change in the pons lesion and relying upon the same to rule out a brain tumor when the etiology of the lesion remained unknown on February 11, 2015;

q)  Negligently continuing through their agent Defendants Jacobs and Lacey, PA-C, to diagnose the Plaintiff patient with an L CN 6 palsy only, based on the lesion in the pons of unknown etiology;

r)  Negligently failing to identify the resident who did the note for documented findings and plan of care for the February 11, 2015 neurosurgery consultation;

s)  Negligently relying upon a spinal tap for a diagnosis of Multiple Sclerosis in the presence of an unresolved brain lesion with etiology that included possible astrocytoma diagnosis through their agents, Defendant Jacobs and Defendant Lacey, PA-C, Paduck, PA-C, and the unidentified resident;

t)  Negligently failing to follow up on a plan to perform an MRI in three (3) or six (6) months' time.  Neither Defendant agents, Jacobs, Lacey, PA-C, or Paduck, PA-C, ever scheduled a follow up MRI for Sarah DeRichie within three (3) or six (6) months of her February 11, 2015 follow up neurosurgery consultation;

u)  Failing to offer any explanation as of February 11, 2015 as to why Sarah DeRichie's films and case facts were not shared at tumor board conference as planned on December 24, 2014, thereby increasing the likelihood that her astrocytoma would go undiagnosed, untreated and hasten her premature death;

v)  Negligently delaying, through their agents, Defendants Jacobs and Lacey, PA-C, and Defendant Paduck, PA-C, presentation of her case at Geisinger tumor board conference from December 24, 2014, through February 11, 2015, through January 14, 2017, the approximate time when her tumor was ultimately and belatedly diagnosed;

w)  Negligently failing to ever conduct an updated neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite planning to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

x)  Negligently failing, through their agents, Defendants Jacobs and Lacey, PA-C, and Defendant Paduck, PA-C, to correctly diagnose or obtain a diagnosis of Sarah DeRichie's astrocytoma brain tumor on February 11, 2015 or any time prior to January 14, 2017;

y)  Negligently failing, through their agents, Defendants Nathanson and Pombo, PA-C, to diagnose and/or assist with the diagnosis of astrocytoma brain tumor, the incorrect diagnosis of Multiple Sclerosis (MS);

z)  Negligently suspecting that the patient had Multiple Sclerosis through their agents, Defendants Nathanson and Pombo, PA-C, when the patient's history, examination findings and test results did not support the diagnosis of MS;

aa)  Negligently suspecting a diagnosis of MS, despite the fact that the patient's primary and counter diagnosis was a brain stem lesion which Defendant Nathanson did nothing to further investigate or rule out an astrocytoma;

bb)  Negligently failing to follow up on a large lesion in the pons to determine whether it was a tumor and whether it was causing her neurologic dysfunction through their agents, Defendants, Nathanson and Pombo, PA-C;

cc)  Negligently suspecting demyelinating lesion, despite the fact that Defendants Nathanson and Pombo, PA-C, could not rule out a tumor;

dd)  Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had

103

a brain tumor, through their agent Defendants, Nathanson and Pombo, PA-C;

ee) Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

ff) Negligently suspecting a diagnosis of MS without ruling out a brain tumor when historical information, including no other family history of MS, and increase for MS symptoms were negative, in the presence of a known large lesion in the brain for which a tumor could not be ruled out as the etiological source;

gg) Negligently failing to diagnose or order an appropriate biopsy as of January 16, 2015 in order to definitively diagnose the Plaintiff patient's lesion through their agents, Defendants Nathanson and Pombo, PA-C;

hh) Negligently diagnosing and treating Sarah DeRichie for MS based on marginal lumbar puncture results, absent history, physical examination findings and other test results and in the presence of a known lesion for which a tumor was not ruled out, thereby resulting in delayed diagnosis by Defendants agents, Nathanson, Paduck, PA-C, and Pombo, PA-C, and subsequent treating physicians thereby increasing the risk that she would not have an opportunity for a cure, treatment and/or that it would hasten her premature death;

ii) Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

jj) Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine whether there had been resolution of her undiagnosed brain lesion; and,

kk) Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions.

154. As a direct and proximate result of the negligence of Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, and their agents, Defendant Jacobs, Lacey,

PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, and their agents, servants and

employees, as described herein, jointly and severally, Sarah DeRichie suffered serious,

catastrophic and irreversible injuries, including death, together with damages and losses

as set forth in the preceding and subsequent paragraphs which include:

a) The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b) The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c) The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d) The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e) The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f) The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

155.   At all relevant times, Defendants, Geisinger Clinic d/b/a Geisinger

Wyoming Valley Medical Center, through their agents, Defendants Jacobs, Lacey, PA-C,

Paduck, PA-C, Nathanson and Pombo, PA-C, as well as others whose names cannot be

deciphered in Sarah DeRichie's medical records who participated in the care of Sarah

DeRichie, as more specifically described herein, as agents, servants and/or employees,

who provided medical care and treatment to Sarah DeRichie, acting within the course

and scope of their actual, apparent and/or ostensible agency and/or employment with

Defendants, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center.

Accordingly, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center are derivatively liable for the negligent acts and omissions of Defendants Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, as well as others whose names cannot be deciphered in Sarah DeRichie's medical records, who participated in her care from December of 2014 through the date of her death on May 1, 2017, as more specifically described herein, under principals of *respondeat superior*, master-servant, vicarious liability, agency or right of control.

156.    The foregoing negligence of Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, as well as their agents, Defendants Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, as well as those other agents whose names cannot be deciphered in Sarah DeRichie's medical records who participated in her care as more specifically described herein, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

157.    As the direct and proximate result of the negligent acts and/or omissions of Defendants Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, as well as their agents, Defendants Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, and their agents, servants or employees who cannot be identified in the record presently, deprived Sarah DeRichie of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

158.    As a direct and proximate result of the negligence of the aforementioned Defendants Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, and their

agents, servants and/or employees as described herein, and those who cannot be identified in the record presently, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendants, Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center, jointly and severally, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT IX

## NEGLIGENCE

## MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

## VS.

## DARREN L. JACOBS, D.O.

159.    The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

160.    Defendant, Darren L. Jacobs, D.O., was negligent under the circumstances in all or some of the following ways:

a)    Negligently failing to correctly diagnose and/or assist with the diagnosis of astrocytoma brain tumor, as opposed to Multiple Sclerosis, thereby resulting in a significant delay in the diagnosis of the Plaintiff patient's brain tumor which increased the likelihood that it will cause her premature death;

b)    Negligently and incorrectly diagnosing Sarah DeRichie with Multiple

Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as opposed to astrocytoma brain tumor when he knew or should have known there was scant historical testing or examination findings to support a diagnosis of Multiple Sclerosis over confirmation of an astrocytoma seen on multiple MRIs in December of 2014 and February of 2015;

c)     Negligently failing to appreciate the relationship between the patient's double vision, inability to look far lateral left eye and MRI findings within the pons as signs and symptoms more consistent with a brain tumor than an L CN 6 palsy or Multiple Sclerosis;

d)     Negligently allowing a certified physician's assistant, Defendant Mark Lacey, PA-C and Heather Paduck, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurosurgeon Jacobs, who does not event appear to have authored an attending note for the initial Neurosurgery consultation on December 24, 2014;

e)     Negligently interpreting the MRI of the brain as only showing diffuse abnormal signal intensity within the pons;

f)     Negligently failing to ensure review of the patient's MRI films from December 11, 2014 by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

g)     Negligently allowing Defendants Lacey, PA-C and Paduck, PA-C to interpret the MRI film as failing to reveal an astrocytoma when they did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

h)     Negligently diagnosing the patient only with an L CN 6th palsy when, in fact, she had an astrocytoma brain tumor visible on MRI and in need of a biopsy;

i)     Negligently failing to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

j)     Negligently failing to perform a biopsy of the lesion in an effort to correctly diagnose her then existing astrocytoma in order to afford the Plaintiff patient the earliest opportunity for diagnosis, treatment

and cure;

k)      Negligently failing to have Sarah DeRichie's films and case
        evaluated in tumor board as specifically noted as part of the plan
        on December 24, 2014, more than two (2) years before her
        delayed diagnosis;

l)      Negligently failing to ensure compliance with standards of care for
        neurosurgical evaluation of brain lesions through oversight and
        compliance;

m)      Negligently causing a delay in the diagnosis of the Sarah DeRichie's
        astrocytoma brain tumor as of December 24, 2014, thereby causing
        an increased risk that the same would go undiagnosed and
        untreated, as well as increasing the likelihood that it would cause
        her premature death;

n)      Negligently causing subsequent treating physicians, including
        Defendant Neurology Consultant, Nathanson, as well as her
        primary treaters, to believe that the Plaintiff patient did not have a
        brain tumor and did not require emergent intervention based on
        the misdiagnosis of Defendants Jacobs and Lacey, PA-C;

o)      Negligently failing to ever submit Sarah DeRichie's case to the
        tumor board and/or submitting the case to the tumor board and
        erroneously concluding that she did not have a brain tumor;

p)      Negligently accepting the interpretation of the February 3, 2015
        follow up brain MRI by Defendant Larar as showing no change in
        the pons lesion and relying upon the same to rule out a brain
        tumor when the etiology of the lesion remained unknown on
        February 11, 2015;

q)      Negligently continuing to diagnose the Plaintiff patient with an L CN
        6 palsy only, based on the lesion in the pons of unknown etiology;

r)      Negligently failing to identify the Resident Physician who did the
        note for documented findings and plan of care for the February 11,
        2015 neurosurgery consultation;

s)      Negligently relying upon a spinal tap for a diagnosis of Multiple
        Sclerosis in the presence of an unresolved brain lesion with etiology
        that included possible astrocytoma diagnosis;

t)   Negligently failing to follow up on a plan to perform an MRI in three (3) or six (6) months' time.  Neither Defendant agents, Jacobs or Lacey, PA-C, or Paduck, PA-C, ever scheduled a follow up MRI for Sarah DeRichie within three (3) or six (6) months of her February 11, 2015 follow up neurosurgery consultation;

u)   Failing to offer any explanation as of February 11, 2015 as to why Sarah DeRichie's films and case facts were not shared at tumor board conference as planned on December 24, 2014, thereby increasing the likelihood that her astrocytoma would go undiagnosed, untreated and hasten her premature death;

v)   Negligently delaying, through their agents, Defendants Jacobs and Lacey, PA-C, presentation of her case at Geisinger tumor board conference from December 24, 2014, through February 11, 2015, through January 14, 2017, the approximate time when her tumor was ultimately and belatedly diagnosed;

w)   Negligently failing to ever conduct an updated neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite planning to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

x)   Negligently failing to correctly diagnose or obtain a diagnosis of Sarah DeRichie's astrocytoma brain tumor on February 11, 2015 or any time prior to January 14, 2017;

y)   Negligently suspecting demyelinating lesion, despite the fact that a tumor could not be ruled out;

z)   Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had a brain tumor;

aa)  Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

bb)  Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

cc)   Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine whether there had been resolution of her undiagnosed brain lesion; and,

dd)   Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions.

161.   As a direct and proximate result of the negligence of Defendant Jacobs, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)   The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)   The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)   The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)   The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)   The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

162.   The foregoing negligence of Defendant Jacobs, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

163.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Jacobs, Sarah DeRichie was deprived of necessary, timely and appropriate

111

evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

164.    As a direct and proximate result of the negligence of the aforementioned Defendant Jacobs, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against Defendant, Darren L. Jacobs, D.O., in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT X

## NEGLIGENCE

## MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

## VS.

## MARK A. LACEY, PA-C

165.    The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

166.    Defendant, Mark A. Lacey, PA-C, was negligent under the circumstances in all or some of the following ways:

    a)    Negligently failing to correctly diagnose and/or assist with the diagnosis of astrocytoma brain tumor, as opposed to Multiple Sclerosis, thereby resulting in a significant delay in the diagnosis of the Plaintiff patient's brain tumor which increased the likelihood that it will cause her premature death;

    b)    Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as opposed to astrocytoma brain tumor when he knew or should have

known there was scant historical testing or examination findings to support a diagnosis of Multiple Sclerosis over confirmation of an astrocytoma seen on multiple MRIs in December of 2014 and February of 2015;

c)    Negligently failing to appreciate the relationship between the patient's double vision, inability to look far lateral left eye and MRI findings within the pons as signs and symptoms more consistent with a brain tumor than an L CN 6 palsy or Multiple Sclerosis;

d)    Negligently allowing a certified physician's assistant, Defendant Mark Lacey, PA-C and Heather Paduck, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurosurgeon Jacobs, who does not event appear to have authored an attending note for the initial Neurosurgery consultation on December 24, 2014;

e)    Negligently interpreting the MRI of the brain as only showing diffuse abnormal signal intensity within the pons;

f)    Negligently failing to ensure review of the patient's MRI films from December 11, 2014 by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

g)    Negligently allowing Defendants Lacey, PA-C and Paduck, PA-C to interpret the MRI film as failing to reveal an astrocytoma when they did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

h)    Negligently diagnosing the patient only with an L CN 6th palsy when, in fact, she had an astrocytoma brain tumor visible on MRI and in need of a biopsy;

i)    Negligently failing to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

j)    Negligently failing to perform a biopsy of the lesion in an effort to correctly diagnose her then existing astrocytoma in order to afford the Plaintiff patient the earliest opportunity for diagnosis, treatment and cure;

k)   Negligently failing to have Sarah DeRichie's films and case evaluated in tumor board as specifically noted as part of the plan on December 24, 2014, more than two (2) years before her delayed diagnosis;

l)   Negligently failing to ensure compliance with standards of care for neurosurgical evaluation of brain lesions through oversight and compliance;

m)   Negligently causing a delay in the diagnosis of the Sarah DeRichie's astrocytoma brain tumor as of December 24, 2014, thereby causing an increased risk that the same would go undiagnosed and untreated, as well as increasing the likelihood that it would cause her premature death;

n)   Negligently causing subsequent treating physicians, including Defendant Neurology Consultant, Nathanson, as well as her primary treaters, to believe that the Plaintiff patient did not have a brain tumor and did not require emergent intervention based on the misdiagnosis of Defendants Jacobs and Lacey, PA-C;

o)   Negligently failing to ever submit Sarah DeRichie's case to the tumor board and/or submitting the case to the tumor board and erroneously concluding that she did not have a brain tumor;

p)   Negligently accepting the interpretation of the February 3, 2015 follow up brain MRI by Defendant Larar as showing no change in the pons lesion and relying upon the same to rule out a brain tumor when the etiology of the lesion remained unknown on February 11, 2015;

q)   Negligently continuing to diagnose the Plaintiff patient with an L CN 6 palsy only, based on the lesion in the pons of unknown etiology;

r)   Negligently failing to identify the Resident Physician who did the note for documented findings and plan of care for the February 11, 2015 neurosurgery consultation;

s)   Negligently relying upon a spinal tap for a diagnosis of Multiple Sclerosis in the presence of an unresolved brain lesion with etiology that included possible astrocytoma diagnosis;

t)   Negligently failing to follow up on a plan to perform an MRI in three (3) or six (6) months' time.  Neither Defendant agents, Jacobs or

Lacey, PA-C, or Paduck, PA-C, ever scheduled a follow up MRI for Sarah DeRichie within three (3) or six (6) months of her February 11, 2015 follow up neurosurgery consultation;

u)    Failing to offer any explanation as of February 11, 2015 as to why Sarah DeRichie's films and case facts were not shared at tumor board conference as planned on December 24, 2014, thereby increasing the likelihood that her astrocytoma would go undiagnosed, untreated and hasten her premature death;

v)    Negligently delaying, through their agents, Defendants Jacobs and Lacey, PA-C, presentation of her case at Geisinger tumor board conference from December 24, 2014, through February 11, 2015, through January 14, 2017, the approximate time when her tumor was ultimately and belatedly diagnosed;

w)    Negligently failing to ever conduct an updated neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite planning to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

x)    Negligently failing to correctly diagnose or obtain a diagnosis of Sarah DeRichie's astrocytoma brain tumor on February 11, 2015 or any time prior to January 14, 2017;

y)    Negligently suspecting demyelinating lesion, despite the fact that a tumor could not be ruled out;

z)    Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had a brain tumor;

aa)   Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

bb)   Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

cc)   Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine

whether there had been resolution of her undiagnosed brain lesion; and,

dd)    Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions.

167.    As a direct and proximate result of the negligence of Defendant Lacey, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)    The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)    The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)    The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)    The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)    The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)    The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

168.    The foregoing negligence of Defendant Lacey, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

169.    As the direct and proximate result of the negligent acts and/or omissions of Defendant Lacey, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it

to further progress and become life threatening before causing her untimely death.

170.   As a direct and proximate result of the negligence of the aforementioned

Defendant Lacey, Sarah DeRichie suffered catastrophic, permanent and fatal injuries

and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against Defendant, Mark A. Lacey,

PA-C, in an amount in excess of the applicable arbitration limits of Seventy-Five

Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT XI

## NEGLIGENCE

## MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
## OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

## VS.

## HEATHER R. PADUCK, PA-C

171.   The preceding paragraphs of this Complaint are incorporated as though

fully set forth herein.

172.   Defendant, Heather R. Paduck, PA-C, was negligent under the

circumstances in all or some of the following ways:

  a)   Negligently failing to correctly diagnose and/or assist with the diagnosis of astrocytoma brain tumor, as opposed to Multiple Sclerosis, thereby resulting in a significant delay in the diagnosis of the Plaintiff patient's brain tumor which increased the likelihood that it will cause her premature death;

  b)   Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as opposed to astrocytoma brain tumor when he knew or should have known there was scant historical testing or examination findings to support a diagnosis of Multiple Sclerosis over confirmation of an

117

astrocytoma seen on multiple MRIs in December of 2014 and February of 2015;

c)  Negligently failing to appreciate the relationship between the patient's double vision, inability to look far lateral left eye and MRI findings within the pons as signs and symptoms more consistent with a brain tumor than an L CN 6 palsy or Multiple Sclerosis;

d)  Negligently allowing a certified physician's assistant, Defendant Mark Lacey, PA-C and Heather Paduck, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurosurgeon Jacobs, who does not event appear to have authored an attending note for the initial Neurosurgery consultation on December 24, 2014;

e)  Negligently interpreting the MRI of the brain as only showing diffuse abnormal signal intensity within the pons;

f)  Negligently failing to ensure review of the patient's MRI films from December 11, 2014 by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

g)  Negligently allowing Defendants Lacey, PA-C and Paduck, PA-C to interpret the MRI film as failing to reveal an astrocytoma when they did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

h)  Negligently diagnosing the patient only with an L CN 6th palsy when, in fact, she had an astrocytoma brain tumor visible on MRI and in need of a biopsy;

i)  Negligently failing to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

j)  Negligently failing to perform a biopsy of the lesion in an effort to correctly diagnose her then existing astrocytoma in order to afford the Plaintiff patient the earliest opportunity for diagnosis, treatment and cure;

k)  Negligently failing to have Sarah DeRichie's films and case evaluated in tumor board as specifically noted as part of the plan

on December 24, 2014, more than two (2) years before her delayed diagnosis;

l)      Negligently failing to ensure compliance with standards of care for neurosurgical evaluation of brain lesions through oversight and compliance;

m)     Negligently causing a delay in the diagnosis of the Sarah DeRichie's astrocytoma brain tumor as of December 24, 2014, thereby causing an increased risk that the same would go undiagnosed and untreated, as well as increasing the likelihood that it would cause her premature death;

n)      Negligently causing subsequent treating physicians, including Defendant Neurology Consultant, Nathanson, as well as her primary treaters, to believe that the Plaintiff patient did not have a brain tumor and did not require emergent intervention based on the misdiagnosis of Defendants Jacobs and Lacey, PA-C;

o)      Negligently failing to ever submit Sarah DeRichie's case to the tumor board and/or submitting the case to the tumor board and erroneously concluding that she did not have a brain tumor;

p)      Negligently accepting the interpretation of the February 3, 2015 follow up brain MRI by Defendant Larar as showing no change in the pons lesion and relying upon the same to rule out a brain tumor when the etiology of the lesion remained unknown on February 11, 2015;

q)      Negligently continuing to diagnose the Plaintiff patient with an L CN 6 palsy only, based on the lesion in the pons of unknown etiology;

r)      Negligently failing to identify the Resident Physician who did the note for documented findings and plan of care for the February 11, 2015 neurosurgery consultation;

s)      Negligently relying upon a spinal tap for a diagnosis of Multiple Sclerosis in the presence of an unresolved brain lesion with etiology that included possible astrocytoma diagnosis;

t)      Negligently failing to follow up on a plan to perform an MRI in three (3) or six (6) months' time.  Neither Defendant agents, Jacobs or Lacey, PA-C, or Paduck, PA-C, ever scheduled a follow up MRI for Sarah DeRichie within three (3) or six (6) months of her February

119

11, 2015 follow up neurosurgery consultation;

u)    Failing to offer any explanation as of February 11, 2015 as to why Sarah DeRichie's films and case facts were not shared at tumor board conference as planned on December 24, 2014, thereby increasing the likelihood that her astrocytoma would go undiagnosed, untreated and hasten her premature death;

v)    Negligently delaying, through their agents, Defendants Jacobs and Lacey, PA-C, presentation of her case at Geisinger tumor board conference from December 24, 2014, through February 11, 2015, through January 14, 2017, the approximate time when her tumor was ultimately and belatedly diagnosed;

w)    Negligently failing to ever conduct an updated neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite planning to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

x)    Negligently failing to correctly diagnose or obtain a diagnosis of Sarah DeRichie's astrocytoma brain tumor on February 11, 2015 or any time prior to January 14, 2017;

y)    Negligently suspecting demyelinating lesion, despite the fact that a tumor could not be ruled out;

z)    Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had a brain tumor;

aa)    Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

bb)    Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

cc)    Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine whether there had been resolution of her undiagnosed brain lesion; and,

dd)   Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions.

173.   As a direct and proximate result of the negligence of Defendant Jacobs, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)   The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)   The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)   The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)   The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)   The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

174.   The foregoing negligence of Defendant Paduck, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

175.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Paduck, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely

death.

176.   As a direct and proximate result of the negligence of the aforementioned

Defendant Paduck, Sarah DeRichie suffered catastrophic, permanent and fatal injuries

and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against Defendant, Heather R.

Paduck, PA-C, in an amount in excess of the applicable arbitration limits of Seventy-Five

Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

**COUNT XII**

**NEGLIGENCE**

**MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF SARAH E. DERICHIE, DECEASED**

**VS.**

**DOUGLAS C. NATHANSON, M.D.**

177.   The preceding paragraphs of this Complaint are incorporated as though

fully set forth herein.

178.   Defendant, Douglas C. Nathanson, M.D., was negligent under the

circumstances in all or some of the following ways:

a)   Negligently failing to correctly diagnose and/or assist with the diagnosis of astrocytoma brain tumor, as opposed to Multiple Sclerosis, thereby resulting in a significant delay in the diagnosis of the Plaintiff patient's brain tumor which increased the likelihood that it will cause her premature death;

b)   Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as opposed to astrocytoma brain tumor when they knew or should have known there was scant historical testing or examination findings to support a diagnosis of Multiple Sclerosis over

122

confirmation of an astrocytoma seen on multiple MRIs in December of 2014 and February of 2015;

c)      Negligently failing to appreciate the relationship between the patient's double vision, inability to look far lateral left eye and MRI findings within the pons as signs and symptoms more consistent with a brain tumor than an L CN 6 palsy or Multiple Sclerosis;

d)      Negligently allowing a certified physician's assistant, Defendant Pombo, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurologist Nathanson who does not event appear to have authored an attending notes for each consultation;

e)      Negligently interpreting the MRI of the brain, as only showing diffuse abnormal signal intensity within the pons;

f)      Negligently failing to ensure review of the patient's MRI films from December 11, 2014 and February 3, 2015, by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

g)      Negligently interpreting the MRI films as failing to reveal an astrocytoma when he did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

h)      Negligently diagnosing the patient only with an L CN 6th palsy when, in fact, she had an astrocytoma brain tumor visible on MRI and was in need of a biopsy;

i)      Negligently failing to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

j)      Negligently failing to have Sarah DeRichie's films and case evaluated in tumor board as specifically noted as part of the neurosurgery plan on December 24, 2014, more than two (2) years before her delayed diagnosis;

k)      Negligently failing to ensure compliance with standards of care for neurological evaluation of brain lesions;

l)      Negligently causing a delay in the diagnosis of the Sarah DeRichie's

astrocytoma brain tumor, thereby causing an increased risk that the same would go undiagnosed and untreated, as well as increasing the likelihood that it would cause her premature death;

m) Negligently causing subsequent treating physicians, including her primary treaters, to believe that the Plaintiff patient did not have a brain tumor and did not require emergent intervention;

n) Negligently failing to ever submit Sarah DeRichie's case to the tumor board and/or submitting the case to the tumor board and erroneously concluding that she did not have a brain tumor;

o) Negligently accepting the interpretation of the February 3, 2015 follow up brain MRI by Defendant Larar as showing no change in the pons lesion and relying upon the same to rule out a brain tumor when the etiology of the lesion remained unknown on February 11, 2015;

p) Negligently continuing to diagnose the Plaintiff patient with an L CN 6 palsy only, based on the lesion in the pons of unknown etiology;

q) Negligently relying upon a spinal tap for a diagnosis of Multiple Sclerosis in the presence of an unresolved brain lesion with etiology that included possible astrocytoma diagnosis when he knew of false/positives with such findings;

r) Negligently failing to obtain an updated Neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite the need to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

s) Negligently failing to diagnose and/or assist with the diagnosis of astrocytoma brain tumor, the incorrect diagnosis of Multiple Sclerosis (MS);

t) Negligently suspecting that the patient had Multiple Sclerosis when the patient's history, examination findings and test results did not support the diagnosis of MS;

u) Negligently suspecting a diagnosis of MS, despite the fact that the patient's primary and counter diagnosis was a brain stem lesion which he did nothing to further investigate or rule out an astrocytoma;

v) Negligently failing to follow up on a large lesion in the pons to determine whether it was a tumor and whether it was causing her neurologic dysfunction;

w) Negligently suspecting demyelinating lesion, despite the fact that could not rule out a tumor;

x) Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had a brain tumor;

y) Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

z) Negligently suspecting a diagnosis of MS without ruling out a brain tumor when historical information, including no other family history of MS, indices for MS symptoms were negative, in the presence of a known large lesion in the brain for which a tumor could not be ruled out as the etiological source;

aa) Negligently failing to diagnose or order an appropriate biopsy as of January 16, 2015 in order to definitively diagnose the Plaintiff patient's lesion;

bb) Negligently diagnosing Sarah DeRichie with MS based on marginal lumbar puncture results, absent history, physical examination findings and other test results, and in the presence of a known lesion for which a tumor was not ruled out, thereby resulting in delayed diagnosis thereby increasing the risk that she would not have an opportunity for a cure, treatment and/or that it would hasten her premature death;

cc) Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

dd) Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine whether there had been resolution of her undiagnosed brain lesion; and,

    ee)    Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions.

179.    As a direct and proximate result of the negligence of Defendant Nathanson, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

    a)    The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

    b)    The Plaintiff decedent, Sarah DeRichie, became progressively ill;

    c)    The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

    d)    The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

    e)    The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

    f)    The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

180.    The foregoing negligence of Defendant Nathanson, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

181.    As the direct and proximate result of the negligent acts and/or omissions of Defendant Nathanson, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely

death.

182.   As a direct and proximate result of the negligence of the aforementioned

Defendant Nathanson, Sarah DeRichie suffered catastrophic, permanent and fatal

injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against Defendant, Douglas C.

Nathanson, M.D., in an amount in excess of the applicable arbitration limits of Seventy-

Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT XIII

## NEGLIGENCE

## MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

## VS.

## GLORIA A. POMBO, PA-C

183.   The preceding paragraphs of this Complaint are incorporated as though

fully set forth herein.

184.   Defendant, Gloria A. Pombo, PA-C, was negligent under the circumstances

in all or some of the following ways:

a)   Negligently failing to correctly diagnose and/or assist with the diagnosis of astrocytoma brain tumor, as opposed to Multiple Sclerosis, thereby resulting in a significant delay in the diagnosis of the Plaintiff patient's brain tumor which increased the likelihood that it will cause her premature death;

b)   Negligently and incorrectly diagnosing Sarah DeRichie with Multiple Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as opposed to astrocytoma brain tumor when they knew or should have known there was scant historical testing or examination findings to support a diagnosis of Multiple Sclerosis over

confirmation of an astrocytoma seen on multiple MRIs in December of 2014 and February of 2015;

c)      Negligently failing to appreciate the relationship between the patient's double vision, inability to look far lateral left eye and MRI findings within the pons as signs and symptoms more consistent with a brain tumor than an L CN 6 palsy or Multiple Sclerosis;

d)      Negligently allowing a certified physician's assistant, Defendant Pombo, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurologist Nathanson who does not event appear to have authored an attending notes for each consultation;

e)      Negligently interpreting the MRI of the brain, as only showing diffuse abnormal signal intensity within the pons;

f)      Negligently failing to ensure review of the patient's MRI films from December 11, 2014 and February 3, 2015, by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

g)      Negligently interpreting the MRI films as failing to reveal an astrocytoma when he did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

h)      Negligently diagnosing the patient only with an L CN 6th palsy when, in fact, she had an astrocytoma brain tumor visible on MRI and was in need of a biopsy;

i)      Negligently failing to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

j)      Negligently failing to have Sarah DeRichie's films and case evaluated in tumor board as specifically noted as part of the neurosurgery plan on December 24, 2014, more than two (2) years before her delayed diagnosis;

k)      Negligently failing to ensure compliance with standards of care for neurological evaluation of brain lesions;

l)      Negligently causing a delay in the diagnosis of the Sarah DeRichie's

astrocytoma brain tumor, thereby causing an increased risk that the same would go undiagnosed and untreated, as well as increasing the likelihood that it would cause her premature death;

m) Negligently causing subsequent treating physicians, including her primary treaters, to believe that the Plaintiff patient did not have a brain tumor and did not require emergent intervention;

n) Negligently failing to ever submit Sarah DeRichie's case to the tumor board and/or submitting the case to the tumor board and erroneously concluding that she did not have a brain tumor;

o) Negligently accepting the interpretation of the February 3, 2015 follow up brain MRI by Defendant Larar as showing no change in the pons lesion and relying upon the same to rule out a brain tumor when the etiology of the lesion remained unknown on February 11, 2015;

p) Negligently continuing to diagnose the Plaintiff patient with an L CN 6 palsy only, based on the lesion in the pons of unknown etiology;

q) Negligently relying upon a spinal tap for a diagnosis of Multiple Sclerosis in the presence of an unresolved brain lesion with etiology that included possible astrocytoma diagnosis when he knew of false/positives with such findings;

r) Negligently failing to obtain an updated Neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite the need to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

s) Negligently failing to diagnose and/or assist with the diagnosis of astrocytoma brain tumor, the incorrect diagnosis of Multiple Sclerosis (MS);

t) Negligently suspecting that the patient had Multiple Sclerosis when the patient's history, examination findings and test results did not support the diagnosis of MS;

u) Negligently suspecting a diagnosis of MS, despite the fact that the patient's primary and counter diagnosis was a brain stem lesion which he did nothing to further investigate or rule out an astrocytoma;

v)      Negligently failing to follow up on a large lesion in the pons to determine whether it was a tumor and whether it was causing her neurologic dysfunction;

w)      Negligently suspecting demyelinating lesion, despite the fact that could not rule out a tumor;

x)      Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had a brain tumor;

y)      Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

z)      Negligently suspecting a diagnosis of MS without ruling out a brain tumor when historical information, including no other family history of MS, indices for MS symptoms were negative, in the presence of a known large lesion in the brain for which a tumor could not be ruled out as the etiological source;

aa)     Negligently failing to diagnose or order an appropriate biopsy as of January 16, 2015 in order to definitively diagnose the Plaintiff patient's lesion;

bb)     Negligently diagnosing Sarah DeRichie with MS based on marginal lumbar puncture results, absent history, physical examination findings and other test results, and in the presence of a known lesion for which a tumor was not ruled out, thereby resulting in delayed diagnosis thereby increasing the risk that she would not have an opportunity for a cure, treatment and/or that it would hasten her premature death;

cc)     Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

dd)     Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine whether there had been resolution of her undiagnosed brain lesion; and,

130

ee)  Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions.

185.  As a direct and proximate result of the negligence of Defendant Pombo, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)  The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)  The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)  The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)  The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)  The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)  The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

186.  The foregoing negligence of Defendant Pombo, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

187.  As the direct and proximate result of the negligent acts and/or omissions of Defendant Pombo, Sarah DeRichie was deprived of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

188.   As a direct and proximate result of the negligence of the aforementioned Defendant Pombo, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against Defendant, Gloria A. Pombo, PA-C, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT XIV

## NEGLIGENCE

## MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

## VS.

## GEISINGER HEALTH SYSTEM FOUNDATION

189.   The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

190.   The negligence of Geisinger Health System Foundation, acting by and through their actual, apparent and/or ostensible agents, servants and employees, who participated in the care of Sarah DeRichie, as described herein, including, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging and their agents, Defendant Mark M. Skevofilax, D.O. and Defendant, Gerald N. Larar, M.D., Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and their agents, Defendants, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, as well as those medical providers in the Plaintiff-patient's medical records unknown to the Plaintiff presently as their names cannot be deciphered from

the records but who participated in the care of Sarah DeRichie from December 2014

through May of 2017, as more specifically described herein, consisted of one or more of

the following:

a)   Negligently allowing Defendant Skevofilax to interpret Sarah DeRichie's MRI of the brain when they knew, or should have known, that he was not sufficiently skilled to differentiate between a benign lesion and an astrocytoma brain tumor and/or make appropriate recommendations for clinical follow up to confirm the accurate diagnosis;

b)   Negligently allowing Defendant Larar to interpret Sarah DeRichie's MRI of the brain when they knew, or should have known, that he was not sufficiently skilled to differentiate between a benign lesion and an astrocytoma brain tumor and/or make appropriate recommendations for clinical follow up to confirm the accurate diagnosis;

c)   Negligently entrusting Defendant Skevofilax to follow up with the ordering and primary care providers with regard to the serious nature of the findings on Sarah DeRichie's December 11, 2014 MRI of the brain which required accurate diagnosis of her astrocytoma, prompt notification to her health care providers and a recommendation for follow up studies;

d)   Negligently entrusting Defendant Larar to follow up with the ordering and primary care providers with regard to the serious nature of the findings on Sarah DeRichie's December 11, 2014 MRI of the brain which required accurate diagnosis of her astrocytoma, prompt notification to her health care providers and a recommendation for follow up studies;

e)   Negligently failing, through their agent, Defendant Skevofilax, to timely and accurately diagnose Sarah DeRichie's astrocytoma at the earliest opportunity on the December 11, 2014 MRI of the brain;

f)   Negligently failing, through their agent, Defendant Skevofilax, to ensure that the ordering and treating health care providers conducted clinical correlation of the clinical findings to ensure that the diagnosis of brain tumor was not missed;

g)   Negligently failing, through their agent, Defendant Skevofilax, to

comply with the American College of Radiology (ACR) standards for interpretation, documentation, diagnosis and subsequent communication of MRI findings, recommended correlation and required studies for accurate diagnosis;

h)    Negligently failing, through their agent, Defendant Larar, to comply with the American College of Radiology (ACR) standards for interpretation, documentation, diagnosis and subsequent communication of MRI findings, recommended correlation and required studies for accurate diagnosis;

i)    Negligently diagnosing, through their agent, Defendant Skevofilax, the Plaintiff-patient's condition on December 11, 2014 as a possible demyelinating disease rather than a neoplasm, including an astrocytoma;

j)    Negligently failing, through their agent, Defendant Skevofilax, to appreciate the significance of the MRI findings including the nature of the abnormal signal intensity in the pons cerebellar tonsils lying approximately 7 mm below the foramen magnum, mistakenly suggesting a Chiari I malformation, as opposed to a neoplastic process;

k)    Negligently failing, through their agent, Defendant Skevofilax, to properly communicate to the ordering and/or primary physician the significance of the MRI brain findings and the need for specific follow up to rule out a brain tumor;

l)    Negligently failing, through their agent, Defendant Skevofilax, to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

m)    Negligently failing, through their agent, Defendant Larar, to communicate the serious nature of the brain MRI findings, including the presence of a large pontine lesion, and possibility of a brain tumor, so that she and her family could follow up with appropriate testing and/or an appropriate specialist;

n)    Negligently causing the delay in diagnosis of the Plaintiff-patient's astrocytoma brain tumor through their agent, Defendant Skevofilax, by failing to diagnose the same on MRI so that it could be diagnosed and treated as soon as possible thereby increasing

134

the chances of cure, responsiveness to treatment and survival;

o)    Negligently causing the delay in diagnosis of the Plaintiff-patient's astrocytoma brain tumor through their agent, Defendant Larar, by failing to diagnose the same on MRI so that it could be diagnosed and treated as soon as possible thereby increasing the chances of cure, responsiveness to treatment and survival;

p)    Negligently increasing the risk that the astrocytoma brain tumor would go undiagnosed and/or be delayed in diagnosis by failing to diagnose the same on MRI brain study through the actions or inactions of their agent, Defendant Skevofilax;

q)    Negligently increasing the risk that the astrocytoma brain tumor would go undiagnosed and/or be delayed in diagnosis by failing to diagnose the same on MRI brain study through the actions or inactions of their agent, Defendant Larar;

r)    Negligently causing subsequent evaluating physicians to misdiagnose and/or mischaracterize the findings on MRI studies interpreted by their agent, Defendant Skevofilax, due to his failure to diagnose the astrocytoma brain tumor;

s)    Negligently causing subsequent evaluating physicians to misdiagnose and/or mischaracterize the findings on MRI studies interpreted by their agent, Defendant Larar, due to his failure to diagnose the astrocytoma brain tumor;

t)    Failing through its agent, Defendant Larar, to accurately diagnose the Plaintiff-patient's astrocytoma brain tumor on February 3, 2015, despite the benefit of the prior December 11, 2014 MRI of the brain for comparison;

u)    Negligently failing, through their agent, Defendant Larar, to accurately diagnose the astrocytoma, as opposed to a benign pontine lesion, resulting in delay in diagnosis of her brain tumor;

v)    Negligently failing, through its agent, Defendant Larar, to recommend clinical correlation including follow up radiological studies or biopsy despite reporting a large region of signal abnormality anteriorly and inferiorly in the pons measuring approximately 1.8 x 3.7 x 1.8 cm in greatest AP, transverse and cephalocaudad extent;

135

w)     Negligently failing to appreciate the changes between the initial MRI on December 11, 2014 and the subsequent MRI of February 3, 2015 including the size of the signal abnormality, and the mild mass effect with pontine enlargement and cerebellar tonsillar ectopia of 3 to 4 mm, based upon the interpretation of their agent, Defendant Larar;

x)     Failing to contact the referring or treating physicians to discuss the findings of the February 3, 2015 follow up MRI despite the fact that the identified lesion remained of indeterminate etiology with benign and malignant etiologies remaining among differential considerations, including a glioma and astrocytoma, as interpreted by their agent, Defendant Larar;

y)     Inaccurately characterizing, through its agent, Defendant Larar, the large pontine lesion of indeterminate etiology as "stable" given the difference between the initial MRI of December 11, 2014 and subsequent MRI of February 3, 20-15;

z)     Negligently recommending clinical correlation and further management "as warranted", without further radiological direction to the referring and treating physicians when their agent, Defendant Larar, knew or should have known that the clinical correlation should have included either CT scanning or biopsy to remove the uncertainty as to whether the lesion was benign or malignant given the risk to health and life of a malignant tumor;

aa)    Negligently delaying, through its agent, Defendant Larar, the diagnosis of astrocytoma by failing to correctly identify the tumor or recommend clinical correlation or recommend clinical correlation in the form of biopsy to confirm the same, thereby increasing the risk that the tumor would grow, undiagnosed and untreated;

bb)    Negligently allowing their agent, Defendant Larar, to continue to interpret brain MRIs when they knew or should have known that he had misinterpreted prior MRIS resulting in legal action by brain injured patients;

cc)    Failing to maintain an up-to-date credentialing file for Defendant Larar;

dd)    Failing to maintain an up-to-date credentialing file for Defendant Skevofilax;

ee)    Failing to conduct random overreads of radiological studies
       performed by Defendant Larar to ensure his continued competency
       and accuracy;

ff)    Failing to conduct random overreads of radiological studies
       performed by Defendant Skevofilax to ensure his continued
       competency and accuracy;

gg)    Negligently allowing Sarah DeRichie to suffer the continued growth
       and related symptoms, pain and suffering from an undiagnosed
       astrocytoma brain tumor by failing, through their agents,
       Defendants Skevofilax and Larar, to timely diagnose or recommend
       appropriate clinical radiological or pathology/biopsy follow up to
       rule out an astrocytoma;

hh)    Failing to ensure compliance with Geisinger Clinic d/b/a Geisinger
       Viewmont Imaging standards of care for interpretation of MRI
       studies of the brain; and,

ii)    Failing to ensure compliance with Geisinger Clinic d/b/a Geisinger
       Viewmont Imaging standards of care for clinical recommendations,
       including follow up with referring or primary physicians, for
       evaluation of a potentially life-threatening lesion.

jj)    Negligently failing through the actions and inactions of Defendants
       Jacobs and Lacey, Paduck, Nathanson and Pombo, to correctly
       diagnose and/or assist with the diagnosis of astrocytoma brain
       tumor, as opposed to Multiple Sclerosis, thereby resulting in a
       significant delay in the diagnosis of the Plaintiff patient's brain
       tumor which increased the likelihood that it will cause her
       premature death;

kk)    Negligently and incorrectly diagnosing Sarah DeRichie with Multiple
       Sclerosis (MS) and/or acquiescing in the diagnosis of MS, as
       opposed to astrocytoma brain tumor, through their agents,
       Defendants Jacobs, Lacey, Paduck, Nathanson and Pombo, when
       they knew or should have known there was scant historical testing
       or examination findings to support a diagnosis of Multiple Sclerosis
       over confirmation of an astrocytoma seen on multiple MRIs in
       December of 2014 and February of 2015;

ll)    Negligently failing to appreciate the relationship between the
       patient's double vision, inability to look far lateral left eye and MRI
       findings within the pons as signs and symptoms more consistent

137

with a brain tumor than an L CN 6 palsy or Multiple Sclerosis as wrongfully interpreted by their agent Defendants Jacobs and Lacey, PA-C;

mm)  Negligently allowing a certified physician's assistant, Defendant Mark Lacey, PA-C, to solely and/or primarily evaluate a patient with findings of a brain lesion without adequate consultation from Defendant Neurosurgeon Jacobs who does not event appear to have authored an attending note for the initial neurosurgery consultation on December 24, 2014;

nn)  Negligently interpreting the MRI of the brain through their agent, Mark Lacey, PA-C, as only showing diffuse abnormal signal intensity within the pons;

oo)  Negligently failing to ensure review of the patient's MRI films from December 11, 2014 by a Board-Certified Radiologist readily available within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

pp)  Negligently allowing Defendants Lacey, PA-C and Jacobs to interpret the MRI film as failing to reveal an astrocytoma when they did not have adequate expertise to render such an interpretation and should have relied on a Board-Certified Radiologist for a consultative opinion within the Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center;

qq)  Negligently diagnosing the patient only with an L CN 6th palsy through their agents, Defendants Lacey, PA-C, Paduck, PA-C and Defendant Jacobs when, in fact, she had an astrocytoma brain tumor visible on MRI and in need of a biopsy;

rr)  Negligently failing, through their agents, Defendants Jacobs and Lacey, PA-C, to obtain a biopsy of the lesion to determine if Sarah DeRichie had a brain tumor;

ss)  Negligently failing, through their agent, Defendant Jacobs, a Neurosurgeon, to perform a biopsy of the lesion in an effort to correctly diagnose her then existing astrocytoma in order to afford the Plaintiff patient the earliest opportunity for diagnosis, treatment and cure;

tt)  Negligently failing, through their agent, Defendant Jacobs and Defendants, Lacey, PA-C and Paduck, PA-C, to have Sarah

138

DeRichie's films and case evaluated in tumor board as specifically noted as part of the plan on December 24, 2014, more than two (2) years before her delayed diagnosis;

uu)   Negligently failing to ensure compliance with standards of care for neurosurgical evaluation of brain lesions through oversight and compliance by Defendants Jacobs, Lacey, PA-C and Paduck, PA-C;

vv)   Negligently causing a delay in the diagnosis of the Sarah DeRichie's astrocytoma brain tumor as of December 24, 2014, thereby causing an increased risk that the same would go undiagnosed and untreated, as well as increasing the likelihood that it would cause her premature death;

ww)   Negligently causing subsequent treating physicians, including Defendant Neurology Consultant, Nathanson, as well as her primary treaters, to believe that the Plaintiff patient did not have a brain tumor and did not require emergent intervention based on the misdiagnosis of Defendants Jacobs and Lacey, PA-C;

xx)   Negligently failing to ever submit Sarah DeRichie's case to the tumor board and/or submitting the case to the tumor board and erroneously concluding that she did not have a brain tumor;

yy)   Negligently accepting the interpretation of the February 3, 2015 follow up brain MRI by Defendant Larar as showing no change in the pons lesion and relying upon the same to rule out a brain tumor when the etiology of the lesion remained unknown on February 11, 2015;

zz)   Negligently continuing through their agent Defendants Jacobs and Lacey, PA-C, and Paduck, PA-C, to diagnose the Plaintiff patient with an L CN 6 palsy only, based on the lesion in the pons of unknown etiology;

aaa)   Negligently failing to identify the resident who did the note for documented findings and plan of care for the February 11, 2015 neurosurgery consultation;

bbb)   Negligently relying upon a spinal tap for a diagnosis of Multiple Sclerosis in the presence of an unresolved brain lesion with etiology that included possible astrocytoma diagnosis through their agents, Defendant Jacobs and Defendant Lacey, PA-C, and the unidentified resident;

139

ccc)   Negligently failing to follow up on a plan to perform an MRI in three (3) or six (6) months' time.  Neither Defendant agents, Jacobs or Lacey, PA-C, ever scheduled a follow up MRI for Sarah DeRichie within three (3) or six (6) months of her February 11, 2015 follow up neurosurgery consultation;

ddd)   Failing to offer any explanation as of February 11, 2015 as to why Sarah DeRichie's films and case facts were not shared at tumor board conference as planned on December 24, 2014, thereby increasing the likelihood that her astrocytoma would go undiagnosed, untreated and hasten her premature death;

eee)   Negligently delaying, through their agents, Defendants Jacobs and Lacey, PA-C, presentation of her case at Geisinger tumor board conference from December 24, 2014, through February 11, 2015, through January 14, 2017, the approximate time when her tumor was ultimately and belatedly diagnosed;

fff)   Negligently failing to ever conduct an updated neurosurgical evaluation of Sarah DeRichie after February 11, 2015, despite planning to do follow up MRIs and not knowing the etiology of her brain lesion as of the last time she was seen by Defendant agents Jacobs and Lacey, PA-C;

ggg)   Negligently failing, through their agents, Defendants Jacobs and Lacey, PA-C, and Paduck, PA-C, to correctly diagnose or obtain a diagnosis of Sarah DeRichie's astrocytoma brain tumor on February 11, 2015 or any time prior to January 14, 2017;

hhh)   Negligently failing, through their agents, Defendants Nathanson, Paduck, PA-C, and Pombo, PA-C, to diagnose and/or assist with the diagnosis of astrocytoma brain tumor, the incorrect diagnosis of Multiple Sclerosis (MS);

iii)   Negligently suspecting that the patient had Multiple Sclerosis through their agents, Defendants Nathanson, Paduck, PA-C, and Pombo, PA-C, when the patient's history, examination findings and test results did not support the diagnosis of MS;

jjj)   Negligently suspecting a diagnosis of MS, despite the fact that the patient's primary and counter diagnosis was a brain stem lesion which Defendant Nathanson did nothing to further investigate or rule out an astrocytoma;

kkk)   Negligently failing to follow up on a large lesion in the pons to determine whether it was a tumor and whether it was causing her neurologic dysfunction through their agents, Defendants, Nathanson, Paduck, PA-C, and Pombo, PA-C;

lll)   Negligently suspecting demyelinating lesion, despite the fact that Defendants Nathanson, Paduck, PA-C, and Pombo, PA-C, could not rule out a tumor;

mmm)   Negligently failing to order a biopsy of the lesion, as opposed to another MRI, to definitively determine whether Sarah DeRichie had a brain tumor, through their agent Defendants, Nathanson, Paduck, PA-C, and Pombo, PA-C;

nnn)   Negligently failing to work up the large pontine lesion seen on the brain with symptomatic diplopia, identified as a large hyper intense lesion in the pons that could not be ruled out as a tumor when it posed the greatest risk to her health and well-being;

ooo)   Negligently suspecting a diagnosis of MS without ruling out a brain tumor when historical information, including no other family history of MS, and increase for MS symptoms were negative, in the presence of a known large lesion in the brain for which a tumor could not be ruled out as the etiological source;

ppp)   Negligently failing to diagnose or order an appropriate biopsy as of January 16, 2015 in order to definitively diagnose the Plaintiff patient's lesion through their agents, Defendants Nathanson, Paduck, PA-C, and Pombo, PA-C;

qqq)   Negligently diagnosing Sarah DeRichie with MS based on marginal lumbar puncture results, absent history, physical examination findings and other test results and in the presence of a known lesion for which a tumor was not ruled out, thereby resulting in delayed diagnosis by Defendants agents, Nathanson, Paduck, PA-C, and Pombo, PA-C, and subsequent treating physicians thereby increasing the risk that she would not have an opportunity for a cure, treatment and/or that it would hasten her premature death;

rrr)   Negligently failing to follow up after February 11, 2015 to determine whether Sarah DeRichie continued to suffer the effects of an undiagnosed brain tumor as opposed to Multiple Sclerosis;

sss)   Negligently failing to follow up with the Plaintiff patient's primary care providers or subsequent consulting neurologists to determine whether there had been resolution of her undiagnosed brain lesion; and,

ttt)   Failure to follow the standards of care for neurological evaluation, testing and treatment of brain lesions;

uuu)   Failing to ensure compliance with Geisinger Health System Foundation and Geisinger Clinic's policies, procedures and standards of care for the evaluation of patients with potential life-threatening brain tumor.

191.   As a direct and proximate result of the negligence of Geisinger Health System Foundation acting by and through their actual, apparent and/or ostensible agents, servants and employees, who participated in the care of Sarah DeRichie, as described herein, including, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging and their agents, Defendant Mark M. Skevofilax, D.O. and Defendant, Gerald N. Larar, M.D., Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and their agents, Defendants, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, as well as those medical providers in the Plaintiff-patient's medical records unknown to the Plaintiff presently as their names cannot be deciphered from the records but who participated in the care of Sarah DeRichie from December 2014 through May of 2017, Sarah DeRichie suffered serious, catastrophic and irreversible injuries, including death, together with damages and losses as set forth in the preceding and subsequent paragraphs which include:

a)   The Plaintiff decedent, Sarah DeRichie's, deteriorating medical condition caused by an undiagnosed brain tumor continued uncontrolled and untreated through her treatment up until the time immediately before her belated diagnosis and premature death;

b)    The Plaintiff decedent, Sarah DeRichie, became progressively ill;

c)    The Plaintiff decedent, Sarah DeRichie's, medical and physical condition deteriorated;

d)    The Plaintiff decedent, Sarah DeRichie, endured extensive pain and excruciating suffering;

e)    The Plaintiff decedent, Sarah DeRichie, suffered an increased risk of harm and death, which actually occurred as a result of the delayed diagnosis of her brain tumor; and,

f)    The Plaintiff decedent, Sarah DeRichie, suffered an untimely, fear filled and painful death at the age of only forty-four (44) years, leaving behind a husband and two (2) minor children.

192.   At all relevant times, Defendant, Geisinger Health System Foundation acting by and through their actual, apparent and/or ostensible agents, servants and employees, who participated in the care of Sarah DeRichie, as described herein, including, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging and their agents, Defendant Mark M. Skevofilax, D.O. and Defendant, Gerald N. Larar, M.D., Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and their agents, Defendants, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, as well as those medical providers in the Plaintiff-patient's medical records unknown to the Plaintiff presently as their names cannot be deciphered from the records but who participated in the care of Sarah DeRichie from December 2014 through May of 2017, acting within the course and scope of their actual, apparent and/or ostensible agency and/or employment with Defendant, Geisinger Health System Foundation.  Accordingly, Geisinger Health System Foundation is derivatively liable for the negligent acts and omissions of its agents, servants and

employees, as described herein, jointly and severally, who participated in her care from December of 2014 through the date of her death on May 1, 2017, as more specifically described herein, under principals of *respondeat superior*, master-servant, vicarious liability, agency or right of control.

193.   The foregoing negligence of Geisinger Health System Foundation acting by and through their actual, apparent and/or ostensible agents, servants and employees, who participated in the care of Sarah DeRichie, as described herein, including, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging and their agents, Defendant Mark M. Skevofilax, D.O. and Defendant, Gerald N. Larar, M.D., Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and their agents, Defendants, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, as well as those medical providers in the Plaintiff-patient's medical records unknown to the Plaintiff presently as their names cannot be deciphered from the records but who participated in the care of Sarah DeRichie from December 2014 through May of 2017, increased the risk of harm and/or caused the catastrophic injuries and untimely death of Sarah DeRichie.

194.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Geisinger Health System Foundation acting by and through their actual, apparent and/or ostensible agents, servants and employees, who participated in the care of Sarah DeRichie, as described herein, including, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging and their agents, Defendant Mark M. Skevofilax, D.O. and Defendant, Gerald N. Larar, M.D., Geisinger Clinic d/b/a Geisinger Wyoming Valley

Medical Center and their agents, Defendants, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, as well as those medical providers in the Plaintiff-patient's medical records unknown to the Plaintiff presently as their names cannot be deciphered from the records but who participated in the care of Sarah DeRichie from December 2014 through May of 2017, deprived Sarah DeRichie of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

195.  As a direct and proximate result of the negligence of the aforementioned Defendant Geisinger Health System Foundation acting by and through their actual, apparent and/or ostensible agents, servants and employees, who participated in the care of Sarah DeRichie, as described herein, including, the Geisinger Clinic d/b/a Geisinger Viewmont Imaging and their agents, Defendant Mark M. Skevofilax, D.O. and Defendant, Gerald N. Larar, M.D., Geisinger Clinic d/b/a Geisinger Wyoming Valley Medical Center and their agents, Defendants, Darren L. Jacobs, D.O., Mark A. Lacey, PA-C, Heather R. Paduck, PA-C, Douglas C. Nathanson, M.D. and Gloria A. Pombo, PA-C, as well as those medical providers in the Plaintiff-patient's medical records unknown to the Plaintiff presently as their names cannot be deciphered from the records but who participated in the care of Sarah DeRichie from December 2014 through May of 2017, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendant, Geisinger

Health System Foundation, jointly and severally, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT XV

## CORPORATE NEGLIGENCE

## MICHAEL F. DERICHIE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DERICHIE, DECEASED

## VS.

## GEISINGER HEALTH SYSTEM FOUNDATION

196.   The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

197.   In addition to the derivative and vicarious liability of Defendant Geisinger Health System Foundation, for the negligent acts and omissions of its agents, servants and employees, as defined more particularly herein and set forth in the preceding counts, the Defendant Geisinger Health System Foundation owed direct and non-delegable duties to Sarah DeRichie as set forth in *Thompson v. Nason*, 591 A.2d 709 (Pa. 1991) and its progeny of case law, including *Welsh vs. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d 1144 (Pa. Super. 2001).

198.   As part of their duties and responsibilities, Defendant, Geisinger Health System Foundation, owed duties to Sarah DeRichie including a duty to use reasonable care in the maintenance of safe facilities and equipment; a duty to select and retain only competent physicians; a duty to oversee all persons who practice medicine within the four walls as to patient care; and a duty to formulate, adopt and enforce adequate

146

rules and policies to ensure quality care for patients.

199.   Acting through their administrators, various boards, committees and individuals, Defendant Geisinger Health System Foundation was responsible for establishing, ensuring compliance with and enforcing standards of professional medical practice and care by members of its medical staff at the Defendant Geisinger facilities. Defendant Geisinger Health System Foundation had an obligation to establish proper treatment protocols for individuals being evaluated for lesions in their brain with a potential differential diagnosis of astrocytoma brain tumor versus Multiple Sclerosis.

200.   Defendant Geisinger Health System Foundation owed owed a duty to Sarah DeRichie to exercise reasonable care and the appointment and re-appointment of physicians, residents, certified registered nurse practitioners, physician's assistants, nurses, and technicians.

201.   Defendant Geisinger Health System Foundation wed a duty to patients like Sarah DeRichie to provide reasonable and competent medical care and services and to avoid conduct that would increase the risk of and, in fact, cause harm to its patients, including Sarah DeRichie.

202.   It is believed and therefore averred that Defendant Geisinger Health System Foundation through the acts and omissions of its agents, servants and employees as set forth herein, were negligent in failing to properly determine the qualifications and proficiencies of its agent physicians, residents, physician assistants, nursing and technicians, specifically Defendants Skevofelix, Larar, Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, and those other health care providers

147

whose names cannot be deciphered from the record presently.

203.   It is believed and therefore averred that the physicians, residents, physicians assistants, nurses and technicians who participated in the care rendered to Sarah DeRichie from December 2014 to May of 2017, as more particularly detailed herein, did not possess the requisite training, experience, technical skills and judgment to render proper care and services to patients with conditions like Sarah DeRichie, including her historical, examination, MRI findings, presenting signs, symptoms and abnormalities as evidenced by her pontine lesion of unknown etiology.

204.   It is believed and therefore averred that Defendant Geisinger Health System Foundation was negligent in failing to supervise and monitor the medical care and treatment rendered to Sarah DeRichie, when it knew or should have known that the aforementioned physicians, residents, certified registered nurse practitioners, physician's assistants, nurses, technicians and other medical or nursing staff involved in Sarah DeRichie's care who cannot be identified presently in the medical record, that were charged with and responsible for Sarah DeRichie's care, did not possess the requisite medical training, skill, knowledge and/or competence required.

205.   As a direct and proximate result of the conduct set forth above and hereafter, it is believed and therefore averred that Geisinger Health System Foundation violated their non-delegable duties as set forth in the paragraphs above and hereinafter, and failed to exercise a judgment of a reasonable health care provider under the circumstances as follows:

a)    Failing to have physicians, residents, certified registered nurse practitioners (CRNPs), physician's assistants, technicians, and

148

nurses, appropriate in number, training and/or experience, to make appropriate and timely decisions with respect to the evaluation, testing, diagnosis, treatment and management of patients presenting to Geisinger facilities with a clinical history, physical signs and symptoms, and results of diagnostic studies such as those demonstrated by Sarah DeRichie, as more particularly described herein;

b)    Failing to have physicians, residents, certified registered nurse practitioner's (CRNPs), physician's assistants, nurses, and technicians, appropriate in number, training and/or experience, to make appropriate and timely decisions regarding the evaluation, testing, diagnosis, treatment and management of patients with findings on abnormal MRI revealing a large pontine lesion of unknown etiology which could represent a brain tumor;

c)    Failing to ensure that Sarah DeRichie received appropriate medical attention from fully trained, qualified and appropriately experienced physicians, residents, certified registered nurse practitioners (CRNPs), physician's assistants, nurses, technicians and specialists, including in the field of internal medicine, radiology, neurosurgery, neurology able to make appropriate and timely decisions with respect to the evaluation, diagnosis, treatment and management of patients who present to the hospital with a clinical history, physical signs and symptoms and results of diagnostic studies done at Geisinger Clinic facilities within the Geisinger Health System Foundation, such as those demonstrated by Sarah DeRichie as more particularly described herein;

d)    Failing to select and retain physicians, residents, certified registered nurse practitioners (CRNPs), physician's assistants, nurses, and technicians, as well as other competent medical staff with experience in the evaluation, testing, diagnosis, treatment and management of patients like Sarah DeRichie with finding on MRI of a large pontine lesion of unknown etiology, need to rule out brain tumor;

e)    Failing to select and retain physicians, residents, certified registered nurse practitioner's (CRNPs), physician's assistants, nurses, and technicians and other medical staff competent in the evaluation, diagnosis, treatment and management of patients with the clinical, diagnostic, laboratory and vital sign findings like that of Sarah DeRichie from December 2014 through May of 2017

149

f) Failing to oversee all persons who practice medicine, internal medicine, radiology, neurosurgery and neurology within its walls as to patient care to assure that Sarah DeRichie's medical condition and risk for astrocytoma brain tumor, as well as appropriate workup to rule out and/or diagnose and timely treat a brain tumor;

g) Failing to oversee all persons who practice medicine within its healthcare system as to patient care to ensure that the physicians, residents, certified registered nurse practitioners (CRNPs), physician's assistants, nurses, technicians and case managers involved in the care and treatment of Sarah DeRichie were appropriately and adequately supervised by a member of the attending physician staff;

h) Failing to formulate, adopt and enforce adequate policies and procedures to ensure quality patient care, including written policies, procedures and rules regarding:

 i) to ensure quality patient care, including written policies, procedures and rules regarding the oversite of a physician's assistant – certified by a supervising physician consistent with federal and Pennsylvania laws, as well as the standards of practice for the community health standard and the standards of care for medical practice;

 ii) Regarding the follow up on positive radiological findings to determine the etiology of lesions that could be tumors of a life-threatening nature;

 iii) The follow up on consultation, treatment plans with consulting specialties regarding follow up studies or proposed plan of action, including a determination of whether or not a lesion is cancerous be reviewed by a tumor board as proposed;

 iv) Oversight, review, participation in patient care and countersigning of patient office notes by physicians to ensure quality of care for the patient as rendered by physician's assistants be they certified or uncertified;

v)      Radiological surveillance of suspicious brain lesions to ensure they are timely tested, biopsied and diagnosed as soon as possible;

vi)     Communication of testing recommendations from consultants and follow up on plans of actions by consultants for the benefit of the patient;

vii)    Differential diagnosis process requiring the more life-threatening malady, i.e. potential brain tumor, to be addressed prior to a less serious life threatening disease such as a nerve palsy and Multiple Sclerosis;

viii)   Patients with lesions of unknown etiology with a possibility of a brain tumor finding being referred to tumor board for assistance in ruling out a tumor;

ix)     The use of biopsy to definitely diagnose or rule out a brain tumor in a patient with a brain lesion of unknown etiology;

x)      Follow up mechanisms to ensure that MRIs and radiological studies planned as a part of follow up treatment are carried out to ensure appropriate surveillance and monitoring of undefined brain lesions which could represent a brain tumor;

xi)     Communication with primary care, consultative and physicians conducting radiological studies to ensure continuity of care and appropriate diagnosis of the patient's medical conditions and need for evaluation and treatment; and,

xii)    The limitation of patient treatment by physician's assistants, certified or otherwise, and the requirement for PA-C's to be supervised by physicians.

206.    As the direct and proximate result of the negligent acts and/or omissions of Defendant Geisinger Health System Foundation as well as agent as physicians, residents, physician assistants, nursing and technicians, specifically Defendants

Skevofelix, Larar, Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, who cannot be identified in the record presently, deprived Sarah DeRichie of necessary, timely and appropriate evaluation, testing, diagnosis, treatment and management of her condition, allowing it to further progress and become life threatening before causing her untimely death.

207.   As the direct and proximate result of the negligent acts and/or omissions of Defendant Geisinger Health System Foundation as well as agent as physicians, residents, physician assistants, nursing and technicians, specifically Defendants Skevofelix, Larar, Jacobs, Lacey, PA-C, Paduck, PA-C, Nathanson and Pombo, PA-C, who cannot be identified in the record presently, Sarah DeRichie suffered catastrophic, permanent and fatal injuries and damages, including death, as described herein.

WHEREFORE, Plaintiffs, demands judgment against the Defendant, Geisinger Health System Foundation, jointly and severally, in an amount in excess of the applicable arbitration limits of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorney's fees, interest and costs.

## COUNT XVI

## WRONGFUL DEATH ACTION

**PLAINTIFF, MICHAEL F. DeRICHIE, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DeRICHIE, DECEASED**

**VS.**

**WAYNE MEMORIAL COMMUNITY HEALTH CENTERS d/b/a CARBONDALE
FAMILY HEALTH CENTER, WAYNE MEMORIAL HEALTH SYSTEM, INC.,
KENNETH J. BANNON, PA-C, RICHARD K. HACKER, M.D., GEISINGER CLINIC
d/b/a GEISINGER VIEWMONT IMAGING, MARK M. SKEVOFILAX, D.O.,
GEARLD N. LARAR, M.D., GEISINGER CLINIC d/b/a GEISINGER WYOMING
VALLEY MEDICAL CENTER, DARREN L. JACOBS, D.O., MARK A. LACEY, PA-C,
HEATHER R. PADUCK, PA-C, DOUGLAS NATHANSON, M.D., GLORIA A.
POMBO, PA-C and GEISINGER HEALTH SYSTEM FOUNDATION**

208.    The preceding paragraphs of this Complaint are incorporated as though set forth fully herein.

209.    Due to the conduct of the Defendants, and each of them, as aforesaid, Sarah DeRichie prematurely at the age of forty-four (44) and has left individuals entitled to recover for her death.  Plaintiff, Michael F. DeRichie, Administrator of the Estate of Sarah E. DeRichie, Deceased, brings this Wrongful Death Action on behalf of the Estate of Sarah E. DeRichie, Deceased, under and by virtue of the Wrongful Death Act, 42 Pa. C.S.A. §8301, the applicable Rules of Civil Procedure and decisional law interpreting this Act.

210.    Under the Wrongful Death Act, Sarah E. DeRichie, Deceased, left surviving heirs at law, including her husband and two (2) minor children as follows:

a)  Michael F. DeRichie, 15 Dundaff Street, Carbondale, Lackawanna County, PA 18407;

b)  Christopher DeRichie, Minor Son, c/o Michael F. DeRichie, his Father, 215 Dundaff Street, Carbondale, Lackawanna County, PA 18407; and,

c)  Michael C. DeRichie, Minor Son, c/o Michael F. DeRichie, his Father, 215 Dundaff Street, Carbondale, Lackawanna County, PA 18407.

211.   As a result of the negligent acts and omissions of the Defendants, and each of them, as described more fully herein, Plaintiff's decedent, Sarah E. DeRichie, suffered catastrophic, permanent and fatal injuries, including death, resulting in the entitlement to damages by the aforementioned beneficiaries under the Wrongful Death Act.  Plaintiff, Michael F. DeRichie, Administrator of the Estate of Sarah E. DeRichie, Deceased, claims the full measure of damages recoverable under and by virtue of the Wrongful Death Act and the decisional law interpreting the Act, including, recovery for funeral, burial and medical expenses, financial losses, including loss of contributions to family members, as well as other expenses related to the administration of the estate. The decedent's statutory survivors have also suffered the loss of the decedent's society and comfort, friendship, guidance, love, tutelage, affection, moral upbringing, services, work around the home, as well as losses specifically recognized under the Wrongful Death Act and its Pennsylvania case law progeny, including psychological and emotional loss, and other damages, as recoverable under the Wrongful Death Act.

212.   Plaintiff, Michael F. DeRichie, Administrator of the Estate of Sarah E. DeRichie, Deceased, claims the loss of pecuniary value of the services which the decedent could have been expected to provide to the Wrongful Death beneficiaries

during his lifetime had her death not occurred, as well as loss of earnings and

maintenance.

213.    Decedent did not bring an action for personal injuries during her lifetime.

WHEREFORE, Plaintiff demand judgment against all of the Defendants,

individually, jointly and severally, in an amount in excess of Seventy-Five Thousand

($75,000.00) Dollars and in excess of the prevailing arbitration limits under the

Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest and

costs.

## COUNT XVII

## SURVIVAL ACTION

**PLAINTIFF, MICHAEL F. DeRICHIE, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE OF SARAH E. DeRICHIE, DECEASED**

**VS.**

**WAYNE MEMORIAL COMMUNITY HEALTH CENTERS d/b/a CARBONDALE
FAMILY HEALTH CENTER, WAYNE MEMORIAL HEALTH SYSTEM, INC.,
KENNETH J. BANNON, PA-C, RICHARD K. HACKER, M.D., GEISINGER CLINIC
d/b/a GEISINGER VIEWMONT IMAGING, MARK M. SKEVOFILAX, D.O.,
GEARLD N. LARAR, M.D., GEISINGER CLINIC d/b/a GEISINGER WYOMING
VALLEY MEDICAL CENTER, DARREN L. JACOBS, D.O., MARK A. LACEY, PA-C,
HEATHER R. PADUCK, PA-C, DOUGLAS NATHANSON, M.D., GLORIA A.
POMBO, PA-C and GEISINGER HEALTH SYSTEM FOUNDATION**

214.    The preceding paragraphs of this Complaint are incorporated as though

set forth fully herein.

215.    Plaintiff, Michael F. DeRichie, as Administrator of the Estate of Sarah E.

DeRichie, Deceased, bring this Survival Action on behalf of the Estate of Sarah E.

DeRichie, Deceased under and by virtue of the Survival Act, 42 Pa. C.S.A. §8302, the applicable Rules of Civil Procedure 2352(a) and decisional law interpreting the Act.

216.   As a result of the negligent acts and omissions of the Defendants, as described more fully herein, Plaintiff's decedent, Sara E. DeRichie, suffered catastrophic, permanent, fatal injuries and premature death, resulting in the entitlement to damages by the Estate of Sarah E. DeRichie, Deceased, under the aforementioned Survival Act.

217.   Plaintiff, Michael F. DeRichie, Administrator of the Estate of Sarah E. DeRichie, Deceased, brings this action on behalf of the Estate of Sarah E. DeRichie, to recover the full measure of damages recoverable under and by virtue of the Survival Act and the decisional law interpreting the Survival Act, including but not limited to, all economic losses to Sarah E. DeRichie's estate recognized under the Survival Act and its Pennsylvania case law progeny, including the decedent's total estimated future earning capacity, less his personal maintenances cost and the decedent's other financial losses suffered as a result of his death.

218.   On behalf of the decedent's estate the Plaintiff-Husband claims damages for the decedent's physical discomfort, pain and suffering, loss of enjoyment of life and life's pleasures, and all other damages and losses recoverable specifically under the Survival Act and its Pennsylvania case law progeny interpreting the Act.

WHEREFORE, Plaintiff demand judgment against all of the Defendants, individually, jointly and severally, in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars and in excess of the prevailing arbitration limits under the Survival Act, exclusive of pre-judgment interest, post-judgment interest and costs.

156

Respectfully submitted,

McDONALD & MacGREGOR, LLC


By:   /s/ Malcolm L. MacGregor
      Malcolm L. MacGregor, Esquire
      220 Penn Avenue
      Suite 320
      Scranton, PA  18503
      (570) 209-7062
      Attorneys for Plaintiff
      Attorney ID No.:  58625